**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

ZACHARY GREENBERG,

*Plaintiff*,

v.

JAMES C. HAGGERTY, in his official capacity as
Board Chair of The Disciplinary Board of the Supreme
Court of Pennsylvania; JOHN F. CORDISCO, in his
official capacity as Board Vice-Chair of The Disciplinary
Board of the Supreme Court of Pennsylvania; CELESTE
L. DEE, in her official capacity as Member of The
Disciplinary Board of the Supreme Court of
Pennsylvania; JOHN P. GOODRICH, in his official
capacity as Member of The Disciplinary Board of the
Supreme Court of Pennsylvania; JERRY M. LEHOCKY,
in his official capacity as Member of The Disciplinary
Board of the Supreme Court of Pennsylvania;
CHRISTOPHER M. MILLER, in his official capacity as
Member of The Disciplinary Board of the Supreme Court
of Pennsylvania; GRETCHEN A. MUNDORFF, in her
official capacity as Member of The Disciplinary Board of
the Supreme Court of Pennsylvania; JOHN C.
RAFFERTY, in his official capacity as Member of The
Disciplinary Board of the Supreme Court of
Pennsylvania; DION G. RASSIAS, in his official
capacity as Member of The Disciplinary Board of the
Supreme Court of Pennsylvania; ROBERT L. REPARD,
in his official capacity as Member of The Disciplinary
Board of the Supreme Court of Pennsylvania; EUGENE
F. SCANLON, JR., in his official capacity as Member of
The Disciplinary Board of the Supreme Court of
Pennsylvania; DAVID S. SENOFF, in his official
capacity as Member of The Disciplinary Board of the
Supreme Court of Pennsylvania; THOMAS J.
FARRELL, in his official capacity as Chief Disciplinary
Counsel of the Office of Disciplinary Counsel;
RAYMOND S. WIERCISZEWSKI, in his official
capacity as Deputy Chief Disciplinary Counsel of the
Office of Disciplinary Counsel

*Defendants*.

Civil Action No. 2:20-cv-03822

---

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.     More than a half-century ago, our Supreme Court warned that "vague qualification[s]" "easily adapted to fit personal views and predilections, can be a dangerous instrument for discriminatory denial of the right to practice law." *Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 263 (1957). Lawyers must remain "unintimidated—free to think, speak, and act as members of an Independent Bar." *Id.* at 273. Through ratification of Pennsylvania Rule of Professional Conduct 8.4(g) in June, the state of Pennsylvania seeks to dictate what views members of its bar may hold and express, and what views are too offensive to share. As did the State of California in *Konigsberg*, Pennsylvania has "sacrificed vital freedoms" in hopes of molding a bar that will reflect the State's views. *Id.* at 273. The Constitution does not allow that.

2.     Zachary Greenberg, a Pennsylvania-licensed attorney working for a non-profit organization that advocates on behalf of students' constitutional rights, regularly speaks at Continuing Legal Education ("CLE") and non-CLE events on a variety of hot-button legal issues including the constitutionality of hate speech regulation, Title IX's effect on the Due Process rights of individuals accused of sexual assault and misconduct, campaign finance speech restrictions, university policies on fraternity and sorority misconduct, professorial academic freedom, university regulation of hateful expression online, attorney free speech rights, and abusive public records requests. Rule 8.4(g) threatens to impose civil sanction on Plaintiff if an audience member misconstrues his speech as a manifestation of bias or prejudice and registers a complaint with the Office of Disciplinary Counsel.

3.     This civil rights action seeks a declaration that Rule 8.4(g) on its face violates the First Amendment (as incorporated through the Fourteenth Amendment) and an injunction preventing Defendants, in their official capacities, from enforcing the rule.

## JURISDICTION AND VENUE

4.     Plaintiff brings this action pursuant to Section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§2201–02, for violations of the First and Fourteenth Amendments to the United States Constitution.

5.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

6.     Venue is proper in this district under 28 U.S.C. § 1391(b).

## PARTIES

7.     Plaintiff Zachary Greenberg is a Pennsylvania-licensed attorney who is employed by the non-profit Foundation for Individual Rights in Education ("FIRE"). He is a citizen of Pennsylvania who both works and resides in the City and County of Philadelphia.

8.     Defendants James C. Haggerty, John F. Cordisco, Celeste L. Dee, John P. Goodrich, Jerry M. Lehocky, Christopher M. Miller, Gretchen A. Mundorff, John C. Rafferty, Dion G. Rassias, Robert L. Repard, Eugene F. Scanlon, Jr., and David S. Senoff, are the members of The Disciplinary Board of the Supreme Court of Pennsylvania (the "Board"), each of whom is being sued in his or her official capacity. Mr. Haggerty is Board Chair; Mr. Cordisco is Board Vice-Chair. The Pennsylvania Constitution, Article V, §10(c), vests authority in the Pennsylvania Supreme Court to prescribe general rules for practice and procedures of law within the State. Pursuant to this authority, the Pennsylvania Supreme Court established the Board in 1972 to regulate attorney conduct. Sitting in panels, the Board adjudicates actions prosecuted by the Office of Disciplinary Counsel (the "Office") that seek to enforce the Pennsylvania Rules of Professional Conduct against Pennsylvania-licensed respondent-attorneys.

9.     Defendant Thomas J. Farrell is Chief Disciplinary Counsel of the Office of Disciplinary Counsel. Defendant Raymond S. Wierciszewski is Deputy Chief Disciplinary Counsel of the Office of Disciplinary Counsel. Each is being sued in his official capacity. The Office receives complaints of unethical conduct, investigates such complaints, and initiates and prosecutes disciplinary proceedings against respondent-attorneys. The Chief Disciplinary Counsel and the Deputy Chief Disciplinary Counsel supervise the Office.

## FACTS

### The plaintiff

10.     Plaintiff Zachary Greenberg graduated with a Juris Doctor degree from Syracuse University College of Law in 2016.

11.     Greenberg sat for and passed the Pennsylvania Bar Exam in February 2019 and was admitted to the Pennsylvania Bar in May 2019.

12.     Greenberg is currently a member of the Pennsylvania Bar in good standing and of active status.

13.     Greenberg works as a Program Officer for FIRE.

14.     Greenberg's job responsibilities include speaking, writing, publishing, and educating about a variety of topics relevant to FIRE's mission defending and sustaining the individual rights of students and faculty members at America's colleges and universities. These rights include freedom of speech, freedom of association, due process, legal equality, religious liberty, and sanctity of conscience—essential liberties guaranteed by the United States Constitution at public universities and by contract at private universities.

15.     Greenberg is currently a member of the First Amendment Lawyers Association ("FALA"), a not-for-profit, nationwide association of hundreds of attorneys devoted to the protection of Free Expression under the First Amendment. FALA regularly conducts CLE events for its members.

16.     Greenberg regularly speaks at both CLE and non-CLE events as a Program Officer for FIRE and a member of FALA. He has spoken to attorneys, university legal counsels, college administrators, students, parents, and alumni on legal topics related to FIRE work and the First Amendment.

17.     Greenberg has presented CLE seminars to attorneys on the First Amendment's limits on rules of professional conduct and legal ethics related to the practice of law.

18.     Greenberg has presented educational seminars to college administrators and legal counsels on reforming university policies that violate student free speech rights, and the legal ramifications on failing to do so.

19.     Greenberg has written and spoken against banning hate speech on university campuses, a controversial position that some people would view as manifesting bias against minority groups that advocate for hate speech regulation.

20.     Greenberg has written and spoken against university regulation of hateful online expression protected by First Amendment standards, and has defended the right of professors, students, and student groups to engage in hateful expression protected by First Amendment standards—a controversial position that some people would view as manifesting bias against minority groups that advocate for hate speech regulation.

21.     Greenberg has written and spoken in favor of plenary Due Process protections for college students accused of sexual misconduct, a controversial position that some people would view as manifesting bias against women.

22.     Greenberg has written and spoken in favor of the First Amendment right to participate in political speech through making monetary contributions to political organizations and candidates, a controversial position that some people would view as manifesting bias on the basis of socioeconomic status.

23.     Greenberg has written and spoken in favor of allowing religious speech on college campus even when that speech espouses discriminatory views, a controversial position that some people would view as manifesting bias on the basis of gender identity, gender expression, sexual orientation and marital status.

24.     Since he has been at FIRE, Greenberg has participated in numerous speaking engagements, many of which are addressed to students, student groups, and fellow attorneys.

25.     Additionally, Greenberg has also presented at formally-accredited CLE and non-CLE seminars.

26.     For example, in 2017, at a CLE at a FALA conference in San Diego, California, Greenberg spoke to dozens of attorneys about *Citizens United v. FEC*, 558 U.S. 310 (2010), a controversial decision that some view as sustaining race and class-based bias in the election system.

27.     For example, in 2018, Greenberg spoke to dozens of attorneys about the First Amendment limitations on rules of professional conduct and legal ethics related to the practice of law at a CLE at a FALA conference in Denver, Colorado.

28.     For example, in 2018, at a CLE in Villanova, Pennsylvania, Greenberg spoke to attorneys, parents, and students on the legal limits of a university's power to punish student online expression deemed offensive, prejudiced and hateful.

29.     For example, in 2019, Greenberg spoke to the American Association of University Professors chapter at La Salle University in Philadelphia, Pennsylvania, on the legal limits of a university's power to punish professors for expression, teaching, and research deemed offensive, prejudiced and hateful.

30.     For example, in a virtual educational seminar in 2019, Greenberg spoke to university administrations and legal counsels on the legal limits of a university's power to punish students and student groups for expression deemed offensive, prejudiced and hateful.

31.     In 2020 Greenberg was scheduled to speak at an accredited CLE hosted by FIRE again on the topic of the *Citizens United v. FEC*, 558 U.S. 310 (2010). This event will likely be rescheduled after Rule 8.4(g)'s effective date in December 2020.

32.     Greenberg intends and expects to continue speaking at similar events on similar topics for the foreseeable future.

### Pennsylvania Rule of Prof. Conduct 8.4(g)

33.     Since the late 1990s, the American Bar Association's Model Rules of Professional Responsibility have included a comment explaining that "A lawyer who, in the course of representing a client, knowingly manifests, by words or conduct, bias or prejudice based on race,

sex, religion, national origin, disability, age, sexual orientation, or socioeconomic status violates paragraph [8.4](d) when such actions are prejudicial to the administration of justice."

34.     In August 2016, the ABA promulgated Model Rule of Professional Conduct 8.4(g), which prohibits "engag[ing] in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of race, sex, religion, national origin, ethnicity, disability, age, sexual orientation, gender identity, marital status or socioeconomic status in conduct related to the practice of law."

35.     A comment to M.R.P.C 8.4(g) explains that "[s]uch discrimination includes harmful verbal or physical conduct that manifests bias or prejudice towards others."

36.     Subsequently, numerous states including Arizona, Idaho, Illinois, Louisiana, Minnesota, Montana, Nevada, South Carolina, Tennessee, and Texas have all rejected proposals to adopt forms of M.R.P.C. 8.4(g).

37.     Many of those states explicitly recognized that the rule would violate the First Amendment. *See, e.g.*, Tex. Att'y Gen. Op. KP-0123 (Dec. 20, 2016).

38.     In October 2016, the Pennsylvania Bar Association's Commission on Women in the Profession proposed adopting Rule 8.4(g) in Pennsylvania.

39.     The Disciplinary Board of the Supreme Court of Pennsylvania declined to adopt the ABA Model Rule, noting in 2018 that as drafted, Model Rule 8.4(g) is "susceptible to challenges related to constitutional rights of lawyers, such as freedom of speech, association and religion."

40.     After an iterative process of notice and comment, on June 8, 2020, Pennsylvania became one of the first states to adopt a variation of M.R.P.C. 8.4(g) when, over Justice Mundy's dissent, the Supreme Court of Pennsylvania approved the recommendation of the Board and ordered that Pennsylvania Rule of Professional Conduct 8.4 would be amended to include the new Rule 8.4(g), which reads as follows:

It is professional misconduct for a lawyer to:

* * *

(g) in the practice of law, by words or conduct, knowingly manifest bias or prejudice, or engage in harassment or discrimination, as those terms are defined in applicable federal, state or local statutes or ordinances, including but not limited to bias, prejudice, harassment or discrimination based upon race, sex, gender identity or expression, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, or socioeconomic status. This paragraph does not limit the ability of a lawyer to accept, decline or withdraw from a representation in accordance with Rule 1.16. This paragraph does not preclude advice or advocacy consistent with these Rules.

Comment:

* * *

[3] For the purposes of paragraph (g), conduct in the practice of law includes participation in activities that are required for a lawyer to practice law, including but not limited to continuing legal education seminars, bench bar conferences and bar association activities where legal education credits are offered.

[4] The substantive law of antidiscrimination and anti-harassment statutes and case law guide application of paragraph (g) and clarify the scope of the prohibited conduct.

41.      Under the Pennsylvania Supreme Court's order, Rule 8.4(g) becomes effective on December 8, 2020. Unfortunately, the modifications of Rule 8.4(g) that Pennsylvania imposed do not cure the First Amendment problems created by the Model Rule.

42.      Rule 8.4(g) is not limited to manifestations that occur "in the course of representing a client" and "when such actions are prejudicial to the administration of justice."

43.      Rule 8.4(g) Pennsylvania's proposed rule does not define the terms bias, prejudice, or harassment, and states that bias or harassment entails conduct "including but not limited to" a variety of categories.

44.      Rule 8.4(g) is not restricted to conduct, but expressly regulates "words."

45.     As with all Pennsylvania Rules of Professional Conduct, the Office will have authority to investigate putative violations of Rule 8.4(g) and the authority to prosecute enforcement actions against Pennsylvania-licensed attorneys who the Office believes to be in violation of the rule.

46.     In furthering its functions of investigating alleged disciplinary rules violations and enforcing the rules, the Office receives and investigates complaints lodged by any member of the public.

47.     Submitting a complaint requires only filling out a simple 2-page form and submitting it on the Board's website (padisciplinaryboard.org) or in paper form.

48.     The Office will assist the complainant in reducing the grievance to writing if necessary.

49.     The online complaint form promises that the Office and the Board are bound by a promise of confidentiality to complainants.

50.     The online complaint form promises that under Enforcement Rule 209(a), complainants will be immune from civil suit based upon their communications with Disciplinary Counsel or the Board.

51.     Upon receiving a complaint, the Office sends notice to the attorney accused of misconduct.

52.     Within 30 days, or a shorter time if fixed by Disciplinary Counsel in the notice, the respondent-attorney must respond by filing a statement of position in writing detailing his defense.

53.     Failing to respond is itself grounds for discipline.

54.     As part of its initial notification process, Disciplinary Counsel may obtain a subpoena to compel the respondent-attorney to produce records and documents.

55.     If the Office and Disciplinary Counsel decline to dismiss a complaint, they may recommend a variety of sanctions: informal admonition, private reprimand, public reprimand or the prosecution of formal charges before a hearing committee. A respondent-attorney may object to the recommended disposition.

56.     In the event that formal charges are pursued, the Office acts as prosecutor in a formal proceeding in front of a hearing committee or special master, who will issue a report and recommended disposition.

57.     Sitting in panels of three, the Board then reviews objections to the report and recommendation of the hearing committee or special master.

58.     If the Board declines to dismiss the proceeding, it has the authority to sanction attorneys through informal admonition, private reprimand, public reprimand as well as the authority to tax the expenses of the investigation and prosecution to the respondent-attorney.

59.     The Board may also recommend dispositions of probation, censure, suspension or disbarment, which will be determined by the Pennsylvania Supreme Court upon the record of the Board and sometimes oral argument with the participation of Disciplinary Counsel and/or the Board.

### Injury

60.     Greenberg plans to continue to speaking at CLE and non-CLE events like those discussed above in ¶¶14-32, pursuant to the expectations of his employer, his professional organization memberships, and his personal interests, but the existence of Rule 8.4(g) and the uncertainty surrounding the scope of Rule 8.4(g) will chill his speech.

61.     The vast majority of topics covered by Greenberg's speaking engagements, and virtually all the examples used by Greenberg in his speaking engagements to illustrate his points, are considered biased, prejudiced offensive, and hateful by some members of his audience, and some members of society at large.

62.     For example, during his presentations, Greenberg's discussion of hateful speech protected by the First Amendment involves a detailed summation of the law in this area, which includes a walkthrough of prominent, precedential First Amendment cases addressing incendiary speech. This summation covers, among other cases: *Metal v. Tam*, 137 S. Ct. 1744 (2017) (addressing trademark protection for the band called the "Slants"—a common racial epithet for persons of Asian descent); *Snyder v. Phelps*, 562 U.S. 443 (2011) (considering the right of

picketers carrying such signs as "God Hates Fags" and "Priests Rape Boys"); *Papish v. Board of Curators of the University of Missouri*, 410 U.S. 667, 667-68 (1973) (upholding as protected speech a student newspaper's front-page use of the vulgar headline "Motherfucker Acquitted" and a "political cartoon . . . depicting policemen raping the Statue of Liberty and the Goddess of Justice.").

63.     Greenberg believes it would be nearly impossible to illustrate United States First Amendment jurisprudence, such as by accurately citing and quoting precedent First Amendment cases, without engaging in speech that at least some members of his audience will perceive as biased, prejudiced, offensive, and potentially hateful.

64.     Greenberg believes that every one of his speaking engagements on First Amendment issues carries the risk that an audience member will file a bar disciplinary complaint against him based on the content of his presentation under rule 8.4(g).

65.     Considering the large amount of time and money Greenberg devoted to attaining his Pennsylvania license to practice law, Greenberg is justifiability unwilling to take this risk, and will refrain from conduct speaking engagement on controversial issues as a result. Greenberg's self-censorship will extend to excluding, limiting, and sanitizing the examples used in his speaking engagements to illustrate his points, in order to reduce the risk of an audience member reporting his expression to the Office.

66.     Greenberg does not wish to be subjected to a disciplinary investigation by the Office.

67.     Greenberg does not wish to be subjected to disciplinary proceedings in front of the Board.

68.     Greenberg does not wish to be subjected to disciplinary sanctions by the Office or the Board.

69.     A disciplinary investigation would harm Greenberg's professional reputation, available job opportunities, and speaking opportunities.

70.     Disciplinary proceedings would harm Greenberg's professional reputation, available job opportunities, and speaking opportunities.

71.     Disciplinary sanctions would harm Greenberg's professional reputation, available job opportunities, and speaking opportunities.

72.     Greenberg reasonably fears that his writings and speeches could be misconstrued by readers and listeners, and state officials within the Board or Office, as violating Rule 8.4(g).

73.     This fear of misuse of Rule 8.4(g) is far from hypothetical. Activists have frequently used anti-discrimination rules and accusations of bigotry to harass speakers for political reasons.

a.  For example, in 2012, Judge Edith Jones gave a speech about the death penalty at the University of Pennsylvania Law School Federalist Society where she made the empirical observation that members of some racial groups commit crime at rates disproportionate to their population. In 2013, activists mischaracterized Judge Jones's remarks for political purposes to file an ethics complaint against her for "racial bias." *In re Charges of Judicial Misconduct*, No. DC-13-90021 at Appx. 23-28 (Jud. Council D.C. Cir. 2014).

b.  In 2015, Northwestern University professor Laura Kipnis wrote an essay in the *Chronicle of Higher Education* critical of the use of Title IX policies on sexual misconduct. In retaliation, two graduate students filed a Title IX complaint against Professor Kipnis claiming that her essay created a "hostile environment," and then filed a second Title IX complaint against her when she wrote about the first Title IX complaint. Jeannie Suk Gerson, *Laura Kipnis's Endless Trial by Title IX*, NEW YORKER (Sep. 20, 2017).

c.  While Judge Jones and Professor Kipnis were eventually cleared of wrongdoing, they faced years of investigation and harassment at non-trivial costs to themselves and their reputations. Moreover, Rule 8.4(g) is amorphous enough to include their "words" as potentially sanctionable if Greenberg were to repeat their arguments.

d.  An evolutionary biologist postdoctoral student at Penn State, Colin Wright, was labeled a transphobe after he published on social media in support of an established theory that societal factors are causally responsible for recent rises in gender dysphoria. Wright became subject to a coordinated effort that attempted to inflict reputational and vocational harm on him. Colin Wright (@swipewright), TWITTER (Jul 10, 2020, 11:30 PM), https://twitter.com/SwipeWright/status/1281793005968437248 [https://web.archive.org/web/20200711130230/https://twitter.com/SwipeWright/status/1281793005968437248]; Colin Wright, *Think Cancel Culture Doesn't Exist? My Own 'Lived Experience Says Otherwise*, QUILLETTE (Jul. 30, 2020), https://quillette.com/2020/07/30/think-cancel-culture-doesnt-exist-my-own-lived-experience-says-otherwise/ [https://web.archive.org/web/20200731131527/https://quillette.com/2020/07/30/think-cancel-culture-doesnt-exist-my-own-lived-experience-says-otherwise/].

e.  Mere mention of certain hateful epithets, even when quoting text from legal opinions in a purely academic and pedagogical context, has been met with accusations of prejudice and bias, and has even resulted in university discipline. Adam Steinbaugh, *Emory Law Professor faces termination hearing for using 'n-word' in discussion of civil rights case, discussion with student*, FIRE NEWSDESK (Aug. 30, 2019), https://www.thefire.org/emory-law-professor-faces-termination-hearing-for-using-n-word-in-discussion-of-civil-rights-case-discussion-with-student/ [https://web.archive.org/web/20200608173249/https://www.thefire.org/emory-law-professor-faces-termination-hearing-for-using-n-word-in-discussion-of-civil-rights-case-discussion-with-student/]; Colleen Flaherty, *Too Taboo for Class*, INSIDE HIGHER ED, (Feb. 1, 2019),

https://www.insidehighered.com/news/2019/02/01/professor-suspended-using-n-word-class-discussion-language-james-baldwin-essay [https://web.archive.org/web/20200726223221/https://www.insidehighered.com/news/2019/02/01/professor-suspended-using-n-word-class-discussion-language-james-baldwin-essay]; Eugene Volokh, *UCLA Law Dean Apologizes for My Having Accurately Quoted the Word "Nigger" in Discussing a Case*, THE VOLOKH CONSPIRACY (Apr. 14, 2020, 5:14 PM), https://reason.com/2020/04/14/ucla-law-dean-apologizes-for-my-having-accurately-quoted-the-word-nigger-in-discussing-a-case/ [https://web.archive.org/web/20200717062702/https://reason.com/2020/04/14/ucla-law-dean-apologizes-for-my-having-accurately-quoted-the-word-nigger-in-discussing-a-case/].

f.  In the wake of the killing of George Floyd, dozens of people lost their jobs or suffered other negative repercussions for words or conduct perceived to manifest racial bias or prejudice. *List of People Canceled in Post-George-Floyd Antiracism Purges*, FUTURE OF CAPITALISM, (Jun. 11, 2020, 10:46 PM) (chronicling accounts of more than thirty individuals by the time this complaint was filed), https://www.futureofcapitalism.com/2020/06/list-of-people-canceled-in-post-george-floyd [https://web.archive.org/web/20200804095555/https://www.futureofcapitalism.com/2020/06/list-of-people-canceled-in-post-george-floyd].

g.  For example, a progressive data analyst, David Shor, was labeled as a racist and fired after sharing a study which argued that violent protests are not as effective as non-violent ones. Jonathan Chait, *An Elite Progressive LISTSERV Melts Down Over a Bogus Racism Charge*, NEW YORK INTELLIGENCER (Jun. 23, 2020), https://nymag.com/intelligencer/2020/06/white-fragility-racism-racism-progressive-progressphiles-david-shor.html

[https://web.archive.org/web/20200724164256/https://nymag.com/intelligencer/2020/06/white-fragility-racism-racism-progressive-progressphiles-david-shor.html].

h. A longtime museum curator at the San Francisco Museum of Modern Act was labeled a racist and ousted because he had said that shunning white artists would be impermissible "reverse discrimination." Robby Soave, *Museum Curator Resigns After He is Accused of Racism for Saying He Would Still Collect Art From White Men*, REASON (Jul. 14, 2020, 1:35 PM), https://reason.com/2020/07/14/gary-garrels-san-francisco-museum-modern-art-racism/ [https://web.archive.org/web/20200724171511/https://reason.com/2020/07/14/gary-garrels-san-francisco-museum-modern-art-racism/].

74. Even Supreme Court Justices are now routinely accused of manifesting prejudice or bias on bases that would subject them to Rule 8.4(g) liability.

a. Justice Scalia's discussion of "mismatch" theory during oral argument in *Fisher v. Univ. of Texas*, 136 S. Ct. 2198 (2016) led numerous commentators to accuse him of racism. *See, e.g.*, Stephen Dinan, *Scalia Accused of Embracing 'Racist' Ideas for Suggesting 'Lesser' Schools for Blacks*, WASH. TIMES (Dec. 10, 2015), http://www.washingtontimes.com/news/2015/dec/10/antonin-scaliaaccused-of-embracing-racist-ideas-f/ [https://perma.cc/V6CX-DWHY]; Lauren French, Pelosi: *Scalia Should Recuse Himself from Discrimination Cases*, POLITICO (Dec. 11, 2015, 12:56 PM), http://www.politico.com/story/2015/12/nancy-pelosi-antonin-scalia-216680 [https://perma.cc/BCL5-VGWY]; Joe Patrice, *Scientists Agree: Justice Scalia Is a Racist Idiot*, ABOVE THE LAW (Dec. 14, 2015, 9:58 AM), http://abovethelaw.com/2015/12/scientists-agree-justice-scalia-is-a-racist-idiot/ [https://perma.cc/9GA8-2NGT]; David Savage, *Justice Scalia Under Fire for Race Comments During Affirmative Action Argument*,

L.A. TIMES (Dec. 10, 2015, 2:40 PM), http://www.latimes.com/nation/la-na-scalia-race-20151210-story.html [https://perma.cc/U3T2-CBAE]; Debra Cassens Weiss, *Was Scalia's Comment Racist?*, A.B.A. J. (Dec. 10, 2015, 7:32 AM), http://www.abajournal.com/news/article/was_scalias_comment_racist_some_contend_blacks_may_do_better_at_slower_trac/ [https://perma.cc/G7DH-U5H3].

b. Justice Thomas has been characterized as "homophobic" based upon opinions and dissents that he has penned. *See* Trudy Ring, *Homophobic Justice Clarence Thomas Ill, May Miss LGBTQ Rights Cases*, ADVOCATE, (Oct. 7, 2019, 1:02 PM), https://www.advocate.com/news/2019/10/07/homophobic-justice-clarence-thomas-ill-may-miss-lgbtq-rights-cases [https://web.archive.org/web/20191208082732/https://www.advocate.com/news/2019/10/07/homophobic-justice-clarence-thomas-ill-may-miss-lgbtq-rights-cases].

c. Justice Alito has been maligned as having manifested a "jurisprudence of white racial innocence." *See* Ian Millhiser, *Justice Alito's Jurisprudence of White Racial Innocence*, VOX, (Jun. 23, 2020, 9:26 AM), https://www.vox.com/2020/4/23/21228636/alito-racism-ramos-louisiana-unanimous-jury [https://web.archive.org/web/20200702011327/https://www.vox.com/2020/4/23/21228636/alito-racism-ramos-louisiana-unanimous-jury].

d. Justice Gorsuch was alleged to have "affirmed a chauvinistic view of women" through "sexist" comments he made while teaching at the University of Colorado Law School. *See* Mark Joseph Stern, *Why Gorsuch's Alleged Sexist Classroom Comments Are So Troubling—And Revealing*, SLATE, (Mar. 20, 2017, 3:07 PM), https://slate.com/human-interest/2017/03/gorsuchs-sexist-

classroom-comments-are-troubling-and-revealing.html
[https://web.archive.org/web/20190510052004/https://slate.com/human-interest/2017/03/gorsuchs-sexist-classroom-comments-are-troubling-and-revealing.html].

e.  Justice Kavanaugh has been accused of authoring an opinion that peddles "class prejudice." Andrew Strom, *Brett Kavanaugh, "Common Sense," and Class Prejudice,* ONLABOR, (Jul. 12, 2018), https://www.onlabor.org/brett-kavanaugh-common-sense-and-class-prejudice/ [https://web.archive.org/web/20190807113628/https://www.onlabor.org/brett-kavanaugh-common-sense-and-class-prejudice/].

f.  Justice Roberts has not escaped criticism either. The Chief Justice has been denounced for manifesting "gendered and ideological" biases in his superintendent role at Supreme Court oral arguments. Leah Litman & Tonja Jacobi, *Does John Roberts Need to Check His Own Biases?*, N.Y. TIMES, (Jun. 2, 2020), https://www.nytimes.com/2020/06/02/opinion/john-roberts-supreme-court.html [https://web.archive.org/web/20200603105342/https://www.nytimes.com/2020/06/02/opinion/john-roberts-supreme-court.html]. In a less diplomatic piece, one commentator opined that "Roberts has consistently shown himself to be a deep racist—albeit one who draws less attention than his cross-burning brethren." Elie Mystal, *The Racism of Chief Justice John Roberts Is About To Be Fully Unleashed*, ABOVE THE LAW, (Jun. 28, 2018, 2:01 PM), https://abovethelaw.com/2018/06/the-racism-of-chief-justice-john-roberts-is-about-to-be-fully-unleashed/ [https://perma.cc/5VH4-CEWF].

g.  After Justice Kennedy's retirement, one academic commentator derided the entire body of his jurisprudence as having "privileged the interests and perspectives of white, heterosexual Christians and ultimately harmed a wide

swath of sexual, racial, and religious minorities." Russell K. Robinson, *Justice Kennedy's White Nationalism*, 53 U.C. DAVIS L. REV. 1027, 1028 (2019). The same article called on its readers "to probe judicial claims of neutrality—such as Chief Justice Roberts' claim that 'we do not have Obama or Trump judges,' because they may cloak unseemly power dynamics, including a white nationalist agenda." *Id.* at 1037.

h. Justices Alito, Gorsuch, Kavanaugh, Roberts and Thomas together were condemned by some commentators as harboring anti-Muslim prejudice when they denied, in *Dunn v. Ray*, 139 S. Ct. 661 (2019), a stay of execution to a prisoner who had made a last-minute request for an imam in the execution chamber. *See, e.g.* Robert Barnes, *Supreme Court's Execution Decision Animates Critics on the Left and Right*, WASHINGTON POST, (Feb. 11, 2019, 5:08 PM), https://www.washingtonpost.com/world/national-security/supreme-courts-execution-decision-animates-critics-on-the-left-and-right/2019/02/11/72da5ed8-2e3a-11e9-813a-0ab2f17e305b_story.html [https://web.archive.org/web/20190226103751/https://www.washingtonpost.com/world/national-security/supreme-courts-execution-decision-animates-critics-on-the-left-and-right/2019/02/11/72da5ed8-2e3a-11e9-813a-0ab2f17e305b_story.html]; Luke Goodrich, *No Anti-Muslim Bias at Supreme Court: Constitution, Argued Properly, Protects All Religions*, THE HILL, (Apr. 5, 2019, 2:30 PM), https://thehill.com/opinion/judiciary/437575-no-anti-muslim-bias-at-supreme-court-constitution-argued-properly-protects [https://web.archive.org/web/20190712165937/https://thehill.com/opinion/judiciary/437575-no-anti-muslim-bias-at-supreme-court-constitution-argued-properly-protects].

i. When Justice Ginsburg referred to Colin Kaepernick's National Anthem protests as "dumb and disrespectful," many media outlets criticized her view as

borderline prejudiced if not explicitly manifesting racial bias. *See* Dave Zirin, *Ruth Bader Ginsburg Could Not Be More Wrong About Colin Kaepernick*, THE NATION, (Oct. 12, 2016), https://www.thenation.com/article/archive/ruth-bader-ginsburg-could-not-be-more-wrong-about-colin-kaepernick/ [https://web.archive.org/web/20200731232043/https://www.thenation.com/article/archive/ruth-bader-ginsburg-could-not-be-more-wrong-about-colin-kaepernick/]; Sam Fulwood III, *Say It Ain't So, Ruth Bader Ginsburg*, CENTER FOR AMERICAN PROGRESS, (Oct. 14, 2016, 11:56 AM), https://www.americanprogress.org/issues/race/news/2016/10/14/146171/say-it-aint-so-ruth-bader-ginsburg/ [https://web.archive.org/web/20200716164625/https://www.americanprogress.org/issues/race/news/2016/10/14/146171/say-it-aint-so-ruth-bader-ginsburg/].

75.     Greenberg will be forced to censor himself to steer clear of an ultimately unknown line so that his speech is not at risk of being incorrectly perceived as manifesting bias or prejudice.

76.     But for Rule 8.4(g), Greenberg would be able to speak and write freely without the fear of the risk of professional liability for offending the wrong observer.

77.     Even if the Defendants were to attempt to assure Greenberg that his speeches and writings were permitted under Rule 8.4(g), given the open-ended language of Rule 8.4(g) and its accompanying comments, Greenberg would not feel comfortable speaking freely and would still reasonably fear professional liability.

## CAUSES OF ACTION

### Claim I: Unconstitutional infringement of free speech

78.     Greenberg reasserts and realleges paragraph 1 through 77 as if fully set forth therein.

79.     According to the First Amendment to the United States Constitution, "Congress shall make no law…abridging the freedom of speech."

80.     The First Amendment has been incorporated to apply to the states through the Fourteenth Amendment.

81.     Greenberg's speech, as described above in ¶¶14-32, 60-65, is fully protected by the First Amendment.

82.     Rule 8.4(g) chills such speech and, on the basis of content and viewpoint of the speech, imposes professional liability in contravention of the First Amendment.

83.     Rule 8.4(g) is overly extensive and unduly burdensome.

84.     Rule 8.4(g) does not serve a compelling interest.

85.     Rule 8.4(g) is not appropriately tailored to any government interest.

86.     Rule 8.4(g) invites arbitrary, subjective, and viewpoint discriminatory enforcement.

87.     To the extent that Rule 8.4(g) is constitutional in any of its applications, it is nonetheless substantially overbroad in relation to any legitimate sweep and is facially unconstitutional for that reason.

88.     Rule 8.4(g) is even more broad than Pennsylvania's non-binding Code of Civility which advises lawyers to "refrain from acting upon or manifesting racial, gender or other bias or prejudice toward any participant in the legal process."

89.     On its face and as applied to speech like Greenberg's, Rule 8.4(g) violates the right to free speech guaranteed by the First Amendment.

90.     Unless Defendants are enjoined from enforcing and adjudicating Rule 8.4(g), Greenberg will suffer irreparable harm.

## Claim II: Unconstitutional vagueness

91.     Greenberg reasserts and realleges paragraph 1 through 90 as if fully set forth therein.

92.     The Fourteenth Amendment provides in relevant part that "…nor shall any State deprive any person of life, liberty, or property, without due process of law."

93.     Disciplinary enforcement proceedings deprive respondent-attorneys of liberty and property.

94.     Due Process requires that people of ordinary intelligence be able to understand what conduct a given rule prohibits.

95.     Rules, statutes or laws that fail to provide this fair notice are void for vagueness.

96.     Rules, statutes or laws that authorize or even encourage discriminatory enforcement are void for vagueness.

97.     Laws implicating and jeopardizing First Amendment rights are required to be especially precise.

98.     People of ordinary intelligence cannot understand what Rule 8.4(g) prohibits.

99.     Greenberg cannot understand what Rule 8.4(g) prohibits.

100.    Rule 8.4(g) does not provide fair notice of what it prohibits.

101.    Rule 8.4(g) authorizes and encourages discriminatory enforcement.

102.    Rule 8.4(g) chills First Amendment protected speech and thus requires a more stringent review for vagueness.

103.    Rule 8.4(g)'s use of the phrase "knowingly manifest bias or prejudice" is unconstitutionally vague.

104.    Rule 8.4(g)'s use of the phrase "engage in harassment or discrimination" is unconstitutionally vague.

105.    Rule 8.4(g)'s use of the phrase "in the practice of law" is unconstitutionally vague.

106.    Rule 8.4(g)'s use of the phrase "as those terms are defined in applicable federal, state or local statutes or ordinances" is unconstitutionally vague.

107.    Rule 8.4(g)'s use of the phrase "including but not limited to bias, prejudice, harassment, or discrimination based upon race, sex, gender identity or express, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, or socioeconomic status" is unconstitutionally vague.

108.    Rule 8.4(g)'s use of the phrase "advice or advocacy consistent with these Rules" is unconstitutionally vague.

109.    Comment 3 to Rule 8.4(g) is unconstitutionally vague.

110.    Comment 4 to Rule 8.4(g) is unconstitutionally vague.

111.    Rule 8.4(g) violates the Due Process Clause of the Fourteenth Amendment and so is void for vagueness.

112.    The vagueness of Rule 8.4(g) chills protected speech and thereby also violates the First Amendment.

113.    Unless Defendants are enjoined from enforcing and adjudicating Rule 8.4(g), Greenberg will suffer irreparable harm.

## REQUEST FOR RELIEF

Therefore, Greenberg respectfully requests the following relief:

A.  A declaratory judgment that Rule 8.4(g) facially violates the First and Fourteenth Amendments to the United States Constitution.

B.  A permanent injunction prohibiting Defendants and their agents from enforcing Rule 8.4(g) en toto.

C.  An award of attorneys' fees, costs, and expenses in this action; and

D.  Any other legal or equitable relief to which Greenberg may show himself to be justly entitled.


Dated: August 6, 2020                 Respectfully submitted,

                                      */s/ Adam E. Schulman*
                                      Adam E. Schulman (PA Bar No. 309749)
                                      HAMILTON LINCOLN LAW INSTITUTE
                                      1629 K Street NW, Suite 300
                                      Washington, DC 20006
                                      adam.schulman@hlli.org
                                      (610) 457-0856

                                      *Attorney for Plaintiff Zachary Greenberg*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Zachary Greenberg have personal knowledge of the matters alleged in the foregoing Verified Complaint concerning myself, my activities and my intentions. I verify under the penalty of perjury that the statements made therein are true and correct.

Executed on August __3__, 2020

_____

Zachary Greenberg