**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ZACHARY GREENBERG, <br><br> *Plaintiff*, <br><br> v. <br><br> JOHN P. GOODRICH, in his official capacity as Board Chair of The Disciplinary Board of the Supreme Court of Pennsylvania; *et al.* <br><br> *Defendants*. | No. 2:20-cv-03822 |

**VERIFIED AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Greenberg v. Haggerty*, 491 F. Supp. 3d 12, 30 (E.D. Pa. 2020) (internal quotation omitted). For "[t]hat is viewpoint discrimination: Giving offense is a viewpoint." *Id.* (internal quotation omitted). Revised Pennsylvania Rule of Professional Conduct 8.4(g) restricts viewpoints by prohibiting expression that denigrates, expression of aversion or hostility, and expression of disregard for what the Rule deems relevant individual characteristics. Though nominally using the language of civil rights, the Rule redefines "harassment" and "discrimination" to censor protected expression, not simply prevent tortious behavior. The First Amendment does not permit this redefinition. *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001) (Alito, J.). Federal, state, and local anti-discrimination and anti-harassment laws promote the high-minded aim of equal access. But once again, "the plain language of Rule 8.4(g) does not reflect this intention." *Greenberg*, 491 F. Supp. 3d at 31. Indeed, the 2021 revisions explicitly decouple Rule 8.4(g) from existing civil rights law, again in favor of "creat[ing] a pathway for its handpicked arbiters to determine, without any concrete standards, who and what offends." *Id.* at 32. And again, that will leave the defendants free to determine which language denigrates, which shows aversion or hostility, and which manifests disregard for relevant individual characteristics all "based upon whether the viewpoint expressed is socially and politically acceptable." *Id.*

2.      Zachary Greenberg, a Pennsylvania-licensed attorney working for a non-profit organization that advocates on behalf of students' constitutional rights, regularly speaks at Continuing Legal Education ("CLE") and non-CLE events on a variety of hot-button legal issues including the constitutionality of hate speech regulation, Title IX's effect on the Due Process rights of individuals accused of sexual assault and misconduct, campaign finance speech restrictions,

university policies on fraternity and sorority misconduct, professorial academic freedom, university regulation of hateful expression online, attorney free speech rights, and abusive public records requests. Rule 8.4(g) threatens to impose civil sanction on Plaintiff if an audience member misconstrues his speech as denigrating, or showing hostility or aversion, and registers a complaint with the Office of Disciplinary Counsel.

3.      This civil rights action seeks a declaration that Rule 8.4(g) on its face violates the First Amendment (as incorporated through the Fourteenth Amendment) and an injunction preventing Defendants, in their official capacities, from enforcing the rule.

## JURISDICTION AND VENUE

4.      Plaintiff brings this action pursuant to Section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Declaratory Judgment Act, 28 U.S.C. §§2201–02, for violations of the First and Fourteenth Amendments to the United States Constitution.

5.      This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

6.      Venue is proper in this district under 28 U.S.C. § 1391(b).

## PARTIES

7.      Plaintiff Zachary Greenberg is a Pennsylvania-licensed attorney who is employed by the non-profit Foundation for Individual Rights in Education ("FIRE"). He is a citizen of Pennsylvania who both works and resides in the City and County of Philadelphia.

8.      Defendants John P. Goodrich, Jerry M. Lehocky, Celeste L. Dee, Christopher M. Miller, Gretchen A. Mundorff, John C. Rafferty, Dion G. Rassias, Robert L. Repard, Eugene F. Scanlon, Jr., David S. Senoff, Robert J. Mongeluzzi, and Shohin H. Vance are the members of The Disciplinary Board of the Supreme Court of Pennsylvania (the "Board"), each of whom is being sued in his or her official capacity. Mr. Goodrich is Board Chair; Mr. Lehocky is Board Vice-Chair.

9.      Defendant Thomas J. Farrell is Chief Disciplinary Counsel of the Office of Disciplinary Counsel ("ODC"). Defendant Raymond S. Wierciszewski is Deputy Chief Disciplinary Counsel of ODC. Each is being sued in his official capacity. ODC receives complaints

of unethical conduct, investigates such complaints, and initiates and prosecutes disciplinary proceedings against respondent-attorneys. The Chief Disciplinary Counsel and the Deputy Chief Disciplinary Counsel supervise ODC.

## FACTS

### The plaintiff

10.   Plaintiff Zachary Greenberg graduated with a Juris Doctor degree from Syracuse University College of Law in 2016.

11.   Greenberg sat for and passed the Pennsylvania Bar Exam in February 2019 and was admitted to the Pennsylvania Bar in May 2019.

12.   Greenberg is currently a member of the Pennsylvania Bar in good standing and of active status.

13.   Greenberg works as a Program Officer for FIRE.

14.   Greenberg's job responsibilities include speaking, writing, publishing, and educating about a variety of topics relevant to FIRE's mission defending and sustaining the individual rights of students and faculty members at America's colleges and universities. These rights include freedom of speech, freedom of association, due process, legal equality, religious liberty, and sanctity of conscience—essential liberties guaranteed by the United States Constitution at public universities and by contract at private universities.

15.   Greenberg is currently a member of the First Amendment Lawyers Association ("FALA"), a not-for-profit, nationwide association of hundreds of attorneys devoted to the protection of Free Expression under the First Amendment. FALA regularly conducts CLE events for its members.

16.   Greenberg, at least every other month, speaks at both CLE and non-CLE events as a Program Officer for FIRE and a member of FALA. He has spoken to attorneys, university legal counsels, college administrators, students, parents, and alumni on legal topics related to FIRE work and the First Amendment.

17.     Greenberg has presented CLE seminars to attorneys on the First Amendment's limits on rules of professional conduct and legal ethics related to the practice of law.

18.     Greenberg has presented educational seminars to college administrators and legal counsels on reforming university policies that violate student free speech rights, and the legal ramifications on failing to do so.

19.     Greenberg has written and spoken against banning "hate speech" on university campuses—a controversial position that some people would view as denigrating, or showing hostility or aversion toward minority groups that advocate for hate speech regulation.

20.     Greenberg has written and spoken against university regulation of hateful online expression protected by First Amendment standards, and has defended the right of professors, students, and student groups to engage in hateful expression protected by First Amendment standards—a controversial position that some people would view as denigrating, or showing hostility or aversion toward minority groups that advocate for hate speech regulation.

21.     Greenberg has written and spoken in favor of plenary Due Process protections for college students accused of sexual misconduct—a controversial position that some people would view as denigrating, or showing hostility or aversion toward women.

22.     Greenberg has written and spoken in favor of the First Amendment right to participate in political speech through making monetary contributions to political organizations and candidates—a controversial position that some people would view as denigrating, or showing hostility or aversion on the basis of socioeconomic status.

23.     Greenberg has written and spoken in favor of allowing religious speech on college campus even when that speech espouses discriminatory views—a controversial position that some people would view as denigrating, or showing hostility or aversion on the basis of gender identity, gender expression, sexual orientation and marital status.

24.     Since he has been at FIRE, Greenberg has participated in numerous speaking engagements, many of which are addressed to students, student groups, and fellow attorneys.

25.     Additionally, Greenberg has also presented at formally-accredited CLE and non-CLE seminars.

26.     For example, in 2017, at a CLE at a FALA conference in San Diego, California, Greenberg spoke to dozens of attorneys about *Citizens United v. FEC*, 558 U.S. 310 (2010), a controversial decision that some view as sustaining race and class-based hostility in the election system.

27.     For example, in 2018, Greenberg spoke to dozens of attorneys about the First Amendment limitations on rules of professional conduct and legal ethics related to the practice of law at a CLE at a FALA conference in Denver, Colorado.

28.     For example, in 2018, at a CLE in Villanova, Pennsylvania, Greenberg spoke to attorneys, parents, and students on the legal limits of a university's power to punish student online expression deemed offensive, denigrating and hateful.

29.     For example, in 2019, Greenberg spoke to the American Association of University Professors chapter at La Salle University in Philadelphia, Pennsylvania, on the legal limits of a university's power to punish professors for expression, teaching, and research deemed offensive, denigrating and hateful.

30.     For example, in 2019, Greenberg spoke to university administrations and legal counsels on the legal limits of a university's power to punish students and student groups for expression deemed offensive, denigrating and hateful.

31.     For example, in 2021, Greenberg spoke to FALA in a virtual CLE on government rules and ethical limitations on attorneys' First Amendment rights.

32.     For example, in 2021, for a Good Citizen Day civics education event for the Union League, Greenberg spoke, discussing the effects of banning hateful expression.

33.     Greenberg is scheduled to speak to student groups at numerous universities over the next several months as the fall 2021 semester begins.

34.     Greenberg intends and expects to continue speaking at similar events on similar topics for the foreseeable future.

**Pennsylvania Rule of Prof. Conduct 8.4(g)**

35.     Since the late 1990s, the American Bar Association's Model Rules of Professional Responsibility have included a comment explaining that "A lawyer who, in the course of representing a client, knowingly manifests, by words or conduct, bias or prejudice based on race, sex, religion, national origin, disability, age, sexual orientation, or socioeconomic status violates paragraph [8.4](d) when such actions are prejudicial to the administration of justice."

36.     In August 2016, the ABA promulgated Model Rule of Professional Conduct 8.4(g), which prohibits "engag[ing] in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of race, sex, religion, national origin, ethnicity, disability, age, sexual orientation, gender identity, marital status or socioeconomic status in conduct related to the practice of law."

37.     A comment to M.R.P.C 8.4(g) explains that "[s]uch discrimination includes harmful verbal or physical conduct that manifests bias or prejudice towards others."

38.     Subsequently, numerous states including Arizona, Idaho, Illinois, Louisiana, Minnesota, Montana, Nevada, South Carolina, Tennessee, and Texas have all rejected proposals to adopt forms of M.R.P.C. 8.4(g).

39.     Many state authorities have explicitly recognized that the rule would violate the First Amendment. *See* Ark. Att'y Gen. Op. No. 2020-055 (Jul. 14, 2021); Letter from Robert Cook, S.C. Solicitor Gen., to State Rep. John R. McCravy, III (May 1, 2017); La. Atty. Gen. Op. 17-0114 (Sep. 8, 2017); Tenn. Atty. Gen. Op. 18-11 (March 16, 2018); Tex. Att'y Gen. Op. KP-0123 (Dec. 20, 2016); Letter from Kevin Clarkson, Alaska Atty. Gen., to Alaska Bar Ass'n (Aug. 9, 2019); Sen. J. Res. No. 15 (Mont. 2017), *available at* https://leg.mt.gov/bills/2017/billhtml/SJ0015.htm; Letter from Roger S. Burdick, Chief Justice of the Idaho Supreme Court, to Diane Minnich, Executive Director of the Idaho State Bar (Sept. 6, 2018), *available at* https://www.clsreligiousfreedom.org/sites/default/files/site_files/ISC%20Letter%20-%20IRPC%208.4(g).pdf.

40.     In October 2016, the Pennsylvania Bar Association's Commission on Women in the Profession proposed adopting Rule 8.4(g) in Pennsylvania.

41.     The Board declined to adopt the ABA Model Rule, noting in 2018 that as drafted, Model Rule 8.4(g) is "susceptible to challenges related to constitutional rights of lawyers, such as freedom of speech, association and religion."

42.     After an iterative process of notice and comment, on June 8, 2020, Pennsylvania became one of the first states to adopt a variation of M.R.P.C. 8.4(g) when, over Justice Mundy's dissent, the Supreme Court of Pennsylvania approved the recommendation of the Board and ordered that Pennsylvania Rule of Professional Conduct 8.4 would be amended to include Rule 8.4(g) ("Old 8.4(g)"), which read as follows:

It is professional misconduct for a lawyer to:

* * *


(g) in the practice of law, by words or conduct, knowingly manifest bias or prejudice, or engage in harassment or discrimination, as those terms are defined in applicable federal, state or local statutes or ordinances, including but not limited to bias, prejudice, harassment or discrimination based upon race, sex, gender identity or expression, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, or socioeconomic status. This paragraph does not limit the ability of a lawyer to accept, decline or withdraw from a representation in accordance with Rule 1.16. This paragraph does not preclude advice or advocacy consistent with these Rules.

Comment:

* * *

[3] For the purposes of paragraph (g), conduct in the practice of law includes participation in activities that are required for a lawyer to practice law, including but not limited to continuing legal education seminars, bench bar conferences and bar association activities where legal education credits are offered.

[4] The substantive law of antidiscrimination and anti-harassment statutes and case law guide application of paragraph (g) and clarify the scope of the prohibited conduct.

43.     Under the Pennsylvania Supreme Court's order, Old 8.4(g) was scheduled to become effective on December 8, 2020.

44.     Greenberg filed his initial complaint in this action on August 6, 2020, seeking an injunction against enforcement of Old 8.4(g), and a declaration of its unconstitutionality. Dkt. 1.

45.     On December 8, 2020, the Eastern District of Pennsylvania issued a preliminary injunction enjoining enforcement of Old 8.4(g). Dkts. 29, 31.

46.     Defendants appealed the preliminary injunction order to the Third Circuit, but subsequently voluntarily dismissed their appeal in March 2021.

47.     At their April 13, 2021 meeting, Defendants forwarded to the Pennsylvania Supreme Court recommendations regarding amendments to Old 8.4(g).

48.     On July 26, 2021, the Pennsylvania Supreme Court adopted the Board's recommended amendments and approved New Rule 8.4(g) ("New 8.4(g)" or just "8.4(g)"). *See* Dkt. 45-1.

49.     Justice Mundy again dissented from the adoption, reasoning that the amendments failed to cure the unconstitutionality recognized in this Court's December 2020 decision.

50.     New 8.4(g) did not go through any public notice and comment procedure.

51.     New 8.4(g) is set to take effect on August 25, 2021.

52.     Pursuant to stipulation of the parties, Defendants have agreed to forebear from enforcement of New 8.4(g) until this Court has rendered a decision on the cross-motions for summary judgment and to not retroactively enforce Rule 8.4(g) against alleged violations during that forbearance period. Dkt. 46 at 2.

53.     As Justice Mundy's dissent recognizes, the modifications of New 8.4(g) do not cure the First Amendment infirmities of Old 8.4(g).

54.     New 8.4(g) reads as follows:

It is professional misconduct for a lawyer to:

* * *

(g) in the practice of law, knowingly engage in conduct constituting harassment or discrimination based upon race, sex, gender identity or expression, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, or socioeconomic status. This paragraph does not limit the ability of a lawyer to accept, decline or withdraw from a representation in accordance with Rule 1.16. This paragraph does not preclude advice or advocacy consistent with these Rules.

Comment:

* * *

[3] For the purposes of paragraph (g), conduct in the practice of law includes (1) interacting with witnesses, coworkers, court personnel, lawyers, or others, while appearing in proceedings before a tribunal or in connection with the representation of a client; (2) operating or managing a law firm or law practice; or (3) participation in judicial boards conferences, or committees; continuing legal education seminars; bench bar conferences; and bar association activities where legal education credits are offered. The term "the practice of law" does not include speeches, communications, debates, presentations, or publications given or published outside the contexts described in (1)-(3).

[4] "Harassment" means conduct that is intended to intimidate, denigrate or show hostility or aversion toward a person on any of the bases listed in paragraph (g). "Harassment" includes sexual harassment, which includes but is not limited to sexual advances, requests for sexual favors, and other conduct of a sexual nature that is unwelcome.

[5] "Discrimination" means conduct that a lawyer knows manifests an intention: to treat a person as inferior based on one or more of the characteristics listed in paragraph (g); to disregard relevant considerations of individual characteristics or merit because of one or

more of the listed characteristics; or to cause or attempt to cause inference with the fair administration of justice based on one or more of the listed characteristics.

55.     New 8.4(g) is not limited to denigration, hostility, or aversion displayed "in the course of representing a client" and "when such actions are prejudicial to the administration of justice."

56.     New 8.4(g), unlike Old 8.4(g), is not tethered to standard legal definitions of harassment and discrimination in federal or state law.

57.     New 8.4(g) instead promulgates novel, expansive, and vague definitions for "harassment" and "discrimination."

58.     New 8.4(g) restricts First Amendment protected expression, including speeches, communications, debates, and presentations at CLE seminars and bar association events.

**The Disciplinary Process**

59.     The Pennsylvania Constitution, Article V, §10(c), vests authority in the Pennsylvania Supreme Court to prescribe general rules for practice and procedures of law within the State.

60.     The Pennsylvania Supreme Court established the Board in 1972 to regulate attorney conduct.

61.     One of the Board's functions is to adjudicate actions prosecuted by ODC, which is charged with investigating complaints against Pennsylvania-licensed attorneys for violating the Pennsylvania Rules of Professional Conduct and, if necessary, charging and prosecuting attorneys under the Pennsylvania Rules of Disciplinary Enforcement. *See* Pa.R.D.E. 205-08; Pa.D.Bd.R. §§ 93.21, 93.61.

62.     As with all Pennsylvania Rules of Professional Conduct, ODC will have authority to investigate putative violations of Rule 8.4(g) and the authority to prosecute enforcement actions against Pennsylvania-licensed attorneys who ODC believes to be in violation of the rule.

63.     In its capacity to investigate alleged disciplinary rules violations and enforce the rules, ODC receives and investigates complaints lodged by any member of the public.

11

64.     Submitting a complaint requires only filling out a simple 2-page form and submitting it on the Board's website (padisciplinaryboard.org) or in paper form.

65.     ODC will assist the complainant in reducing the grievance to writing if necessary.

66.     The online complaint form promises that ODC and the Board are bound by a promise of confidentiality to complainants.

67.     The online complaint form promises that under Enforcement Rule 209(a), complainants will be immune from civil suit based upon their communications with Disciplinary Counsel or the Board.

68.     Upon receipt of a complaint involving an attorney, ODC conducts an investigation. The complaint is not a charging document, but a request to investigate an attorney.

69.     Unless ODC determines that a complaint is frivolous or that policy or prosecutorial discretion warrant dismissal, it issues a DB-7 letter to the attorney, which is a Request for Statement of Respondent's Position.

70.     Within 30 days, or a shorter time if fixed by Disciplinary Counsel in the notice, the respondent-attorney must respond by filing a statement of position in writing detailing his defense. See Pa.D.B.R. 87.7(b)(2).

71.     Failing to respond is itself grounds for discipline. *See* Pa.R.D.E. 203(a)(7).

72.     As part of its investigation of a complaint, Disciplinary Counsel may obtain a subpoena to compel the respondent-attorney to produce records and documents. See Pa.R.D.E. 213.

73.     If, after an investigation and serving a DB-7 letter, ODC determines that some form of discipline is appropriate, they may recommend a variety of sanctions: informal admonition, private reprimand, public reprimand or the prosecution of formal charges before a hearing committee. A respondent-attorney may object to the recommended disposition.

74.     ODC then drafts a form DB-3, a "Referral of Complaint to Reviewing Hearing Committee Member."

75.     The DB-3 summarizes the results of the investigation and describes the respondent attorney's response to the charges in the DB-7. It cites the applicable rules of professional conduct and how the investigation demonstrates that the respondent violated specific rules. After considering the severity of the misconduct as compared to precedent, the respondent's history of prior discipline, and any other aggravating or mitigating circumstances, the DB-3 concludes with a recommendation of private discipline or a public reprimand or the filing of a petition for discipline (which is used only for seeking suspension or disbarment).

76.     The Counsel in Charge of the District reviews the recommendation and, if they concur, drafts a recommendation to accompany the DB-3, which is reviewed by defendant Thomas Farrell, prior to seeking discipline.

77.     Unless an attorney consents to discipline or resigns, if the DB-3 is approved, a hearing committee member reviews and approves or disapproves of the proposed disposition. See Pa.R.D.E. 208(a)(3). A three-member panel of the Board reviews recommendations for private and public reprimands. See Pa.R.D.E. 208(a)(5); Pa.D.B.R. § 87.34.

78.     If the matter is approved for informal admonition, private or public reprimand, the attorney is notified. If the attorney does not consent to the disposition, they have the right to insist on the filing of a petition for discipline, which then proceeds to a hearing before a hearing committee and review by the Board and possibly the Supreme Court of Pennsylvania. See Pa.R.D.E. 208(a)(6). ODC acts as prosecutor in a formal proceeding.

79.     If the reviewing Hearing Committee member approves the filing of a petition for discipline, ODC Disciplinary Counsel drafts it and, after review and approval by the District's Counsel in Charge and Deputy Chief Disciplinary Counsel, serves it on the attorney. The case proceeds to a hearing before a Hearing Committee and then de novo review by the Board and the Supreme Court of Pennsylvania. See Pa.R.D.E. 208(b). The Board has the authority to sanction attorneys through informal admonition, private reprimand, public reprimand as well as the authority to tax the expenses of the investigation and prosecution to the respondent-attorney.

80.     The Board may also recommend dispositions of probation, censure, suspension or disbarment, which will be determined by the Pennsylvania Supreme Court upon the record of the Board and sometimes oral argument with the participation of Disciplinary Counsel and/or the Board.

### Injury

81.     Greenberg plans to continue to speaking at CLE and non-CLE events like those discussed above in ¶¶14-34, pursuant to the expectations of his employer, his professional organization memberships, and his personal interests. But the existence of 8.4(g) and the uncertainty surrounding the scope of 8.4(g) will chill his speech.

82.     During his presentations, Greenberg's discussion of hateful speech protected by the First Amendment involves a detailed summation of the law in this area, which includes a walkthrough of prominent, precedential First Amendment cases addressing incendiary speech.

83.     This summation covers, among other cases: *Matal v. Tam*, 137 S. Ct. 1744 (2017) (addressing trademark protection for the band called the "Slants"—a common racial epithet for persons of Asian descent); *Snyder v. Phelps*, 562 U.S. 443 (2011) (considering the right of picketers carrying such signs as "God Hates Fags" and "Priests Rape Boys"); *Papish v. Board of Curators of the University of Missouri*, 410 U.S. 667, 667-68 (1973) (upholding as protected speech a student newspaper's front-page use of the vulgar headline "Motherfucker Acquitted" and a "political cartoon . . . depicting policemen raping the Statue of Liberty and the Goddess of Justice."); *Dambrot v. Central Michigan University*, 55 F.3d 1177 (6th Cir. 1995) (invalidating campus speech code in a case involving the coach's utterance of a racial epithet in a college basketball locker room). The *Dambrot* opinion uses the racial epithet nineteen times.

84.     The vast majority of topics covered by Greenberg's speaking engagements, and virtually all the examples used by Greenberg in his speaking engagements to illustrate his points, are considered offensive, denigrating, hostile, and hateful by some members of his audience, and some members of society at large.

85.     After a May 2018 CLE presentation by Greenberg in Villanova, Pennsylvania, attorneys told him his presentation on his interpretation of the legal limits of a university's power to punish student online expression deemed offensive, prejudiced, and hateful was in and of itself offensive.

86.     After a September 2018 presentation by Greenberg at the University of New Hampshire on free speech on campus, students approached Greenberg and told him that the content of his presentation and the ideas he expressed were offensive.

87.     After a June 2019 virtual presentation by Greenberg with college administrators on fraternity and sorority student group rights, attendees provided feedback to Greenberg that the content of his presentation and the ideas he expressed were offensive.

88.     A 2017 study from the Cato Institute on Free Speech and Tolerance in America, which surveyed 2300 members of the public of majority age, found that 43% agreed with the statement: "Supporting someone's right to say racist things is as bad as holding racist views yourself."

89.      According to findings from Cato's 2017 Free Speech and Tolerance Survey, 48% of Democratic respondents and 36% of all respondents said that they would favor "a law that would make it illegal to say offensive or insulting things in public about…Gays, lesbians, and transgender people."

90.     According to Cato's 2017 Free Speech and Tolerance Survey and FIRE's 2017 Student Attitudes Free Speech Survey, many people believe that the First Amendment should not protect hate speech. *See* Student Attitudes Free Speech Survey, FIRE, https://www.thefire.org/research/publications/student-surveys/student-attitudes-free-speech-survey/student-attitudes-free-speech-survey-full-text/ [https://web.archive.org/web/20200919100210/https://www.thefire.org/research/publications/student-surveys/student-attitudes-free-speech-survey/student-attitudes-free-speech-survey-full-text/].

91.     A true and correct copy of the report of this Cato survey is found at Dkt. 23-1.

92.     Greenberg believes it would be nearly impossible to illustrate United States First Amendment jurisprudence, such as by accurately citing and quoting precedent First Amendment cases, without engaging in speech that at least some members of his audience will perceive as denigrating, offensive, hostile, aversive, and potentially hateful.

93.     Greenberg believes that opposing hate speech bans and regulation is a controversial position that some people view as manifesting the same hostility and aversion against minority groups as hate speech itself.

94.     Greenberg believes that advocating for the right of people to express intolerant religious views is a controversial position that some people would view as denigrating individuals on the basis of gender identity, gender expression, sexual orientation and marital status.

95.     FIRE's 2018 Student Attitudes Due Process Survey, which surveyed 2,225 undergraduate students who attended a two- or four-year education institution in the United States, showed that a smaller percentage of respondents supported due process protections for those of accused of "sexual misconduct" offenses rather than for those who are accused of "underage drinking" or generally accused of "breaking a campus rule." Student Attitudes Due Process Survey, FIRE, https://www.thefire.org/research/publications/student-surveys/student-attitudes-due-process-survey/student-attitudes-due-process-survey-full-text/
[https://web.archive.org/web/20200921042004/https://www.thefire.org/research/publications/student-surveys/student-attitudes-due-process-survey/student-attitudes-due-process-survey-full-text/].

96.     When the U.S. Department of Education proposed reforms to Title IX guidance to provide the sort of due process protections Greenberg has supported, the National Women's Law Center sued to stop the Final Rule, and, in a June 2020 statement, said that the decision on the guidance was "another attempt to deliberately silence survivors based on the sexist myth that they are liars." NWLC's June 2020 federal complaint in the District of Massachusetts, Victim Rights Law Center v. DeVos, No. 1:20-cv-1104, called the procedural rules and standards "biased" and "motivated by discriminatory sex-based stereotypes." Arpan Lobo, *Another group sues DeVos,*

16

*DOE, over Title IX rules*, HOLLAND SENTINEL (JUN. 13, 2020, 12:01 PM), https://www.hollandsentinel.com/news/20200613/another-group-sues-devos-doe-over-title-ix-rules [https://web.archive.org/web/20200922211217/https://www.hollandsentinel.com/news/20200613/another-group-sues-devos-doe-over-title-ix-rules]; Complaint at 11, 13, *Victim Rights Law Center v. DeVos*, No. 1:20-cv-1104 (D. Mass. Jun. 10, 2020).

97.    Greenberg believes that supporting Due Process protections for students accused of sexual misconduct is a controversial position that some people view as denigrating women and showing hostility and aversion toward women.

98.    According to 2015 Stacked Deck Report by the think tank Demos, led by law professors and attorneys, our political system supporting the First Amendment right to participate in political speech through making monetary contributions to political organizations and candidates contains an "economic bias" that "creates and sustains similar racial bias because the donor class as a whole and campaign contributors are overwhelmingly white; and because the policy preferences of people of color are much more similar to those of the rest of the general public than to those of the rich." Adam Lioz, *Stacked Deck: How the Racial Bias in Our Big Money Political System Undermines Our Democracy and Our Economy*, DEMOS (Dec. 14, 2015), https://www.demos.org/sites/default/files/publications/StackedDeck2_1.pdf [https://web.archive.org/web/20200810050042/https://www.demos.org/sites/default/files/publications/StackedDeck2_1.pdf].

99.    Greenberg believes that supporting the First Amendment right to participate in political speech through making monetary contributions to political organizations and candidates is a controversial position that some people view as displaying race and class-based hostility and perpetuating race and class-based discrimination in the political system.

100.    According to a 2019 Brennan Center for Justice explainer, "the most troubling result of Citizens United" is that "the decision has helped reinforce the growing sense that our democracy primarily serves the interests of the wealthy few, and that democratic participation for

the vast majority of citizens is of relatively little value." The explainer also states that "an election system that is skewed heavily toward wealthy donors also sustains racial bias and reinforces the racial wealth gap." Tim Lau, *Citizens United Explained*, BRENNAN CENTER FOR JUSTICE (Dec. 12, 2019), https://www.brennancenter.org/our-work/research-reports/citizens-united-explained [https://web.archive.org/web/20201008123523/https://www.brennancenter.org/our-work/research-reports/citizens-united-explained].

101.    Greenberg believes that *Citizens United* is a controversial decision that some view as displaying race and class-based hostility and perpetuating race and class-based discrimination in the political system.

102.    Greenberg believes that every one of his speaking engagements on First Amendment issues carries the risk that an audience member will file a bar disciplinary complaint against him based on the content of his presentation under Rule 8.4(g).

103.    Considering the large amount of time and money Greenberg devoted to attaining his Pennsylvania license to practice law, Greenberg is justifiability unwilling to take this risk, and will refrain from conducting speaking engagements on controversial issues as a result.

104.    Greenberg's self-censorship will extend to excluding, limiting, and sanitizing the examples used in his speaking engagements to illustrate his points, in order to reduce the risk of an audience member reporting his expression to ODC.

105.    Greenberg does not wish to be subjected to a disciplinary investigation by ODC.

106.    Greenberg does not wish to be subjected to disciplinary proceedings in front of the Board.

107.    Greenberg does not wish to be subjected to disciplinary sanctions by ODC or the Board.

108.    A disciplinary investigation would harm Greenberg's professional reputation, available job opportunities, and speaking opportunities.

109.    Disciplinary proceedings would harm Greenberg's professional reputation, available job opportunities, and speaking opportunities.

110.    Disciplinary sanctions would harm Greenberg's professional reputation, available job opportunities, and speaking opportunities.

111.    Greenberg reasonably fears that his written and oral CLE presentations could be misconstrued by readers and listeners, and state officials within the Board or ODC, as violating Rule 8.4(g).

112.    Greenberg reasonably fears that activists will attempt to use Rule 8.4(g) and the disciplinary complaint process to punish him for his speech in support of political positions they disagree with in the hopes of chilling other opponents from participating in the political debate.

113.    This fear of misuse of Rule 8.4(g) is far from hypothetical. Activists have frequently used anti-discrimination rules and accusations of bigotry to hector speakers for political reasons.

      a.    For example, in 2013 Judge Edith Jones gave a speech about the death penalty at the University of Pennsylvania Law School Federalist Society where she made the empirical observation that members of some racial groups commit crime at rates disproportionate to their population.  Organizations, activists, and law professors, supported by the affidavits of five University of Pennsylvania Law students and one attorney who attended the lecture and by the affidavits of two attorneys who had not attended the lecture, filed an ethics complaint against Judge Jones for "racial bias" on the basis of her speech and its "hostile rhetoric." When, after appointing a law professor to investigate, a three-judge Special Committee of the D.C. Circuit rejected the complaint in a 71-page single-spaced report, the complainants filed a Petition for Review to the Judicial Conference of the United States, which affirmed. The entire process subjected Judge Jones to extensive adverse publicity and investigation for nearly two years. *See In re Complaint of Judicial Misconduct*, C.C.D. No. 14-01 (Committee on Judicial Conduct and Disability of the Judicial Conference of the United States Feb. 19, 2015), *opinion available at* http://www.ca5.uscourts.gov/docs/default-source/judicial-council-orders/resolution-of-judicial-misconduct-complaint-

against-circuit-judge-edith-h-jones.pdf

[https://web.archive.org/web/20200524121449/http://www.ca5.uscourts.gov/d ocs/default-source/judicial-council-orders/resolution-of-judicial-misconduct-complaint-against-circuit-judge-edith-h-jones.pdf].

b.  In 2018, professor Amy Wax of University of Pennsylvania Law School made an empirical claim that black students scored lower than their counterparts in her first-year lecture class. Law student alumni created a petition condemning her "racial hostility and intimidation." Wax agreed to be barred from teaching first-year courses. Derek Hawkins, *Penn Law professor who said black students are 'rarely' in top half of class loses teaching duties*, WASH. POST (Mar. 15, 2018,      8:49      AM),      https://www.washingtonpost.com/news/morning-mix/wp/2018/03/15/penn-law-professor-who-said-black-students-rarely-perform-well-loses-teaching-duties

[https://web.archive.org/web/20200525000401/https://www.washingtonpost.c om/news/morning-mix/wp/2018/03/15/penn-law-professor-who-said-black-students-rarely-perform-well-loses-teaching-duties/]; Paul S. Levy, *University Boardrooms Need Reform*, WALL. ST. J. (Jun. 10, 2018, 1:36 PM), https://www.wsj.com/articles/university-boardrooms-need-reform-1528652211

[https://web.archive.org/web/20180718124838/https://www.wsj.com/articles/ university-boardrooms-need-reform-1528652211].

c.  In 2015, Northwestern University professor Laura Kipnis wrote an essay in the *Chronicle of Higher Education* critical of the use of Title IX policies on sexual misconduct. In retaliation, two graduate students filed a Title IX complaint against Professor Kipnis claiming that her essay created a "hostile environment," and then filed a second Title IX complaint against her when she

wrote about the first Title IX complaint. Jeannie Suk Gerson, *Laura Kipnis's Endless Trial by Title IX*, NEW YORKER (Sep. 20, 2017).

d.  While Judge Jones and Professor Kipnis were eventually cleared of wrongdoing, they faced years of investigation and harassment at non-trivial costs to themselves and their reputations. Moreover, Rule 8.4(g) is amorphous enough to include their words as potentially sanctionable if Greenberg were to repeat their arguments in CLE presentations.

e.  In October of 2020, a group of students at Duke University School of Law authored an open letter requesting that their school disinvite a speaker, professor Helen Alvare, because Alvare's support for religious freedom accommodation laws and opposition to gay marriage reflected in amicus briefs she wrote reflected homophobic aversion to LGBTQ students. A true and correct copy of this letter is found at Dkt. 23-2.

f.  An evolutionary biologist postdoctoral student at Penn State, Colin Wright, was labeled a transphobe after he published on social media in support of an established theory that societal factors are causally responsible for recent rises in gender dysphoria. Wright became subject to a coordinated effort that attempted to inflict reputational and vocational harm on him. Colin Wright (@swipewright), TWITTER (Jul 10, 2020, 11:30 PM), https://twitter.com/SwipeWright/status/1281793005968437248 [https://web.archive.org/web/20200711130230/https://twitter.com/SwipeWright/status/1281793005968437248]; Colin Wright, *Think Cancel Culture Doesn't Exist? My Own 'Lived Experience Says Otherwise*, QUILLETTE (Jul. 30, 2020), https://quillette.com/2020/07/30/think-cancel-culture-doesnt-exist-my-own-lived-experience-says-otherwise/ [https://web.archive.org/web/20200731131527/https://quillette.com/2020/07/3

0/think-cancel-culture-doesnt-exist-my-own-lived-experience-says-otherwise/].

g. In 2021, student groups at University of San Diego School of Law called for the termination of a professor, Tom Smith, who had authored a blog post critical of China's handling of Covid-19. The dean of the law school responded by condemning the denigrating language and instituting an investigation as to whether Smith violated the school's anti-harassment policies. Eugene Volokh, *Univ. of San Diego Law School Investigating Professor for Post Critical of China*, THE VOLOKH CONSPIRACY (Mar. 20, 2021, 2:50 PM), https://reason.com/volokh/2021/03/20/univ-of-san-diego-law-school-investigating-professor-for-post-critical-of-china/ [https://web.archive.org/web/20210402013433/https://reason.com/volokh/2021/03/20/univ-of-san-diego-law-school-investigating-professor-for-post-critical-of-china/].

h. Students, student groups, and faculty members have leveled accusations of harassment and discrimination against professors who mention certain hateful epithets, even when quoting text from legal opinions in a purely academic and pedagogical context, and such accusations have in some instances resulted in university discipline. *See* Randall Kennedy & Eugene Volokh, *The New Taboo: Quoting Epithets in the Classroom and Beyond*, 49 CAPITAL UNIV. L. REV. 1 (2021).

i. During the 2018-19 school year, Augsburg University suspended professor of history Phillip Adamo for using the n-word during a class discussion about a James Baldwin book in which the word appeared. Colleen Flaherty, *Too Taboo for Class*, INSIDE HIGHER ED, (Feb. 1, 2019), https://www.insidehighered.com/news/2019/02/01/professor-suspended-using-n-word-class-discussion-language-james-baldwin-essay

[https://web.archive.org/web/20200726223221/https://www.insidehighered.com/news/2019/02/01/professor-suspended-using-n-word-class-discussion-language-james-baldwin-essay].

j.   In 2019, Emory Law professor Paul Zwier faced a termination hearing after repeating the n-word in academic and germane classroom discussion of a civil rights case. Adam Steinbaugh, *Emory Law Professor faces termination hearing for using 'n-word' in discussion of civil rights case, discussion with student*, FIRE NEWSDESK (Aug. 30, 2019), https://www.thefire.org/emory-law-professor-faces-termination-hearing-for-using-n-word-in-discussion-of-civil-rights-case-discussion-with-student/ [https://web.archive.org/web/20200608173249/https://www.thefire.org/emory-law-professor-faces-termination-hearing-for-using-n-word-in-discussion-of-civil-rights-case-discussion-with-student/].

k.   In 2020, the UCLA law school dean apologized for the offense caused when law professor Eugene Volokh quoted the n-word in discussing a case. Eugene Volokh, *UCLA Law Dean Apologizes for My Having Accurately Quoted the Word "Nigger" in Discussing a Case*, THE VOLOKH CONSPIRACY (Apr. 14, 2020, 5:14 PM), https://reason.com/2020/04/14/ucla-law-dean-apologizes-for-my-having-accurately-quoted-the-word-nigger-in-discussing-a-case/ [https://web.archive.org/web/20200717062702/https://reason.com/2020/04/14/ucla-law-dean-apologizes-for-my-having-accurately-quoted-the-word-nigger-in-discussing-a-case/].

l.   In 2020, the University of California at Irvine Law School barred professor Carrie Menkel-Meadow from teaching first-year 1L classes "for the foreseeable future" after she used the n-word pedagogically in class; several law professors and deans at the school criticized her for "harm…to black students" and "condemn[ed]" her. Kathryn Rubino, *Professor At Top Law*

*School Uses N-Word And Won't Apologize For It*, Above the Law (Aug. 28, 2020, 1:44 PM)  https://abovethelaw.com/2020/08/professor-at-top-law-school-uses-n-word-and-wont-apologize-for-it/

[https://webcache.googleusercontent.com/search?q=cache:em0ntAL9aBEJ:https://abovethelaw.com/2020/08/professor-at-top-law-school-uses-n-word-and-wont-apologize-for-it/+&cd=1&hl=en&ct=clnk&gl=us]. The UCI Black Law Students Association, in a June 3, 2020, letter, said that professor Menkel-Meadow's use of the n-word "harms our Black colleagues and upholds white supremacy and institutionalized racism." *Reprinted at* UCI Professor Criticized for Saying the N Word, Reddit (Aug. 26, 2020, 7:58 PM), https://www.reddit.com/r/LawSchool/comments/ihahfj/uci_law_professor_criticized_for_saying_the_n_word/

[https://web.archive.org/web/20200829233034/https://www.reddit.com/r/LawSchool/comments/ihahfj/uci_law_professor_criticized_for_saying_the_n_word/].

m.  In 2020, law students, law student associations, and faculty at Stanford Law School condemned professor Michael McConnell for quoting Patrick Henry's use of the n-word during a classroom lecture. Nick Anderson, *A Stanford law professor read a quote with the n-word to his class, stirring outrage at the school*, Wash. Post (Jun. 3, 2020, 7:24 PM) https://www.washingtonpost.com/education/2020/06/03/stanford-law-professor-read-quote-with-n-word-his-class-stirring-outrage-school

[https://web.archive.org/web/20201004232656/https://www.washingtonpost.com/education/2020/06/03/stanford-law-professor-read-quote-with-n-word-his-class-stirring-outrage-school/]; Joe Patrice, *Stanford Joins List of Law Schools With White Professors Using the N-Word In Class*, Above The Law (Jun. 1, 2020, 1:43 PM), https://abovethelaw.com/2020/06/stanford-joins-list-of-law-

schools-with-white-professors-using-the-n-word-in-class/

[https://webcache.googleusercontent.com/search?q=cache:Yn0RYgO685sJ:htt

ps://abovethelaw.com/2020/06/stanford-joins-list-of-law-schools-with-white-

professors-using-the-n-word-in-class/+&cd=1&hl=en&ct=clnk&gl=us].

n.  In 2020, Tim Boudeau, a tenured professor at Central Michigan University

and chair of the CMU journalism department, lost his job for vocalizing the n-

word while, as part of a media law class, accurately quoting from a leading

Sixth Circuit decision invalidating college speech codes, *Dambrot v. Central*

*Michigan University*, 55 F.3d 1177 (6th Cir. 1995). Eugene Volokh, *Tenured*

*Professor Fired for Accurately Quoting Leading Campus Speech Code Case*,

THE VOLOKH CONSPIRACY (Sept. 3, 2020, 11:37 AM),

https://reason.com/2020/09/03/tenured-professor-fired-for-accurately-quoting-

leading-campus-speech-code-case/

[https://web.archive.org/web/20200918022914/https://reason.com/2020/09/03

/tenured-professor-fired-for-accurately-quoting-leading-campus-speech-code-

case/].

o.  A group of students reported another professor to his superiors for "assigning

a book with a gay slur in the title." John McWhorter, *Academics Are Really,*

*Really Worried About Their Freedom*, THE ATLANTIC, (Sept. 1, 2020),

https://www.theatlantic.com/ideas/archive/2020/09/academics-are-really-

really-worried-about-their-freedom/615724/

[https://web.archive.org/web/20200904032437/https://www.theatlantic.com/id

eas/archive/2020/09/academics-are-really-really-worried-about-their-

freedom/615724/].

p.  Even the expurgated use of the "n-word" can be construed as demonstrating

racial hostility and denigrating on the basis of race. In 2021, the Dean of the

Illinois Chicago John Marshall Law School condemned a civil procedure

professor who used that expurgation on his final exam, and ordered an investigation based on the exam question. Eugene Volokh, *The Law School Acknowledges That the Racial and Gender References on the Examination Were Deeply Offensive*, THE VOLOKH CONSPIRACY (Jan. 15, 2021, 7:05 PM), https://reason.com/volokh/2021/01/15/tenured-law-prof-apparently-suspended-for-racial-harassment-lawsuit-problem-on-a-civil-procedure-exam/ [https://web.archive.org/web/20210727075401/https://reason.com/volokh/2021/01/15/tenured-law-prof-apparently-suspended-for-racial-harassment-lawsuit-problem-on-a-civil-procedure-exam/].

q. In the wake of the killing of George Floyd, dozens of people lost their jobs or suffered other negative repercussions for words or conduct perceived to display racial hostility or aversion. *List of People Canceled in Post-George-Floyd Antiracism Purges*, FUTURE OF CAPITALISM, (Jun. 11, 2020, 10:46 PM) (chronicling accounts of more than thirty individuals by the time this complaint was filed), https://www.futureofcapitalism.com/2020/06/list-of-people-canceled-in-post-george-floyd [https://web.archive.org/web/20200804095555/https://www.futureofcapitalism.com/2020/06/list-of-people-canceled-in-post-george-floyd].

r. For example, members of a data analysts' listserv labeled David Shor, a progressive data analyst, a racist and expelled him after he shared a study which argued that violent protests are not as effective as non-violent ones. He subsequently lost his job. Jonathan Chait, *An Elite Progressive LISTSERV Melts Down Over a Bogus Racism Charge*, NEW YORK INTELLIGENCER (Jun. 23, 2020), https://nymag.com/intelligencer/2020/06/white-fragility-racism-racism-progressive-progressphiles-david-shor.html [https://web.archive.org/web/20200724164256/https://nymag.com/intelligence

r/2020/06/white-fragility-racism-racism-progressive-progressphiles-david-shor.html].

s. Employees at the San Francisco Museum of Modern Act labeled as a racist and ousted a longtime museum curator because he had said that shunning white artists would be impermissible "reverse discrimination." Robby Soave, *Museum Curator Resigns After He is Accused of Racism for Saying He Would Still Collect Art From White Men*, REASON (Jul. 14, 2020, 1:35 PM), https://reason.com/2020/07/14/gary-garrels-san-francisco-museum-modern-art-racism/ [https://web.archive.org/web/20200724171511/https://reason.com/2020/07/14/gary-garrels-san-francisco-museum-modern-art-racism/].

114. Attorney commentators, academics, and members of the public routinely accuse Supreme Court Justices and sitting judges of manifesting hostility or aversion on the bases listed in 8.4(g).

a. Justice Scalia's discussion of "mismatch" theory during oral argument in *Fisher v. Univ. of Texas*, 136 S. Ct. 2198 (2016) led numerous commentators, including the current New York Attorney General, to accuse him of racism. *See, e.g.*, Stephen Dinan, *Scalia Accused of Embracing 'Racist' Ideas for Suggesting 'Lesser' Schools for Blacks*, WASH. TIMES (Dec. 10, 2015), http://www.washingtontimes.com/news/2015/dec/10/antonin-scaliaaccused-of-embracing-racist-ideas-f/ [https://perma.cc/V6CX-DWHY]; Lauren French, Pelosi: *Scalia Should Recuse Himself from Discrimination Cases*, POLITICO (Dec. 11, 2015, 12:56 PM), http://www.politico.com/story/2015/12/nancy-pelosi-antonin-scalia-216680 [https://perma.cc/BCL5-VGWY]; Joe Patrice, *Scientists Agree: Justice Scalia Is a Racist Idiot*, ABOVE THE LAW (Dec. 14, 2015, 9:58 AM), http://abovethelaw.com/2015/12/scientists-agree-justice-scalia-is-a-racist-idiot/ [https://perma.cc/9GA8-2NGT]; David Savage, *Justice*

*Scalia Under Fire for Race Comments During Affirmative Action Argument*, L.A. TIMES (Dec. 10, 2015, 2:40 PM), http://www.latimes.com/nation/la-na-scalia-race-20151210-story.html [https://perma.cc/U3T2-CBAE]; Debra Cassens Weiss, *Was Scalia's Comment Racist?*, A.B.A. J. (Dec. 10, 2015, 7:32 AM), http://www.abajournal.com/news/article/was_scalias_comment_racist_some_contend_blacks_may_do_better_at_slower_trac/ [https://perma.cc/G7DH-U5H3]. A true and correct copy of Public Advocate Letitia James, FACEBOOK (Dec. 11, 2015), https://www.facebook.com/PALetitiaJames/posts/the-racist-remarks-made-by-supreme-court-justice-antonin-scalia-are-unacceptable/1630528300533740/, is found at Dkt. 23-3.

b.  A writer for Advocate magazine characterized Justice Clarence Thomas as "homophobic" based upon opinions and dissents that he has penned. *See* Trudy Ring, *Homophobic Justice Clarence Thomas Ill, May Miss LGBTQ Rights Cases*, ADVOCATE, (Oct. 7, 2019, 1:02 PM), https://www.advocate.com/news/2019/10/07/homophobic-justice-clarence-thomas-ill-may-miss-lgbtq-rights-cases [https://web.archive.org/web/20191208082732/https://www.advocate.com/news/2019/10/07/homophobic-justice-clarence-thomas-ill-may-miss-lgbtq-rights-cases].

c.  Attorney and senior legal correspondent at Vox, Ian Millhiser, maligned Justice Samuel Alito as having manifested a "jurisprudence of white racial innocence." *See* Ian Millhiser, *Justice Alito's Jurisprudence of White Racial Innocence*, VOX, (Jun. 23, 2020, 9:26 AM), https://www.vox.com/2020/4/23/21228636/alito-racism-ramos-louisiana-unanimous-jury

[https://web.archive.org/web/20200702011327/https://www.vox.com/2020/4/
23/21228636/alito-racism-ramos-louisiana-unanimous-jury].

d. Attorney and legal correspondent for Slate, Mark Joseph Stern alleged that
   Justice Neil Gorsuch "affirmed a chauvinistic view of women" through "sexist"
   comments he made while teaching at the University of Colorado Law School.
   *See* Mark Joseph Stern, *Why Gorsuch's Alleged Sexist Classroom Comments
   Are So Troubling—And Revealing*, SLATE, (Mar. 20, 2017, 3:07 PM),
   https://slate.com/human-interest/2017/03/gorsuchs-sexist-classroom-
   comments-are-troubling-and-revealing.html
   [https://web.archive.org/web/20190510052004/https://slate.com/human-
   interest/2017/03/gorsuchs-sexist-classroom-comments-are-troubling-and-
   revealing.html].

e. Attorney and longtime union lawyer Andrew Strom accused Justice Brett
   Kavanaugh of authoring an opinion that peddles "class prejudice." Andrew
   Strom, *Brett Kavanaugh, "Common Sense," and Class Prejudice,* ONLABOR,
   (Jul. 12, 2018), https://www.onlabor.org/brett-kavanaugh-common-sense-and-
   class-prejudice/
   [https://web.archive.org/web/20190807113628/https://www.onlabor.org/brett-
   kavanaugh-common-sense-and-class-prejudice/].

f. Justice Roberts has not escaped criticism either. A professor of law at the
   University of Michigan, Leah Litman, writing together with a professor of law
   at Northwestern University, Tonya Jacobi, denounced the Chief Justice for
   manifesting "gendered and ideological" discrimination in his superintendent
   role at Supreme Court oral arguments. Leah Litman & Tonja Jacobi, *Does John
   Roberts Need to Check His Own Biases?*, N.Y. TIMES, (Jun. 2, 2020),
   https://www.nytimes.com/2020/06/02/opinion/john-roberts-supreme-
   court.html

[https://web.archive.org/web/20200603105342/https://www.nytimes.com/2020/06/02/opinion/john-roberts-supreme-court.html]. Attorney and commentator at Above the Law, Elie Mystal, opined that "Roberts has consistently shown himself to be a deep racist—albeit one who draws less attention than his cross-burning brethren." Elie Mystal, *The Racism of Chief Justice John Roberts Is About To Be Fully Unleashed*, ABOVE THE LAW, (Jun. 28, 2018, 2:01 PM), https://abovethelaw.com/2018/06/the-racism-of-chief-justice-john-roberts-is-about-to-be-fully-unleashed/ [https://perma.cc/5VH4-CEWF].

g.  After Justice Kennedy's retirement, a professor of law at UC Berkeley, Russell Robinson derided the entire body of his jurisprudence as having "privileged the interests and perspectives of white, heterosexual Christians and ultimately harmed a wide swath of sexual, racial, and religious minorities." Russell K. Robinson, *Justice Kennedy's White Nationalism*, 53 U.C. DAVIS L. REV. 1027, 1028 (2019). The same article called on its readers "to probe judicial claims of neutrality—such as Chief Justice Roberts' claim that 'we do not have Obama or Trump judges,' because they may cloak unseemly power dynamics, including a white nationalist agenda." *Id.* at 1037.

h.  When Justices Alito, Gorsuch, Kavanaugh, Roberts and Thomas together denied, in *Dunn v. Ray*, 139 S. Ct. 661 (2019), a stay of execution to a prisoner who had made a last-minute request for an imam in the execution chamber, some commentators condemned them as harboring anti-Muslim hostility. *See, e.g.* Robert Barnes, *Supreme Court's Execution Decision Animates Critics on the Left and Right*, WASHINGTON POST, (Feb. 11, 2019, 5:08 PM), https://www.washingtonpost.com/world/national-security/supreme-courts-execution-decision-animates-critics-on-the-left-and-right/2019/02/11/72da5ed8-2e3a-11e9-813a-0ab2f17e305b_story.html [https://web.archive.org/web/20190226103751/https://www.washingtonpost.c

om/world/national-security/supreme-courts-execution-decision-animates-critics-on-the-left-and-right/2019/02/11/72da5ed8-2e3a-11e9-813a-0ab2f17e305b_story.html]; Luke Goodrich, *No Anti-Muslim Bias at Supreme Court: Constitution, Argued Properly, Protects All Religions*, THE HILL, (Apr. 5, 2019, 2:30 PM), https://thehill.com/opinion/judiciary/437575-no-anti-muslim-bias-at-supreme-court-constitution-argued-properly-protects [https://web.archive.org/web/20190712165937/https://thehill.com/opinion/judiciary/437575-no-anti-muslim-bias-at-supreme-court-constitution-argued-properly-protects].

i. When late Justice Ginsburg referred to Colin Kaepernick's National Anthem protests as "dumb and disrespectful," many media outlets criticized her view as borderline prejudiced if not explicitly manifesting racial hostility. *See* Dave Zirin, *Ruth Bader Ginsburg Could Not Be More Wrong About Colin Kaepernick*, THE NATION, (Oct. 12, 2016), https://www.thenation.com/article/archive/ruth-bader-ginsburg-could-not-be-more-wrong-about-colin-kaepernick/ [https://web.archive.org/web/20200731232043/https://www.thenation.com/article/archive/ruth-bader-ginsburg-could-not-be-more-wrong-about-colin-kaepernick/]; Sam Fulwood III, *Say It Ain't So, Ruth Bader Ginsburg*, CENTER FOR AMERICAN PROGRESS, (Oct. 14, 2016, 11:56 AM), https://www.americanprogress.org/issues/race/news/2016/10/14/146171/say-it-aint-so-ruth-bader-ginsburg/ [https://web.archive.org/web/20200716164625/https://www.americanprogress.org/issues/race/news/2016/10/14/146171/say-it-aint-so-ruth-bader-ginsburg/].

j. When Justice Amy Coney Barrett used the term "sexual preference" at her confirmation hearing, several commentators, including Hawaii Senator Mazie Hirono (a law graduate of Georgetown University Law Center) and Lambda

Legal, accused her of making a homophobic slur. Justice Ginsburg used identical language. John Riley, *Senator Mazie Hirono: Amy Coney Barrett is a "danger to us on so many fronts*," METRO WEEKLY (Oct. 14, 2020), https://www.metroweekly.com/2020/10/senator-mazie-hirono-amy-coney-barrett-is-a-danger-to-us-on-so-many-fronts/ [https://web.archive.org/web/20201018032014/https://www.metroweekly.com/2020/10/senator-mazie-hirono-amy-coney-barrett-is-a-danger-to-us-on-so-many-fronts/]; Aldous J. Pennyfarthing, *Pete Buttigieg Slaps Back at Amy Coney Barrett's Not-so-subtle Homophobic Slur*, DAILY KOS (Oct. 13, 2020, 5:20 PM), https://www.dailykos.com/stories/2020/10/13/1986241/-Pete-Buttigieg-slaps-back-at-Amy-Coney-Barrett-s-not-so-subtle-homophobic-slur [https://web.archive.org/web/20201014184710/https://www.dailykos.com/stories/2020/10/13/1986241/-Pete-Buttigieg-slaps-back-at-Amy-Coney-Barrett-s-not-so-subtle-homophobic-slur]; Li Zhou, *Amy Coney Barrett used an offensive term while talking about LGBTQ rights. Her apology was telling.*, VOX (Oct. 13, 2020, 9:10 PM), https://www.vox.com/2020/10/13/21515169/amy-coney-barrett-supreme-court-confirmation [https://web.archive.org/web/20201014030222/https://www.vox.com/2020/10/13/21515169/amy-coney-barrett-supreme-court-confirmation]; Hank Berrien, *Dems Attack Coney Barrett For Saying 'Sexual Preference.' Look At All The Dems, Plus Bader Ginsburg, Who Said 'Sexual Preference'*, DAILY WIRE (Oct. 14, 2020), https://editorial.dailywire.com/news/dems-attack-coney-barrett-for-saying-sexual-preference-look-at-all-the-dems-plus-bader-ginsburg-who-said-sexual-preference/ [https://web.archive.org/web/20201021133748/https://editorial.dailywire.com/news/dems-attack-coney-barrett-for-saying-sexual-preference-look-at-all-the-dems-plus-bader-ginsburg-who-said-sexual-preference/]

115.    A leading LGBTQ+ advocacy group issued a report accusing "nearly 40 percent of federal judges that Trump has appointed to the courts of appeals" of having "a demonstrated history of hostility towards the LGBTQ+ community," often on the basis of advocacy for free expression, free association, or free exercise rights. Lambda Legal, COURTS, CONFIRMATIONS, & CONSEQUENCES: HOW TRUMP RESTRUCTURED THE FEDERAL JUDICIARY AND USHERED IN A CLIMATE OF UNPRECEDENTED HOSTILITY TOWARD LGBTQ+ PEOPLE AND CIVIL RIGHTS 1 (Jan. 2021), *available at* https://www.lambdalegal.org/sites/default/files/judicial_report_2020.pdf [https://web.archive.org/web/20210128091708/https://www.lambdalegal.org/sites/default/files/judicial_report_2020.pdf].

116.    On Twitter, Senator Ed Markey stated on October 26, 2020, "Originalism is racist. Originalism is sexist. Originalism is homophobic. Originalism is just a fancy word for discrimination." Markey's tweet received more than 20,000 "likes." Ed Markey (@SenMarkey), TWITTER (Oct 26, 2020, 3:22 PM), https://twitter.com/SenMarkey/status/1320808025393868800 [https://web.archive.org/web/20201030165054/https://twitter.com/SenMarkey/status/1320808025393868800]; Thomas Barrabi, *Markey blasts Barrett's judicial philosophy: 'Originalism is just a fancy word for discrimination'*, FOX NEWS (Oct. 26, 2020) https://www.foxnews.com/politics/markey-amy-coney-barrett-originalism-supreme-court [https://web.archive.org/web/20201027110546/https://www.foxnews.com/politics/markey-amy-coney-barrett-originalism-supreme-court].

117.    Similarly, on Twitter, in early 2021, social media users commonly referred to the U.S. Senate's 60-vote filibuster procedure as a racist relic of the Jim Crow era. Sahil Kapur, (@sahilkapur), TWITTER (Jan. 21, 9:04 PM), https://twitter.com/sahilkapur/status/1352436928843558918 [https://web.archive.org/web/20210202170625/https://twitter.com/sahilkapur/status/1352436928843558918].

118.    In July 2020, former Pennsylvania Supreme Court Justice Cynthia Baldwin accused current Pennsylvania Supreme Court Chief Justice Thomas Saylor of bias for allegedly referring

to her "minority agenda" during a 2012 conversation with another judge. *Ex-justice levels bias accusation at state's chief justice*, AP NEWS (Jul. 24, 2020), https://apnews.com/article/pennsylvania-race-and-ethnicity-courts-0257a5d4e7e98fffd90c433d0bc3cbd5 [https://web.archive.org/web/20201031000836/https://apnews.com/article/pennsylvania-race-and-ethnicity-courts-0257a5d4e7e98fffd90c433d0bc3cbd5]; Craig R. McCoy, *Pa. Supreme Court chief justice complained about a Black justice and her 'minority agenda,' former judge says*, THE PHILADELPHIA INQUIRER (Jul. 23, 2020) https://www.inquirer.com/news/pa-chief-justice-thomas-saylor-cynthia-baldwin-minority-agenda-reprimand-20200723.html [https://web.archive.org/web/20200724011049/https://www.inquirer.com/news/pa-chief-justice-thomas-saylor-cynthia-baldwin-minority-agenda-reprimand-20200723.html].

119. In June 2021, the Supreme Court of South Carolina upheld professional discipline for an attorney who had made Facebook posts denigrating George Floyd in the wake of his murder and denigrating "college educated, liberal suburbanite" women who get tattoos. *In re Traywick*, 2021 WL 2492772, 2021 S.C. LEXIS 72, at *3-*4 (S.C. Jun. 18, 2021). South Carolina's Office of Disciplinary Counsel received 46 complaints about twelve postings in total. The South Carolina Supreme Court held that a six-month suspension from practice was warranted because the statements "were intended to incite, and had the effect of inciting, gender and race-based conflict." *Id.* at *4.

120. Greenberg will be forced to censor himself to steer clear of an ultimately unknown line so that his speech is not at risk of being incorrectly perceived as denigrating others or displaying hostility or aversion on the bases listed in 8.4(g).

121. Absent Rule 8.4(g), Greenberg would be able to speak and write freely without the fear of the risk of professional liability for offending the wrong observer.

122. Even if the Defendants were to attempt to assure Greenberg that his speeches and writings were permitted under 8.4(g), given the open-ended language of the Rule and its

34

comments, Greenberg would not feel comfortable speaking freely and would still reasonably fear professional liability.

## CAUSES OF ACTION

### Claim I: Unconstitutional infringement of free speech

123.    Greenberg reasserts and realleges paragraphs 1 through 122 as if fully set forth therein.

124.    According to the First Amendment to the United States Constitution, "Congress shall make no law…abridging the freedom of speech."

125.    The First Amendment has been incorporated to apply to the states through the Fourteenth Amendment.

126.    Greenberg's speech, as described above in paragraphs 14-34, 81-104 is fully protected by the First Amendment.

127.    Rule 8.4(g) chills such speech and, on the basis of content and viewpoint of the speech, imposes professional liability in contravention of the First Amendment.

128.    Rule 8.4(g) is overly extensive and unduly burdensome.

129.    Rule 8.4(g) does not serve a compelling interest.

130.    Rule 8.4(g) is not appropriately tailored to any government interest.

131.    Rule 8.4(g) invites arbitrary, subjective, and viewpoint discriminatory enforcement.

132.    To the extent that Rule 8.4(g) is constitutional in any of its applications, it is nonetheless substantially overbroad in relation to any legitimate sweep and is facially unconstitutional for that reason.

133.    Rule 8.4(g) is even more broad than Pennsylvania's non-binding Code of Civility which advises lawyers to "refrain from acting upon or manifesting racial, gender or other bias or prejudice toward any participant in the legal process."

134.    On its face and as applied to speech like Greenberg's, Rule 8.4(g) violates the right to free speech guaranteed by the First Amendment.

135.    Unless Defendants are enjoined from enforcing and adjudicating Rule 8.4(g), Greenberg will suffer irreparable harm.

### Claim II: Unconstitutional vagueness

136.    Greenberg reasserts and realleges paragraphs 1 through 135 as if fully set forth therein.

137.    The Fourteenth Amendment provides in relevant part that "…nor shall any State deprive any person of life, liberty, or property, without due process of law."

138.    Disciplinary enforcement proceedings deprive respondent-attorneys of liberty and property.

139.    Due Process requires that people of ordinary intelligence be able to understand what conduct a given rule prohibits.

140.    Rules, statutes, or laws that fail to provide this fair notice are void for vagueness.

141.    Rules, statutes, or laws that authorize or even encourage discriminatory enforcement are void for vagueness.

142.    Laws implicating and jeopardizing First Amendment rights are required to be especially precise.

143.    People of ordinary intelligence cannot understand what Rule 8.4(g) prohibits.

144.    Greenberg cannot understand what Rule 8.4(g) prohibits.

145.    Rule 8.4(g) does not provide fair notice of what it prohibits.

146.    Rule 8.4(g) authorizes and encourages discriminatory enforcement.

147.    Rule 8.4(g) chills First Amendment protected speech and thus requires a more stringent review for vagueness.

148.    Rule 8.4(g)'s use of the phrase "engage in conduct constituting harassment or discrimination" is unconstitutionally vague.

149.    Rule 8.4(g)'s use of the phrase "conduct that is intended to intimidate, denigrate or show hostility or aversion toward a person on any of the bases listed in paragraph (g)" is unconstitutionally vague.

150.     Rule 8.4(g)'s use of the phrase "manifests an intention…to treat a person as inferior" is unconstitutionally vague.

151.     Rule 8.4(g)'s use of the phrase "manifests an intention… to disregard relevant considerations of individual characteristics or merit because of one or more of the listed characteristics" is unconstitutionally vague.

152.     Rule 8.4(g)'s use of the phrase "advice or advocacy consistent with these Rules" is unconstitutionally vague.

153.     Comment 4 to Rule 8.4(g) is unconstitutionally vague.

154.     Comment 5 to Rule 8.4(g) is unconstitutionally vague.

155.     Rule 8.4(g) violates the Due Process Clause of the Fourteenth Amendment and so is void for vagueness.

156.     The vagueness of Rule 8.4(g) chills protected speech and thereby also violates the First Amendment.

157.     Unless Defendants are enjoined from enforcing and adjudicating Rule 8.4(g), Greenberg will suffer irreparable harm.

**REQUEST FOR RELIEF**

Therefore, Greenberg respectfully requests the following relief:

A.  A declaratory judgment that Rule 8.4(g) facially violates the First and Fourteenth Amendments to the United States Constitution.

B.  A permanent injunction prohibiting Defendants and their agents from enforcing Rule 8.4(g) en toto.

C.  An award of attorneys' fees, costs, and expenses in this action; and

D.  Any other legal or equitable relief to which Greenberg may show himself to be justly entitled.

Dated: August 19, 2021                    Respectfully submitted,

                                          /s/ Adam E. Schulman
                                          Adam E. Schulman (PA Bar No. 309749)
                                          HAMILTON LINCOLN LAW INSTITUTE
                                          1629 K Street NW, Suite 300
                                          Washington, DC 20006
                                          adam.schulman@hlli.org
                                          (610) 457-0856

                                          *Attorney for Plaintiff Zachary Greenberg*

**VERIFICATION**


Pursuant to 28 U.S.C. § 1746, I, Zachary Greenberg have personal knowledge of the matters alleged in the foregoing Verified Complaint concerning myself, my activities and my intentions. I verify under the penalty of perjury that the statements made therein are true and correct.


Executed on August __18_, 2021


_____

Zachary Greenberg

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I filed the foregoing with the Clerk of the Court via ECF thus effectuating service on all counsel who are registered as electronic filers in this case.

DATED: August 19, 2021

_(s) Adam Schulman_

Adam Schulman