**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ZACHARY GREENBERG,<br><br>      *Plaintiff*,<br><br>      v.<br><br>JOHN P. GOODRICH, in his official capacity as Board Chair of The Disciplinary Board of the Supreme Court of Pennsylvania, *et al.*<br><br>      *Defendants*. | No. 2:20-cv-03822-CFK |

**SUPPLEMENTAL DECLARATION OF ZACHARY GREENBERG IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I, Zachary Greenberg, declare as follows:

1. I have personal knowledge of the facts set forth herein and, if called as a witness, could testify competently thereto.

2. I am the plaintiff in this action.

3. Authorities from Alaska, Arkansas, Idaho, Louisiana, Montana, South Carolina, and Texas, Montana have stated their belief that Model Rule 8.4(g) would infringe the First Amendment.

## My future plans

4. As discussed in the parties' joint stipulation (Dkt. 53), I have spoken at multiple CLE events, on a variety of controversial legal issues, including the constitutionality of hate speech regulation, campaign finance speech restrictions, university regulation of hateful expression online, and attorney free speech rights.

5. In addition to those speaking engagements, I also routinely speak non-CLE events on the above topics as well as Title IX's effect on the Due Process rights of individuals accused of sexual assault, university policies on fraternity and sorority misconduct, professorial academic freedom, religious freedom on campus, and abusive public records requests.

6. I have spoken to attorneys, university legal counsels, college administrators, students, parents, and alumni on these legal topics related to FIRE work and the First Amendment.

7. I have presented educational seminars to college administrators and legal counsels on reforming university policies that I believe violate student free speech rights, and the legal ramifications of failing to do so.

8. In 2019, I spoke to the American Association of University Professors chapter at La Salle University in Philadelphia, Pennsylvania, on the legal limits of a university's power to punish professors for expression, teaching, and research deemed offensive, prejudiced and hateful.

9. In a virtual educational seminar in 2019, I spoke to university administrations and legal counsels on his interpretation of the legal limits of a university's power to punish students and student groups for expression deemed offensive, prejudiced and hateful.

10. I have written and spoken against banning hate speech on university campuses

11. I have written and spoken against university regulation of hateful online expression protected by First Amendment standards, and in those writings and speeches, have defended the rights of professors, students, and student groups to engage in hateful expression protected by First Amendment standards.

12. I have written and spoken in favor of plenary Due Process protections for college students accused of sexual misconduct.

13. I have written and spoken in favor of the First Amendment right to participate in political speech through making monetary contributions to political organizations and candidates.

14. I have written and spoken in favor of allowing religious speech on college campuses even when that speech espouses discriminatory views.

15. In the future, I intend and expect to offer written and spoken presentations at CLE events on any and all of these topics relating to my work at FIRE, including topics that I have only previously written and spoken about outside the CLE context.

**My perception of the public climate**

16. A 2017 study from Cato Institute on Free Speech and Tolerance in America, which surveyed 2,300 members of the public of majority age, found that 43% agreed with the statement "Supporting someone's right to say racist things is as bad as holding racist views yourself."

17. A true and correct copy of the report of findings on this survey is found at Dkt. 23-1.

18. I believe that opposing hate speech bans and regulation is a controversial position that some people view as denigrating, or showing the same hostility or aversion toward minority groups as hate speech itself.

19. FIRE's 2018 Student Attitudes Due Process Survey, which surveyed 2,225 undergraduate students who attended a two- or four-year education institution in the United States, showed that a smaller percentage of respondents supported due process protections for those of accused of "sexual misconduct" offenses rather than for those who are accused of "underage drinking" or generally accused of "breaking a campus rule." Student Attitudes Due Process Survey, FIRE, https://www.thefire.org/research/publications/student-surveys/student-attitudes-due-process-survey/student-attitudes-due-process-survey-full-text/ [https://web.archive.org/web/20200921042004/https://www.thefire.org/research/publications/student-surveys/student-attitudes-due-process-survey/student-attitudes-due-process-survey-full-text/].

20. When the U.S. Department of Education proposed reforms to Title IX guidance to provide the sort of due process protections I have supported, the National Women's Law Center sued to stop the Final Rule, and, in a June 2020 statement, said that the decision on the guidance was "another attempt to deliberately silence survivors based on the sexist myth that they are liars." NWLC's June 2020 federal complaint in the District of Massachusetts, *Victim Rights Law Center v. DeVos*, No. 1:20-cv-1104, called the procedural rules and standards "biased" and "motivated by discriminatory sex-based stereotypes." Arpan Lobo, *Another group sues DeVos, DOE, over Title IX rules*, HOLLAND SENTINEL (JUN. 13, 2020, 12:01 PM), https://www.hollandsentinel.com/news/20200613/another-group-sues-devos-doe-over-title-ix-rules [https://web.archive.org/web/20200922211217/https://www.hollandsentinel.com/news/20200613/another-group-sues-devos-doe-over-title-ix-rules]; Complaint at 11, 13, *Victim Rights Law Center v. DeVos*, No. 1:20-cv-1104 (D. Mass. Jun. 10, 2020).

21. I believe that supporting Due Process protections for students accused of sexual misconduct is a controversial position that some people view as denigrating, or showing hostility or aversion toward women.

22. According to 2015 Stacked Deck Report by the think tank Demos, led by law professors and attorneys, our political system supporting the First Amendment right to participate in political speech through making monetary contributions to political organizations and candidates contains an "economic bias" that "creates and sustains similar racial bias because the donor class as a whole and campaign contributors are overwhelmingly white; and because the policy preferences of people of color are much more similar to those of the rest of the general public than to those of the rich." Adam Lioz, *Stacked Deck: How the Racial Bias in Our Big Money Political System Undermines Our Democracy and Our Economy*, DEMOS (Dec. 14, 2015), https://www.demos.org/sites/default/files/publications/StackedDeck2_1.pdf [https://web.archive.org/web/20200810050042/https://www.demos.org/sites/default/files/publications/StackedDeck2_1.pdf].

23. I believe that supporting the First Amendment right to participate in political speech through making monetary contributions to political organizations and candidates is a controversial position that some people view as displaying race and class-based hostility and perpetuating race and class-based discrimination in the political system.

24. According to findings from the Cato Institute's 2017 Free Speech and Tolerance Survey, 48% of Democratic respondents and 36% of all respondents said that they would favor "a law that would make it illegal to say offensive or insulting things in public about…Gays, lesbians, and transgender people." *See* Dkt. 23-1.

25. I believe that advocating for the right of people to express intolerant religious views is a controversial position that some people would view as manifesting bias on the basis of gender identity, gender expression, sexual orientation and marital status.

26. According to a 2019 Brennan Center for Justice explainer, "the most troubling result of Citizens United" is that "the decision has helped reinforce the growing sense that our democracy primarily serves the interests of the wealthy few, and that democratic participation for the vast majority of citizens is of relatively little value." The explainer also states that "an election

system that is skewed heavily toward wealthy donors also sustains racial bias and reinforces the racial wealth gap." Tim Lau, *Citizens United Explained*, BRENNAN CENTER FOR JUSTICE (Dec. 12, 2019), https://www.brennancenter.org/our-work/research-reports/citizens-united-explained [https://web.archive.org/web/20201008123523/https://www.brennancenter.org/our-work/research-reports/citizens-united-explained].

27. I believe that *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) is a controversial decision that some view as displaying race and class-based hostility and perpetuating race and class-based discrimination in the political system..

28. Some audience members at my speaking engagements and some members of society at large consider the topics I cover, and many of the examples I use to illustrate my points, to be biased, prejudiced, denigrating, hostile, offensive, and hateful.

29. I believe it would be nearly impossible to discuss United States First Amendment jurisprudence, such as by accurately citing and quoting from the above First Amendment cases, without engaging in speech that at least some members of my audience will perceive as biased, prejudiced, denigrating, hostile, offensive, and hateful.

30. I believe that every one of my speaking engagements on First Amendment issues carries the risk that an audience member may file a disciplinary complaint against me based on the content of my presentation under Rule 8.4(g).

31. Considering the amount of time and money I have devoted to attaining my Pennsylvania license to practice law, I am unwilling to take this risk, and will refrain from conducting speaking engagements on controversial issues as a result.

32. My self-censorship will extend to excluding, limiting, and sanitizing the examples used in my speaking engagements to illustrate my points, in order to reduce the risk of an audience member reporting my expression to the ODC.

33. I do not wish to be subjected to a disciplinary investigation by ODC.

34. I do not wish to be subjected to a disciplinary proceeding in front of the Board.

35. I do not wish to be subjected to disciplinary sanctions by ODC or the Board.

36. I believe that a disciplinary investigation would potentially harm my professional reputation, available job opportunities, and speaking opportunities.

37. I believe that disciplinary proceedings would potentially harm my professional reputation, available job opportunities, and speaking opportunities.

38. I believe that a disciplinary sanction would potentially harm my professional reputation, available job opportunities, and speaking opportunities.

39. I fear that my written and oral CLE presentations could be misconstrued by readers and listeners, and Commonwealth officials within the Board or ODC, as violating Rule 8.4(g).

40. I fear that activists will attempt to use Rule 8.4(g) and the disciplinary complaint process to punish me for my speech in support of political positions they disagree with in the hopes of chilling other opponents from participating in the political debate.

41. I will censor myself to steer clear of speech that could be incorrectly perceived as denigrating others or displaying hostility or aversion on the bases listed in 8.4(g).

42. Absent 8.4(g), I would be unafraid to speak and write freely without fear of the risk of professional liability for offending the wrong observer.

43. Even if the Defendants were to attempt to assure me that my speech and writings were permitted under Rule 8.4(g), I would still not feel comfortable speaking freely and would still fear professional liability because of the language of the Rule and its accompanying comments.

### Public accusations of hostility, harassment, and prejudice

44. In 2013 Judge Edith Jones gave a speech about the death penalty at the University of Pennsylvania Law School Federalist Society where she made the empirical observation that members of some racial groups commit crime at rates disproportionate to their population.

45. Organizations, activists, and law professors, supported by the affidavits of five University of Pennsylvania Law students and one attorney who attended the lecture and by the

affidavits of two attorneys who had not attended the lecture, filed an ethics complaint against Judge Jones for "racial bias" on the basis of her speech. When, after appointing a law professor to investigate, a three-judge Special Committee of the D.C. Circuit rejected the complaint in a 71-page single-spaced report, the complainants filed a Petition for Review to the Judicial Conference of the United States, which affirmed. The entire process subjected Judge Jones to extensive adverse publicity and investigation for nearly two years. =*See*' *In re Complaint of Judicial Midsconduct*, C.C.D. No. 14-01 (Committee on Judicial Conduct and Disability of the Judicial Conference of the United States Feb. 19, 2015), *opinion available at* http://www.ca5.uscourts.gov/docs/default-source/judicial-council-orders/resolution-of-judicial-misconduct-complaint-against-circuit-judge-edith-h-jones.pdf [https://web.archive.org/web/20200524121449/http://www.ca5.uscourts.gov/docs/default-source/judicial-council-orders/resolution-of-judicial-misconduct-complaint-against-circuit-judge-edith-h-jones.pdf].

46. I am aware of articles in the Washington Post and Wall Street Journal that describe how in 2018, professor Amy Wax of University of Pennsylvania Law School made an empirical claim that black students scored lower than their counterparts in her first-year lecture class. Law student alumni created a petition condemning her "racial hostility and intimidation." Wax agreed to be barred from teaching first-year courses. Derek Hawkins, *Penn Law professor who said black students are 'rarely' in top half of class loses teaching duties*, WASH. POST (Mar. 15, 2018, 8:49 AM), https://www.washingtonpost.com/news/morning-mix/wp/2018/03/15/penn-law-professor-who-said-black-students-rarely-perform-well-loses-teaching-duties [https://web.archive.org/web/20200525000401/https://www.washingtonpost.com/news/morning-mix/wp/2018/03/15/penn-law-professor-who-said-black-students-rarely-perform-well-loses-teaching-duties/]; Paul S. Levy, *University Boardrooms Need Reform*, WALL ST. JOURNAL (Jun. 10, 2018, 1:36 PM), https://www.wsj.com/articles/university-boardrooms-need-reform-1528652211

[https://web.archive.org/web/20180718124838/https://www.wsj.com/articles/university-boardrooms-need-reform-1528652211].

47. In 2017, professor Amy Wax of University of Pennsylvania Law School co-wrote an op-ed in the Philadelphia Inquirer stating that "All cultures are not equal." Several dozen Pennsylvania Law faculty members signed a letter noting that, while Professor Wax's statements were protected by the First Amendment from legal sanction, they criticized them as falling short of an ideal of "respect[ing] one another without bias or stereotype." *Guest Column by 33 Penn Law faculty members/Open letter to the University of Pennsylvania community*, THE DAILY PENNSYLVANIAN (Aug. 30, 2017, 6:31 PM), https://www.thedp.com/article/2017/08/guest-column-by-33-penn-law-faculty-members-open-letter-to-the-university-of-pennsylvania-community [https://web.archive.org/web/20201018161933/https://www.thedp.com/article/2017/08/guest-column-by-33-penn-law-faculty-members-open-letter-to-the-university-of-pennsylvania-community].

48. I am aware of accounts in the New Yorker magazine and from FIRE of how, in 2015 Northwestern University professor Laura Kipnis wrote an essay in the Chronicle of Higher Education critical of the use of Title IX policies on sexual misconduct. In retaliation, two graduate students filed a Title IX complaint against professor Kipnis claiming that her essay created a "hostile environment," and then filed a second Title IX complaint against her when she wrote about the first Title IX complaint. While Professor Kipnis was eventually cleared of wrongdoing, she faced years of investigation and harassment at non-trivial costs to herself and her reputation. *See* Amended Complaint ¶113.c.

49. I am aware of an account in the magazine Quillette of how feminists and trans activists labeled an evolutionary biologist postdoctoral student at Penn State University, Colin Wright, a transphobe after he posted on social media in support of an established theory that societal factors are causally responsible for recent rises in gender dysphoria. Wright endured a

coordinated effort that attempted to inflict reputational and vocational harm on him because of his speech. *See* Amended Complaint ¶113.f.

50. In October of 2020, a group of students at Duke University School of Law authored an open letter requesting that their school disinvite a speaker, professor Helen Alvare, because Alvare's support for religious freedom accommodation laws and opposition to gay marriage reflected in amicus briefs she wrote reflected homophobic bias against LGBTQ students. *See* Amended Complaint ¶113.e.

51. A true and correct copy of this letter is foundat Dkt. 23-2.

52. I am aware of an account of an 2021 episode in which student groups at University of San Diego School of Law called for the termination of a professor, Tom Smith, who had authored a blog post critical of China's handling of Covid-19. The dean of the law school responded by condemning the denigrating language and instituting an investigation as to whether Smith violated the school's anti-harassment policies. *See* Amended Complaint ¶113.g.

53. Students, student groups and faculty members have leveled accusations of prejudice and bias against professors who mention certain hateful epithets, even when quoting text from legal opinions in a purely academic and pedagogical context, and such accusations have in some instances resulted in university discipline. *See* Randall Kennedy & Eugene Volokh, *The New Taboo: Quoting Epithets in the Classroom and Beyond*, 49 CAPITAL UNIV. L. REV. 1 (2021).

54. I am aware of an account in the legal blog Above The Law of how, in 2020, the University of California at Irvine Law School barred professor Carrie Menkel-Meadow from teaching first-year 1L classes "for the foreseeable future" after she used the n-word pedagogically in class; several law professors and deans at the school criticized her for "harm…to black students" and "condemn[ed]" her. *See* Amended Complaint ¶113.l.

55. The UCI Black Law Students Association, in a June 3, 2020, letter, said that professor Menkel-Meadow's use of the n-word "harms our Black colleagues and upholds white supremacy and institutionalized racism." *Reprinted at* UCI Professor Criticized for Saying the N

Word, REDDIT (Aug. 26, 2020, 7:58 PM), https://www.reddit.com/r/LawSchool/comments/ihahfj/uci_law_professor_criticized_for_saying_the_n_word/ [https://web.archive.org/web/20200829233034/https://www.reddit.com/r/LawSchool/comments/ihahfj/uci_law_professor_criticized_for_saying_the_n_word/].

56. I am aware of accounts in the Washington Post and Above the Law of how, in 2020, law students, law student associations, and faculty at Stanford Law School condemned professor Michael McConnell for quoting Patrick Henry's use of the n-word during a classroom lecture. *See* Amended Complaint ¶113.m.

57. I am aware of an account on Reason magazine's legal blog (the Volokh Conspiracy) of how, in 2020, Tim Boudeau, a tenured professor at Central Michigan University and chair of the CMU journalism department, lost his job for vocalizing the n-word while, as part of a media law class, accurately quoting from a leading Sixth Circuit decision invalidating college speech codes, *Dambrot v. Central Michigan University*, 55 F.3d 1177 (6th Cir. 1995). *See* Amended Complaint ¶113.n.

58. In 2020, the UCLA law school dean apologized for the offense caused when law professor Eugene Volokh quoted the n-word in discussing a case. *See* Amended Complaint ¶113.k.

59. In 2019, Emory Law professor Paul Zwier faced a termination hearing after using the n-word in discussion of a civil rights case in class. *See* Amended Complaint ¶113.j.

60. During the 2018-19 school year, Augsburg University suspended professor of history Phillip Adamo for using the n-word during a class discussion about a James Baldwin book in which the word appeared. *See* Amended Complaint¶113.i.

61. I am aware of an account of a 2021 incident, in which the Dean of the Illinois Chicago John Marshall Law School condemned a civil procedure professor who used the expurgation "n-word" on his final exam, and ordered an investigation based on the exam question.

*See* Amended Complaint ¶113.p. I conclude from this incident that some people construe even the expurgated use of the "n-word" to demonstrate racial hostility and denigrate on basis of race.

62. According to CATO's 2017 Free Speech and Tolerance Survey, many people consider defending the free speech rights of incendiary speakers to be as incendiary as the underlying speech itself. *See* Dkt. 23-1.

63. According to CATO's 2017 Free Speech and Tolerance Survey and FIRE's 2017 Student Attitudes Free Speech Survey, many people believe that the First Amendment should not protect hate speech. *See* Dkt. 23-1; Student Attitudes Free Speech Survey, FIRE, https://www.thefire.org/research/publications/student-surveys/student-attitudes-free-speech-survey/student-attitudes-free-speech-survey-full-text/ [https://web.archive.org/web/20200919100210/https://www.thefire.org/research/publications/student-surveys/student-attitudes-free-speech-survey/student-attitudes-free-speech-survey-full-text/].

64. In the wake of the killing of George Floyd, dozens of people lost their jobs or suffered other negative repercussions for words or conduct perceived to manifest racial bias or prejudice. *See* Amended Complaint ¶113.q.

65. According to an article in The Atlantic, a group of students reported another professor to his superiors for assigning a book with a gay slur in the title. *See* Amended Complaint ¶113.o.

66. I am aware of an account in New York Magazine of how members of a data analysts' listserv labeled David Shor, a progressive data analyst, as a racist and expelled him after he shared a study which argued that violent protests are not as effective as non-violent ones. He subsequently lost his job. *See* Amended Complaint ¶113.r.

67. I am aware of an account in a Reason magazine blogpost of how employees at the San Francisco Museum of Modern Act labeled as a racist and ousted a longtime museum curator

because he had said that shunning white artists would be impermissible "reverse discrimination." *See* Amended Complaint ¶113.s.

68. Attorney commentators, academics, and members of the public routinely accuse Supreme Court Justices and sitting judges of manifesting prejudice or bias.

69. Justice Antonin Scalia's discussion of "mismatch" theory during oral argument in *Fisher v. Univ. of Texas*, 136 S. Ct. 2198 (2016) led numerous commentators, including the current New York Attorney General, Letitia James, to accuse him of racism. *See* Amended Complaint ¶114.a.

70. A true and correct copy of Public Advocate Letitia James, FACEBOOK (Dec. 11, 2015), https://www.facebook.com/PALetitiaJames/posts/the-racist-remarks-made-by-supreme-court-justice-antonin-scalia-are-unacceptable/1630528300533740/, is found at Dkt. 23-3.

71. A writer for the Advocate magazine characterized Justice Clarence Thomas as "homophobic" based upon opinions and dissents that he has penned. *See* Amended Complaint ¶114.b.

72. Attorney and senior legal correspondent at Vox, Ian Millhiser, maligned Justice Samuel Alito as having manifested a "jurisprudence of white racial innocence." *See* Amended Complaint ¶114.c.

73. Attorney and legal correspondent for Slate, Mark Joseph Stern alleged that Justice Neil Gorsuch "affirmed a chauvinistic view of women" through "sexist" comments he made while teaching at the University of Colorado Law School. *See* Amended Complaint ¶114.d.

74. Attorney and longtime union lawyer Andrew Strom accused Justice Brett Kavanaugh of authoring an opinion that peddles "class prejudice." *See* Amended Complaint ¶114.e.

75. Chief Justice John Roberts has not escaped criticism either. A professor of law at the University of Michigan, Leah Litman, writing together with a professor of law at Northwestern University, Tonya Jacobi, denounced the Chief Justice for manifesting "gendered and ideological"

biases in his superintendent role at Supreme Court oral arguments. *See* Amended Complaint ¶114.f.

76. Attorney and commentator at Above the Law, Elie Mystal, opined that "Roberts has consistently shown himself to be a deep racist—albeit one who draws less attention than his cross-burning brethren." *See* Amended Complaint ¶114.f.

77. After Justice Anthony Kennedy's retirement, a professor of law at UC Berkeley, Russell Robinson derided the entire body of Justice Kennedy's jurisprudence as having "privileged the interests and perspectives of white, heterosexual Christians and ultimately harmed a wide swath of sexual, racial, and religious minorities." *See* Amended Complaint ¶114.g.

78. The same article called on its readers "to probe judicial claims of neutrality—such as Chief Justice Roberts' claim that 'we do not have Obama or Trump judges,' because they may cloak unseemly power dynamics, including a white nationalist agenda." *See* Amended Complaint ¶114.g.

79. When Justices Alito, Gorsuch, Kavanaugh, Roberts and Thomas together denied, in *Dunn v. Ray*, 139 S. Ct. 661 (2019), a stay of execution to a prisoner who had made a last-minute request for an imam in the execution chamber, some commentators condemned them as harboring anti-Muslim prejudice. *See* Amended Complaint ¶114.h.

80. When Justice Ginsburg referred to Colin Kaepernick's National Anthem protests as "dumb and disrespectful," many media outlets criticized her view as borderline prejudiced if not explicitly manifesting racial bias. *See* Amended Complaint ¶114.i.

81. When Judge Amy Coney Barrett used the term "sexual preference" at her confirmation hearing, several commentators, including Hawaii Senator Mazie Hirono (a law graduate of Georgetown University Law Center) and Lambda Legal, accused her of making a homophobic slur. Justice Ginsburg used identical language. *See* Amended Complaint ¶114.j.

82. In 2021, a leading LGBTQ+ advocacy group issued a report accusing "nearly 40 percent of federal judges that Trump has appointed to the courts of appeals" of having "a

demonstrated history of hostility towards the LGBTQ+ community," often on the basis of advocacy for free expression, free association, or free exercise rights. *See* Amended Complaint ¶115.

83. In 2021, an LGBTQ+ advocacy group at Duke University Law School accused Eighth Circuit Judge David Stras of "spreading a discriminatory message" when he advocated for an absolutist view of the First Amendment, a view born from his grandparents' experience in the Holocaust. According to an account of his presentation at Duke, a law student stood up to interject and share her view on behalf of the group that they considered any comparison between free-speech-abridging anti-discrimination laws and Nazi laws to be "abhorrent" and "blatant homophobia." Josh Blackman, *Judge David Stras Was Protested At Duke Law School* THE VOLOKH CONSPIRACY (Sept. 30, 2021, 5:06 PM), https://reason.com/volokh/2021/09/30/judge-david-stras-was-protested-at-duke-law-school/ [https://web.archive.org/web/20211001011451/https://reason.com/volokh/2021/09/30/judge-david-stras-was-protested-at-duke-law-school/].

84. On Twitter, Senator Ed Markey stated on October 26, 2020, "Originalism is racist. Originalism is sexist. Originalism is homophobic. Originalism is just a fancy word for discrimination." Markey's tweet received more than 20,000 "likes." *See* Amended Complaint ¶116.

85. Similarly, on Twitter, in early 2021, social media users commonly referred to the U.S. Senate's 60-vote filibuster procedure as a racist relic of the Jim Crow era. *See* Amended Complaint ¶117.

86. According to accounts in the Philadelphia Inquirer and AP News, in July 2020, former Pennsylvania Supreme Court Justice Cynthia Baldwin accused current Pennsylvania Supreme Court Chief Justice Thomas Saylor of bias for allegedly referring to her "minority agenda" during a 2012 conversation with another judge. *See* Amended Complaint ¶118.

87.     In June 2021, the Supreme Court of South Carolina upheld professional discipline for an attorney who had made Facebook posts denigrating George Floyd in the wake of his murder and denigrating "college educated, liberal suburbanite" women who get tattoos. *In re Traywick*, 2021 WL 2492772, 2021 S.C. LEXIS 72, at *3-*4 (S.C. Jun. 18, 2021). According to the opinion, South Carolina's Office of Disciplinary Counsel received 46 complaints about twelve postings in total. The South Carolina Supreme Court held that a six-month suspension from practice was warranted because the statements "were intended to incite, and had the effect of inciting, gender and race-based conflict." *See* Amended Complaint ¶119.

### Personal accusations of hostile, denigrating, and offensive speeches

88.     Not only am I aware of the public accounts described above, I have been personally accused of hostile, denigrating, and offensive speech at my CLE and non-CLE presentations.

89.     In May 2018, I gave a CLE presentation in Villanova, Pennsylvania to attorneys, parents, and students on the legal limits of a university's power to punish student online expression that is deemed offensive, prejudiced, and hateful. At this presentation, as usual I cover many aspects of the issue, from the summaries of notable cases, including mentioning the precise hateful language at issue (Dkt. 49 at ¶83), to a discussion of whether the cases are correctly decided, and the larger societal implications of the issue. After the presentation, attorneys in the audience told me that my presentation, inclined in favor of recognizing students' right to engage in online expression deemed offensive, was in and of itself offensive.

90.     After a September 2018 presentation at the University of New Hampshire on free speech on campus, students approached me and told me that the content of my presentation and the ideas I expressed were offensive.

91.     After a June 2019 virtual presentation with college administrators on fraternity and sorority student group rights, attendees provided me feedback that the content of my presentation and the ideas I expressed were offensive.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

    Executed on October 1, 2021 in Philadelphia, PA.

 

_____
Zachary Greenberg

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I filed the foregoing with the Clerk of the Court via ECF thus effectuating service on all counsel who are registered as electronic filers in this case.

DATED: October 1, 2021

/s/ *Adam E. Schulman*
Adam E. Schulman