**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ZACHARY GREENBERG, <br><br> *Plaintiff*, <br><br> v. <br><br> JOHN P. GOODRICH, in his official capacity as Board Chair of The Disciplinary Board of the Supreme Court of Pennsylvania, *et al.* <br><br> *Defendants*. | No. 2:20-cv-03822-CFK |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES................................................................................................ iii

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

LEGAL STANDARD FOR SUMMARY JUDGMENT .......................................................4

ARGUMENT .......................................................................................................................5

I.    Rule 8.4(g) threatens liability based upon the content and viewpoint of expression. ........ 5

II.    Rule 8.4(g) cannot mask its viewpoint discrimination as an anti-harassment and anti-discrimination regulation of professional conduct........................................................... 13

III.   Rule 8.4(g) does not provide fair notice nor admit of reasoned and even-handed application................................................................................................................... 22

    A.   Rule 8.4(g)'s "conduct that is intended to intimidate, denigrate, or show hostility or aversion" standard is vague. ..................................................................................23

    B.   Rule 8.4(g)'s "conduct" that "manifests an intention" "to treat a person as inferior" or "to disregard relevant considerations of individual characteristics or merit" standard is vague. ..................................................................................................24

IV.   Greenberg's claims remain justiciable........................................................................ 26

CONCLUSION..................................................................................................................29

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ............................................................. 28

*Aristy-Rosa v. State Farm Mut. Auto Ins. Co.*, 994 F.3d 182 (3d Cir. 2021) ............................... 15

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721 (2011) ............................. 11

*Bible Believers v. Wayne County*, 805 F.3d 228 (6th Cir. 2015) ....................................... 6-7

*Billups v. City of Charleston.*, 961 F.3d 673 (4th Cir. 2020) ........................................... 16

*Bruni v. City of Pittsburgh*, 941 F.3d 73 (3d Cir. 2019). ............................................... 9

*Center for Investigative Reporting v. SEPTA*, 975 F.3d 300 (3d Cir. 2020) ................................ 2

*Colwell v. Rite Aid*, 602 F.3d 495 (3d Cir. 2010) ..................................................... 20

*Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278 (1961) ................................................. 23

*Dambrot v. Central Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995) .................................... 17, 23

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) ............................................. 25

*DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008) .......................................... *passim*

*DS Waters of Am., Inc. v. Commonwealth*,150 A.3d 583 (Pa. Commonwealth Ct. 2016) ............. 28

*EQT Prod. Comp. v. Wender*, 870 F.3d 322 (4th Cir. 2017) ............................................. 28

*FCC v. Fox TV Stations, Inc.*, 567 U.S. 239 (2012) ..................................................... 22

*Free Speech Coal., Inc. v. AG United States*, 787 F.3d 142 (3d Cir. 2015) ................................ 8

*Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991) ................................... 2, 22, 23, 25

*Gibson v. State Farm Mut. Auto Ins. Co.*, 994 F.3d 182 (3d Cir. 2021) ................................ 15

*Gooding v. Wilson*, 405 U.S. 518 (1972) ............................................................... 11

*Greenberg v. Haggerty*, 491 F. Supp. 3d 12 (E.D. Pa. 2020) ..................................... *passim*

*Haagensen v. Pa. State Police*, 490 Fed. Appx. 447 (3d Cir. 2012) ....................................... 20

*Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301 (3d Cir. 2020) ........................................ 28

*Heckler v. Cmty. Health Servs. of Crawford Cty.*, 467 U.S. 51 (1984) .................................... 28

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ................................................. 14

*Iancu v. Brunetti*, 139 S. Ct. 2294 (2019) ....................................................... 5, 8-9, 11

*Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887 (6th Cir. 2021) .............................7, 11

*Jones v. SEPTA*, 793 F.3d 323 (3d Cir. 2015) ..................................................... 19-20

*Kolender v. Lawson*, 461 U.S. 352 (1983) ................................................................. 25

*Konigsberg v. State Bar of Cal.*, 353 U.S. 252 (1957) .................................................. 22

*Kurcharek v. Hanaway*, 902 F.2d 513 (7th Cir. 1990) .................................................. 29

*Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205 (3d Cir. 2011) ..................................... 4

*Lewis v. Alexander*, 685 F.3d 325 (3d Cir. 2012) ........................................................ 15

*Lopez v. Candaele*, 630 F.3d 775 (9th Cir. 2010) ........................................................ 29

*Masterpiece Cakeshop, Ltd. v. Colo Civil Rights Comm'n*, 138 S. Ct. 1719 (2018) ................... 12

*Matal v. Tam*, 137 S. Ct. 1744 (2017) .......................................................... *passim*

*McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232 (3d Cir. 2010) ...................... 15, 17, 20, 23

*McGee v. Township of Conyngham*, No. 20-3229, 2021 WL 4315936, 2021 U.S. App. LEXIS
        28829 (3d Cir. Sept. 23, 2021) ...................................................................... 27

*McNair v. Synapse Group, Inc*, 672 F.3d 213 (3d Cir. 2012)........................................... 27

*Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018)................................... 5, 26

*Monroe v. Houston Indep. Sch. Dist.*,419 F. Supp. 3d 1000 (S.D. Tex. 2019)........................... 23

*NAACP v. Button*, 371 U.S. 415 (1963) ...................................................................... 22

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1988) ................................. 23-24

*Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018).......2, 11, 13, 18, 22

*N.H. Right to Life PAC v. Gardner*, 99 F.3d 8 (1st Cir. 1996)........................................... 29

*Northeastern Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 432 (3d Cir.
        2019) ................................................................................................. 5

*Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. #204*, 523 F.3d 668 (7th Cir. 2008)................ 23

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ................................................................. 6

*Otto v. City of Boca Raton*, 981 F.3d 854 (11th Cir. 2020)....................................... 13-14

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020) .................... 16

*Pa. Family Inst., Inc. v. Celluci*, 521 F. Supp. 2d 351 (E.D. Pa. 2007) .............................. 8, 29

*Peroza-Benitez v. Smith*, 994 F.3d 157 (3d Cir. 2021) ..................................................... 4

*Pool v. Houston*, 978 F.3d 307 (5th Cir. 2020) ........................................................ 27

*Presbytery of the Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454 (3d Cir. 1994) .......... 29

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992) ............................................................... 11

*Real Alternatives, Inc v. Sec'y of HHS*, 867 F.3d 338 (3d Cir. 2017) ............................... 4

*Reno v. ACLU*, 521 U.S. 844 (1997) .................................................................... 22

*Rodriguez v. Maricopa County Cmty. College Dist.*, 605 F.3d 703 (9th Cir. 2010) .................... 17

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) .................................................................. 16

*Saxe v. State College Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001)................................... *passim*

*Smith v. Goguen,* 415 U.S. 566 (1974) ................................................................. 24

*Snyder v. Phelps*, 562 U.S. 443 (2011) ............................................................... 10-11

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) ....................................... 28

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ............................................................. 9

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ............................................... 8

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ................................... 18

*Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019)......................................... 16

*Terminiello v. Chicago*, 337 U.S. 1 (1949) ........................................................... 12

*United States v. Stevens*, 533 F.3d 218 (3d Cir. 2008) ............................................... 22

*United States v. Stevens*, 559 U.S. 460 (2010)........................................................ 8

*Vt. Right to Life Comm'n v. Sorrell*, 221 F.3d 376 (2d Cir. 2000)..................................... 29

*W. Va. Bd of Educ. v. Barnette*, 319 U.S. 624 (1943).................................................. 21

*Whitney v. California*, 274 U.S. 357 (1927)........................................................... 22

*Woodhull Freedom Found. v. United States*, 948 F.3d 363 (D.C. Cir. 2020)............................. 28-29

## Constitutional Provisions

U.S. CONST. AMEND. I ................................................................................... *passim*

U.S. CONST. AMEND XIV.................................................................................. *passim*

## Statutes and Rules

18 Pa. Cons. Stat. § 2709 ........................................................................... 20

20 U.S.C. § 1681 ....................................................................................... 25

42 U.S.C. § 2000e-2 ............................................................................ 24-25

43 Pa. Cons. Stat. § 951 ............................................................................ 19

204 Pa. Code § 99.3 .................................................................................. 20

Pa. Code. Jud. Cond. 2.3(C) ..................................................................... 20

Disp. Bd. R. 93.23(a)(7) .............................................................................. 9

Disp. Bd. R. 93.23(a)(8) .............................................................................. 9

Fed. R. Civ. P. 65(d) ................................................................................. 23

Pa. R. D. E. 205(c)(2) ................................................................................. 9

Pa. R. D. E. 205(c)(7) ................................................................................. 9

Pa. R. D. E. 205(c)(8) ................................................................................. 9

Pa. R. Prof. Cond. 4.4(a) ........................................................................... 20

Pa. R. Prof. Cond. 8.4(d) ........................................................................... 20

Pa. R. Prof. Cond. 8.4(g) ..................................................................... *passim*

## Other Authorities

Balkin, J.M., *Some Realism About Pluralism: Legal Realist Approaches To The First
     Amendment*, 1990 DUKE L. J. 375 (1990) ....................................... 12-13

Blackman, Josh, *Reply: A Pause for State Courts Considering Model Rule 8.4(g)*, 30 GEO. J.
     LEGAL ETHICS 241 (2017) ................................................................... 6

Dent Jr., George W., *Model Rule 8.4(g): Blatantly Unconstitutional and Blatantly Political,* 32
     NOTRE DAME J. L. ETHICS & PUB. POL'Y 135 (2018) ............................ 6

Ekins, Emily, *Is Supporting Racists' Free Speech Rights the Same as Being a Racist?*, CATO AT
     LIBERTY (Nov. 1, 2017, 5:40 PM), https://www.cato.org/blog/supporting-racists-free-speech-
     rights-same-being-racist ...................................................................... 7

Lat, David, *Yale Law School And the Federalist Society Caught In a Bad Romance*, ORIGINAL

JURISDICTION (Nov. 13, 2021), https://davidlat.substack.com/p/yale-law-school-and-the-

federalist ................................................................................................................................. 21

Scalia, Antonin & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS

(2012) ..................................................................................................................................... 15

Sibarium, Aaron, *A Yale Law Student Sent a Lighthearted Email Inviting Classmates to His 'Trap

House.' The School is Now Calling Him to Account*, THE WASHINGTON FREE BEACON (Oct.

13, 2021, 5:00 AM), https://freebeacon.com/campus/a-yale-law-student-sent-a-lighthearted-

email-inviting-classmates-to-his-trap-house-the-school-is-now-calling-him-to-account/ ....... 21

Strossen, Nadine, *The Interdependence of Racial Justice and Free Speech for Racists*, 1 J. OF

FREE SPEECH 51 (2021) ........................................................................................................... 12

Terr, Aaron, *How Yale Law School pressued a law student ot appologize for a Constitution Day

'trap house' invitation*, FIRE (Oct. 14, 2021), https://www.thefire.org/how-yale-law-school-

pressured-a-law-student-to-apologize-for-a-constitution-day-trap-house-invitation/ .............. 21

Thomas, Clarence, *Be Not Afraid* (Feb. 13, 2001), *available at* www.aei.org/research-

products/speech/be-not-afraid ................................................................................................. 12

Volokh, Eugene, *Emerson College Conduct Board Finds "China Kinda Sus" Stickers to Be

Forbidden "Discriminatory Conduct*," THE VOLOKH CONSPIRACY (Nov. 12, 2021, 12:43 PM),

https://reason.com/volokh/2021/11/12/emerson-college-conduct-board-finds-china-kinda-sus-

stickers-to-be-forbidden-discriminatory-conduct/ ................................................................... 14

Volokh, Eugene, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct,

"Situation-Altering Utterances," and the Uncharted Zones*, 90 CORNELL L. REV. 1277 (2005)

................................................................................................................................................. 13

Volokh, Eugene, *The "Speech Integral to Criminal Conduct" Exception*, 101 CORNELL L. REV.

981 (2016) .............................................................................................................................. 16

10A Wright, Charles Alan, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND

PROCEDURE § 2727.1 (4th ed. 2021) .......................................................................................... 4

## INTRODUCTION

Last year, this Court determined that the initial version of Pa. R. Prof. Cond. 8.4(g) shattered constitutional bedrock by prohibiting attorneys from expressing offensive viewpoints. *Greenberg v. Haggerty*, 491 F. Supp. 3d 12, 30–32 (E.D. Pa. 2020). Unfortunately, New 8.4(g) suffers from the same fatal flaw as Old 8.4(g). Instead of outlawing expression that "knowingly manifests bias or prejudice," 8.4(g) now outlaws expression intended to "denigrate, or show hostility or aversion" and expression that manifests an intent "to disregard relevant considerations of individual characteristics." Although it cloaks itself in the language of civil rights, the Rule now redefines "harassment" and "discrimination" to stifle and censor distasteful ideas, not simply to prevent tortious behavior. Disparaging (but non-defamatory) speech is protected expression not "discriminatory conduct." *Matal v. Tam*, 137 S. Ct. 1744, 1764–65 (2017). So too is denigrating, hostile, or averse speech. The First Amendment does not permit 8.4(g)'s redefinition of "harassment" and "discrimination." *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001) (Alito, J.); *DeJohn v. Temple Univ.*, 537 F.3d 301 (3d Cir. 2008).

Federal, state, and local anti-discrimination and anti-harassment laws promote the high-minded aim of equal opportunity. But once again, "the plain language of Rule 8.4(g) does not reflect this intention." *Greenberg*, 491 F. Supp. 3d at 31. Indeed, New 8.4(g) strays even farther away from this aim by decoupling the rule from existing civil rights law. New 8.4(g) still "creates a pathway for its handpicked arbiters to determine, without any concrete standards, who and what offends." *Id*. at 32. And again, that will leave the defendants free to determine which language denigrates, which shows aversion or hostility, and which manifests disregard for relevant individual characteristics all "based upon whether the viewpoint expressed is socially and politically acceptable." *Id.* New 8.4(g) remains unconstitutionally viewpoint-based and overbroad.

1

"Because First Amendment freedoms need breathing space to survive," the "government may regulate in the area only with narrow specificity." *Id.* at 30 (quoting *In re Primus*, 436 U.S. 412, 432 (1978)). In other words, vague regulations of speech are impermissible; "all forms of content-based restrictions must be capable of reasoned application." *Ctr. for Investigative Reporting v. SEPTA*, 975 F.3d 300, 314 (3d Cir. 2020). Vague restraints on speech pose "twin problems": a "serious risk of chilling protected speech" and "the risk of discriminatory or arbitrary enforcement." *Id.* at 314 n.4 (internal quotation and citation omitted).

Individuals do not lose these rights when they join a state-regulated guild like the Pennsylvania Bar. "Speech is not unprotected merely because it is uttered by 'professionals.'" *Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) ("*NIFLA*"). "[D]isciplinary rules governing the legal professional cannot punish activity protected by the First Amendment . . . even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1054 (1991). Due process requires that such a rule provides "fair notice to those to whom it is directed" and not be "so imprecise that discriminatory enforcement is a real possibility." *Id.* at 1048, 1051 (cleaned up).

For each step New 8.4(g) takes in the right direction compared to Old 8.4(g), it takes another step back. It trades one amorphous taboo—"manifesting bias or prejudice"—for another—"denigrating, or showing hostility or aversion." Instead of alluding to guidance found in "applicable federal, state, or local statutes or ordinances," the Rule now entirely omits the tether to existing law. As a result, there is no guidance at all, and attorneys are left to wonder what it means to manifest an intent to "treat a person as inferior" or "disregard relevant considerations of individual characteristics or merit."

By each of these measures—viewpoint neutrality, narrow tailoring, and clarity—8.4(g) falls short. Regardless of any possible good intentions, the Rule imposes a speech code on Pennsylvania attorneys, threatening to impose professional liability on the basis of the content and viewpoint of their speech. It does so whether or not that speech has any connection to a legal

proceeding, a client representation, or even the administration of justice. Worse yet, the Rule does not admit of any objective and determinative standard. At its core, the Rule employs vague language that inhibits expressions of moral judgments, religious beliefs, political views, or legal opinions in many law-related settings. Plaintiff Zachary Greenberg and other Pennsylvania attorneys will be chilled by the threat of *ad hoc*, arbitrary, and discriminatory enforcement.

## FACTUAL BACKGROUND

On June 8, 2020, Pennsylvania added Old 8.4(g) to its rules of professional conduct. Stipulated List of Facts (Dkt. 53) ¶ 47. Soon after, Plaintiff Zachary Greenberg filed the initial complaint in this action, seeking declaratory and injunctive relief against enforcement of the rule. Greenberg, a Pennsylvania-licensed attorney who regularly speaks at Continuing Legal Education ("CLE") and non-Continuing Legal Education events on controversial, polarizing, and hot-button legal topics, fears that in today's climate he could be subject to professional disciplinary processes or sanction if his speech is perceived to violate the rule. Greenberg Supp. Decl. (Dkt. 54) ¶¶ 16-43. He brings this action to vindicate his First Amendment and Due Process rights and those of similarly situated Pennsylvania attorneys that are chilled by the viewpoint-discriminatory, overbroad, and vague disciplinary Rule.

On Greenberg's motion, the Court preliminary enjoined Old 8.4(g) in late 2020. Dkt. 31; Stipulated List of Facts ¶ 49. Defendants appealed the preliminary injunction order to the Third Circuit, but voluntarily dismissed that appeal. Stipulated List of Facts ¶ 50. After that dismissal, Defendants recommended to the Pennsylvania Supreme Court amendments to Old 8.4(g). Stipulated List of Facts ¶ 51. Over Justice Mundy's dissent and without any public notice or comment, the Pennsylvania Supreme Court on July 26, 2021 adopted New 8.4(g), superseding Old 8.4(g). Stipulated List of Facts ¶¶ 52-54.

New 8.4(g) was set to take effect on August 25, 2021. Stipulated List of Facts ¶ 55. But the parties stipulated that Defendants will not enforce the rule until this Court has rendered a decision on the cross-motions for summary judgment. Stipulated List of Facts ¶ 56. Greenberg

filed an amended complaint challenging New 8.4(g), and Defendants answered. Dkts. 49, 50. This motion for summary judgment follows.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (internal quotation omitted). "A Verified Complaint" such as Greenberg's (Dkt. 49) "is treated as an affidavit in the summary judgment posture." *Real Alternatives, Inc. v. Sec'y of HHS*, 867 F.3d 338, 371 n.9 (3d Cir. 2017). Such affidavits, including Greenberg's supplemental declaration in support of summary judgment (Dkt. 54), "must be accepted as true on a summary-judgment motion when the party opposing the motion does not offer counter-affidavits or other evidentiary material supporting the opposing contention that an issue of fact remains." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2727.1 (4th ed. 2021).

"[T]he mere existence of *some* alleged factual dispute" "will not defeat an otherwise properly supported motion for summary judgment." *Layshock*, 650 F.3d at 211 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). Only "genuine" disputes regarding "material" facts matter. A dispute is "genuine" if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" if it might affect the outcome of the action under the operative law. *See Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (citing *Anderson*, 477 U.S. at 248). For the reasons discussed below, there are no genuine issues of material fact and Greenberg is entitled to judgment as a matter of law.

## ARGUMENT

### I.    Rule 8.4(g) threatens liability based upon the content and viewpoint of expression.

If a government entity chooses to regulate or restrict speech, it may not do so in a way that discriminates against certain viewpoints. *E.g.*, *Greenberg*, 491 F. Supp. 3d at 32; *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (where rule "is viewpoint-based, it is unconstitutional"); *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018) ("restrictions . . . based on viewpoint are prohibited"); *Matal*, 137 S. Ct. at 1763 ("viewpoint discrimination is forbidden"); *Northeastern Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 938 F.3d 424, 436 (3d Cir. 2019) ("*Freethought Soc'y*") ("viewpoint discrimination is impermissible in any forum"). "Viewpoint discrimination is an egregious form of content discrimination. Rather than aiming at particular subjects, it targets particular views taken by speakers." *Freethought Soc'y*, 938 F.3d at 432 (cleaned up). "[T]hat violates the First Amendment's most basic promise." *Id.*

Rule 8.4(g) runs afoul of this core tenet of First Amendment law by proscribing speech on the basis of viewpoint. *Matal* shows why. *Matal* assessed the constitutionality of a federal statute that prohibited the registration of trademarks that may "disparage or bring into contempt or disrepute" any "persons, living or dead." 137 S. Ct. at 1751 (alterations omitted). In two opinions, the Supreme Court unanimously determined that this statute constituted a viewpoint-based restriction. Writing for half of the eight-member Court, Justice Alito explained: "Our cases use the term 'viewpoint' discrimination in a broad sense." *Id.* at 1763. "[I]n that sense, the disparagement clause discriminates on the bases [sic] of 'viewpoint.'" *Id.* It refuses "speech that is offensive to a substantial percentage of the members of any group." *Id.* And, "that is viewpoint discrimination: Giving offense is a viewpoint." *Id.*

Justice Kennedy, writing for the other half of the Court, echoed this reasoning. "At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Id.* at 1766. On any particular subject, the disparagement clause permitted registration of "a positive or benign mark but not a derogatory one." *Id.* "The law thus reflects

the Government's disapproval of a subset of messages it finds offensive. This is the essence of viewpoint discrimination." *Id.*

8.4(g)'s prohibition on "denigrat[ing] or show[ing] hostility or aversion toward a person on any of the bases listed in paragraph (g)" suffers from the same infirmity. If, for example, a Pennsylvania attorney wishes to discuss fundamentalist religions at a CLE, Rule 8.4(g) inhibits him or her from espousing the view that such religions are regressive, oppressive, and worthy of condemnation. Similarly, imagine an attorney who recently chose to leave the Church of Scientology. If she wishes to explain her departure to attorney acquaintances at a bench-bar conference, she can't cast the religion in a deprecatory light without risking discipline under the Rule.

Conversely, imagine a religious attorney who harbors a good faith belief that allowing pre-adolescent gender identity transitioning is harmful and abusive. Expressing such views at a bar association event is impermissible under the Rule. Or alternatively, imagine a Democratic Socialist attorney who adheres to the views of Bernie Sanders and believes "Billionaires shouldn't exist." If that attorney expresses such denigrating and hostile views (based upon socioeconomic status) at a CLE, 8.4(g) subjects him to discipline. *See also* Josh Blackman, *Reply: A Pause for State Courts Considering Model Rule 8.4(g)*, 30 GEO. J. LEGAL. ETHICS 241, 245 (2017) (offering an assortment of topics that might arise at a CLE seminar and that would implicate issues of race, gender, religion, national origin, ethnicity, sexual orientation, gender identity, marital status, and socioeconomic status); George W. Dent, Jr., *Model Rule 8.4(g): Blatantly Unconstitutional and Blatantly Political*, 32 NOTRE DAME J. L. ETHICS & PUB POL'Y 135, 145–50 (2018) (similar).

In the very same opinion that the Supreme Court announced the Fourteenth Amendment's guarantee of same-sex marriage, it made clear that "those who adhere to religious doctrines[] may continue to advocate with utmost conviction that, by divine precepts, same-sex marriage should not be condoned." *Obergefell v. Hodges*, 576 U.S. 644, 679 (2015). "Preaching hate and denigration" is protected expression, even in the midst of a crowd of angry and offended

listeners. *Bible Believers v. Wayne County*, 805 F.3d 228, 234 (6th Cir. 2015) (*en banc*). Just not if you're a lawyer in Pennsylvania. As in *Matal*, the Rule suppresses certain viewpoints on certain topics: tolerant, benign and respectful speech is allowed; denigrating, hostile, averse, discriminatory, critical and derogatory speech is not. *See also Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 895 (6th Cir. 2021) (holding that restrictions on "antagonistic," "abusive" and "personally directed' speech" are unconstitutionally viewpoint based).

Through his educational advocacy work at CLE seminars, conferences, and law school events, Greenberg defends the right of speakers to express their views, however prejudiced or misguided, free from government penalty. The unfortunate modern reality is that many people today consider defending the free speech rights of incendiary speakers to be as incendiary as the underlying speech itself. Greenberg Supp. Decl. ¶¶ 16-18, 62-63, 82-83; Emily Ekins, *Is Supporting Racists' Free Speech Rights the Same as Being a Racist?*, CATO AT LIBERTY (Nov. 1, 2017, 5:40 PM), https://www.cato.org/blog/supporting-racists-free-speech-rights-same-being-racist (reporting on a CATO survey that found "nearly half (49%) of current college and graduate students believe that 'supporting someone's right to say racist things is as bad as holding racist views yourself'"), *available at* Dkt. 23-1. That is especially true when the defenders of the First Amendment explicitly repeat the distasteful epithets and slurs found in the case law. Greenberg Supp. Decl. ¶¶ 53-61. Even using an expurgated form of such epithets is not safe in the current climate. Greenberg Supp. Decl. ¶ 61.

Defendants have pleaded that ODC "does not bring cases based on misconstruals" so Greenberg's speech does not raise an issue under 8.4(g). Dkt. 50 at 1-2. But that provides Greenberg no solace when potential liability ultimately turns on the perceptions of his public audience—each of whom has the ability to file confidential disciplinary complaints without

consequence[1]—and then the judgment of the disciplinary authorities themselves. Attorneys could be "embedded in an inquisition" and "an exploration of the attorney's character and previously expressed viewpoints" before any misunderstanding could even begin to be cleared up. *Greenberg*, 491 F. Supp. 3d at 28. Nor do the *mens rea* features of the Rule salvage it. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014) (repudiating the notion that plaintiff could feel secure merely because the statute required "knowing" falsehood and plaintiff had no "plans to lie or recklessly disregard the veracity of its speech."); *Greenberg*, 491 F. Supp. 3d at 24 (finding "knowing" requirement "immaterial" given the rule's plain language).

Defendants have also submitted a declaration from Defendant Chief Disciplinary Counsel Thomas Farrell, in which he espouses a more limited view of the scope of Rule 8.4(g). Dkt. 56 ¶¶ 7, 16 (explaining his view that 8.4(g) only covers speech targeting an identifiable person). But the litigation position of a single defendant, departing from the text of the Rule, offers Greenberg and other Pennsylvania attorneys little solace. Greenberg Supp. Decl. ¶ 43; *see also Pa. Family Inst., Inc. v. Celluci,* 521 F. Supp. 2d 351, 365 & n.7 (E.D. Pa. 2007). And not only is it entirely unclear how Mr. Farrell's position accords with the text of 8.4(g), but his "assurances may one day be modified by [ODC] to permit the exercise of the [Rule's] full authority. Accordingly, a promise by the government that it will interpret statutory language in a narrow, constitutional manner cannot, without more, save a potentially unconstitutionally overbroad statute." *Free Speech Coal., Inc. v. AG United States*, 787 F.3d 142, 164 (3d Cir. 2015) (internal quotation omitted). "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

Similarly, courts may not uphold an unconstitutional rule just because defendants intend to use it responsibly. *Stevens*, 559 U.S. at 480. Nor may they "write nonbinding limits into a

---

[1] *See* Stipulated List of Facts ¶¶ 33-34. Complainants are also free to publicize, and thus weaponize, the complaints they have filed. Ex. 1 to Declaration of Adam Schulman, Def.'s Answers to Pl.'s Req. for Admis. ¶ 14.

silent state statute" or "rewrite a law to conform it to constitutional requirements." *Iancu*, 139 S. Ct. at 2301 (quoting *Stevens*, 559 U.S. at 481). There is no "power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Stenberg v. Carhart*, 530 U.S. 914, 944 (2000) (quoting *Boos v. Barry*, 485 U.S. 312, 330 (1988)).

Not only has Mr. Farrell's lone[2] interpretation "not been adopted by any Pennsylvania court," it is "precluded by the plain language of the [rule]." *Bruni v. City of Pittsburgh*, 941 F.3d 73, 85 n.14 (3d Cir. 2019) (quoting in part *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 946 (9th Cir. 2011)). Mr. Farrell's interpretation is untenable, and again *Matal* shows why. *Matal* addressed similar statutory language prohibiting the registration of trademarks "which may disparage . . . persons, living or dead." 137 S. Ct. at 1755. The would-be registrant argued that slurs against abstract racial and ethnic groups were not "persons" subject to the statutory language because "groups are neither natural nor juristic persons." *Id.* But the Supreme Court rejected that reading as inconsistent with the "plain terms" of the clause. *Id.* at 1756. "A mark that disparages a substantial percentage of the members of a racial or ethnic group, necessarily disparages many 'persons,' namely, members of that group." *Id.* (internal citation omitted). In other words, the Court refused to read an implicit targeting requirement into

---

[2] None of the other thirteen defendants has endorsed Mr. Farrell's interpretation of the rule. The Board played no role in drafting Mr. Farrell's declaration. Ex. 1 to Schulman Decl., Def.'s Answers to Pl.'s Req. for Admis. ¶ 10. The Board and its twelve members sit above Mr. Farrell in the hierarchical structure of the judicial branch, and have the power to "review" "approve" or "modify" (or assign to hearing committee members for review) recommended dismissals by ODC. Pa. R. D. E. 205(c)(7)(i), (c)(8); Disp. Bd. R. 93.23(a)(7)(i), (a)(8); *contra* Ex. 1 to Schulman Decl., Def.'s Answers to Pl.'s Req. for Admis. ¶ 7. In fact, the Board has the discretion to appoint a different individual to Mr. Farrell's position whenever they wish. Pa. R. D. E. 205(c)(2); Ex. 1 to Schulman Decl., Def.'s Answers to Pl.'s Req. for Admis. ¶ 11.

the statute. Even though 8.4(g) uses the "singular term 'person,'"[3] *Matal* instructs that the same interpretative argument still "fail[s]." *Id.* Simply put, there is no reasonable and readily apparent construction that can rescue the Rule.

Even if Mr. Farrell's limiting construction were available as a matter of interpretation, it wouldn't resolve any of the Rule's constitutional infirmities—viewpoint discrimination, overbreadth, or vagueness. For example, in response to Mr. Greenberg's interrogatory asking whether answering a CLE audience member's question could be considered targeting that individual, Mr. Farrell stated it would both depend on the question asked and the response of the speaker, in other words, on the *content* of the exchange. Ex. 2 to Schulman Decl., Def.'s Answers to Pl.'s Interrogs. ¶ 16. Thus, the problems of vagueness inherent in the rule persist even when reading a "targeting" requirement into the rule. ODC has issued no internal verbal or written policy guidance to enforcement officials related to New 8.4(g) and provides no mechanism for Pennsylvania-licensed attorneys to seek guidance. Ex. 1 to Schulman Decl., Def.'s Answers to Pl.'s Req. for Admis. ¶15; Ex. 2 to Schulman Decl., Def.'s Answers to Pl.'s Interrogs. ¶¶ 2,4. The rule remains a "sword of Damocles" hanging over the heads of Pennsylvania attorneys. *Greenberg*, 491 F. Supp. 3d at 24.

Nor does a targeting requirement sufficiently remedy the problem of overbreadth. 8.4(g) would still apply outside a legal representation, outside a legal proceeding, and in situations where there is no prejudice to the administration of justice. *NIFLA* does not permit such an expansive usurpation of regulatory authority. Moreover, "[t]he free speech clause protects . . . statements that impugn another's race or national origin or that denigrate religious beliefs." *Saxe*, 240 F.3d at 206. Even when the speech amounts to a "brutalization" of a grieving family at its most vulnerable, the First Amendment does not yield. *See Snyder v. Phelps*, 562 U.S. 443, 466

---

[3] Specifically, comment [4] defines harassment as "conduct that is intended to intimidate, denigrate, or show hostility or aversion toward a person on any of the bases listed in paragraph (g)."

(2011). From *Saxe* and *Snyder*, it is clear that a targeting requirement does not alone suffice to protect free speech. *See also Gooding v. Wilson*, 405 U.S. 518 (1972) (invalidating statute that prohibiting targeted use of "opprobrious words or abusive language"); *Ison*, 3 F.4th at 895 (invalidating restrictions on "antagonistic," "abusive" and "personally directed" speech).

Although Mr. Farrell tries to disavow the notion that discussing "controversial positions" could violate Rule 8.4(g), in the next breath he suggests that CLE panels balance out such controversial views with another speaker holding the opposing view. Farrell Decl. ¶¶ 11-14. Using a fairness-doctrine-like regime to dispel the appearance of denigration, hostility and aversion, is hardly compatible with the First Amendment. *See, e.g.*, *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 741-43 (2011).

"[V]iewpoint discrimination is inherent in the design and structure of this [Rule]. This law is a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J, concurring). "[A] disparaging comment directed at an individual's sex, race, or some other personal characteristic" can be captured under certain anti-discrimination laws "precisely because of its sensitive subject matter and because of the odious viewpoint it expresses." *Saxe,* 240 F.3d at 206.

A rule that unilaterally proscribes speech that "denigrate[s]" "society's sense of rectitude and morality" is unconstitutionally viewpoint based. *Iancu*, 139 S. Ct. at 2299. As Justice Scalia elucidated nearly 30 years ago in striking down a municipal hate speech ordinance:

> [derogatory language] would seemingly be usable ad libitum in the placards of those arguing in favor of racial, color, etc., tolerance and equality, but could not be used by those speakers' opponents. One could hold up a sign saying, for example, that all "anti-Catholic bigots" are misbegotten; but not that all "papists" are, for that would insult and provoke violence "on the basis of religion." St. Paul[, Minnesota] has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.

*R.A.V. v. St. Paul.* 505 U.S. 377, 391–92 (1992). Under *R.A.V.*, 8.4(g) presents exactly this additional kind of viewpoint-based discrimination, by establishing a fixed list of topical

categories of denigration that are off-limits. Hostility on the basis of height or weight or physical attractiveness is fine. Hostility on the basis of race or sex or socioeconomic status is not.

"[A] function of free speech under our system of government is to invite dispute." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949) (protecting speech of antisemitic demagogue). "[I]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Greenberg*, 491 F. Supp. 3d at 30 (internal quotation omitted). When "it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1746 (2018) (Thomas, J., concurring in part and in the judgment) (quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 55 (1988)). Regulating speech "to produce a society free of biases" is unacceptable "for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression." *Id*. (cleaned up).

Not long ago, there was a staunch consensus across the political spectrum that robust protection for free expression was the path toward societal progress, cultural harmony, and American values. *See* Nadine Strossen, *The Interdependence of Racial Justice and Free Speech for Racists*, 1 J. OF FREE SPEECH L. 51 (2021), *available at* https://www.journaloffreespeechlaw.org/strossen.pdf; Clarence Thomas, *Be Not Afraid* (Feb. 13, 2001), *available at* www.aei.org/research-products/speech/be-not-afraid. History proves that consensus right. Once unpopular ideas are the germ from which many civil rights movements burgeoned. Dkt. 16-1 at 30-31 (listing examples). The core ideas of those movements—equality, justice, pluralism, the rule of law—are now popular. But 8.4(g) forgets its roots. Now that the tree of civil rights is full-grown, healthy, and sturdy, 8.4(g) seeks to protect it by shrouding it. The First Amendment knows that isn't how ideas thrive, or how new ideas emerge. *See generally* J.M. Balkin, *Some Realism About Pluralism: Legal Realist Approaches To The First Amendment*, 1990 DUKE L.J. 375, 383-384 (1990) (summarizing the history of First Amendment litigation as normally in service of new ideas and changing values, "whether it was French emigres and

Republicans in the 1790s, abolitionists in the 1840s, pacifists in the 1910s, organized labor in the 1920s and 1930s, or civil rights protesters in the 1950s and 1960s").

Rule 8.4(g) muzzles speech on the basis of viewpoint and is therefore unconstitutional.

## II.     Rule 8.4(g) cannot mask its viewpoint discrimination as an anti-harassment and anti-discrimination regulation of professional conduct.

At first glance, New 8.4(g) might look substantially more solicitous of First Amendment rights than Old 8.4(g). After all, it no longer expressly regulates "words" that "manifest bias or prejudice." Instead, it now regulates the "conduct" of "harassment" and "discrimination." But that's a façade, because the new rule redefines "harassment" and even "discrimination" in a way to encompass pure expression apart from any tortious conduct, let alone professional conduct that "incidentally involves speech." *NIFLA*, 138 S. Ct. at 2372.

Start with the word "conduct." True enough, "there is a real difference between laws directed at conduct sweeping up incidental speech on the one hand and laws that directly regulate speech on the other." *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020); *but see* Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 CORNELL L. REV. 1277, 1346 (2005) (in the context of professional speech, "whatever the right result might be, the 'conduct-speech' distinction is likely to be more misleading than helpful."). But wholly apart from conduct involving incidental speech, verbal or written communicative "conduct" constitutes pure expression and is fully protected by the First Amendment. *Saxe*, 240 F.3d at 202-03 (holding unconstitutional an anti-harassment policy that prohibited "any unwelcome verbal, written or physical **conduct**."); *DeJohn*, 537 F.3d at 305 (holding unconstitutional an anti-harassment policy that prohibited "expressive, visual, or physical **conduct** of a sexual or gender-motivated nature"); Comment 3 to Model Rule of Prof. Cond. 8.4(g) (prohibiting "verbal or physical **conduct**"); *Greenberg*, 491 F. Supp. 3d at 20 (noting the justiciability requirement of "a course of **conduct** arguably affected with a constitutional interest"). "The government cannot regulate speech by relabeling it as conduct." *Otto*, 981 F.3d at 865. That is a "dubious constitutional

13

enterprise," "unprincipled and susceptible to manipulation." *Id.* (internal quotation omitted); *see also* Eugene Volokh*, Emerson College Conduct Board Finds "China Kinda Sus" Stickers to Be Forbidden "Discriminatory Conduct,"* THE VOLOKH CONSPIRACY (Nov. 12, 2021, 12:43 PM), https://reason.com/volokh/2021/11/12/emerson-college-conduct-board-finds-china-kinda-sus-stickers-to-be-forbidden-discriminatory-conduct/. The government regulates speech when the "conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010).[4]

*Otto* is a prime example. There, the Eleventh Circuit reviewed a challenge to county ordinances banning therapists from offering any counseling with the goal of changing a minor's sexual orientation. The counties defended the ordinances as regulations of professional conduct, not protected speech. *Otto* emphatically rejects that argument:

> If [counseling] is conduct, the same could be said of teaching or protesting—both are activities, after all. Debating? Also an activity. Book clubs? Same answer. But the law does not require us to flip back and forth between perspectives until our eyes hurt. Our precedent says the opposite: "Speech is speech, and it must be analyzed as such for purposes of the First Amendment."

981 F.3d at 865 (quoting *Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293, 1307 (11th Cir. 2017) (*en banc*)).

---

[4] In its opinion enjoining Old 8.4(g), the Court stated that "Plaintiff agrees that if we were looking at conduct, the government has a right to regulate conduct." *Greenberg*, 491 F. Supp. 3d at 28 (citing Dkt. 25 at 21). To be precise, Greenberg distinguished between expressive activity and non-expressive conduct. Dkt. 25 at 21 (providing examples of "membership and employment policies"). Old 8.4(g) did not attempt to reinvent the terms "harassment" and "discrimination" to capture pure expression, it used them in their ordinary sense. As Greenberg specifically said, "although prohibitions on harassment can be, and often are, consistent with the Constitution, governments cannot shrink that ambit and 'eliminate First Amendment scrutiny by just labeling communication as the 'conduct' of 'harassment.''" Dkt. 16-1 at 11 n.2 (quoting Eugene Volokh, *One-to-One Speech vs. One-to-Many Speech, Criminal Harassment Laws, and "Cyberstalking*," 107 NW. U. L. REV. 731 (2013)); *see also* Dkt. 16-1 at 24 (contrasting "expressed attitudes and views" with "non-expressive discriminatory conduct"). But now the Rule does attempt such a relabeling. Therefore, there is no contradiction between Greenberg's position now and then.

The Third Circuit has likewise consistently supported the understanding that regulations of communicative conduct are indistinguishable from regulations of speech. *See McCauley v. University of the Virgin Islands*, 618 F.3d 232 (3d Cir. 2010). In *McCauley*, the panel struck down a provision in university speech code aimed at "conduct which causes emotional distress" —similar in effort and effect to Comment [4]'s definition of harassment. *Id.* at 252. The *McCauley* panel first dismissed any argument that the provision was regulating conduct and not speech: "Speech protected by the First Amendment is a type of 'conduct,' as it is a personal behavior, and is therefore regulated by [the provision]." *Id.* at 250. Notwithstanding the fact that certain applications of the student rule—those regulating only "non-expressive, physically harassing conduct"—did not implicate the First Amendment, *McCauley* concluded that the "blanket chilling" of protected speech was "substantial and require[d] vindication." *Id.*

We know that Rule 8.4(g) prohibits verbal and other pure forms of expressive conduct because it exempts "speeches, communications, debates, presentations or publications" *but only* "outside the contexts described in (1)-(3)." Rule 8.4(g), cmt. 3. In other words, "speeches, communications, debates, presentations or publications" *inside* the contexts described in (1)-(3) (*e.g.*, at CLEs, bench bar conferences, or bar association events offering legal education credits) do fall within the ambit of the rule. Under the "negative implication canon," "the expression of one thing implies the exclusion of others (*expresio unius est exclusio alterius*)." *Gibson v. State Farm Mut. Auto. Ins. Co*., 994 F.3d 182, 188 (3d Cir. 2021) (quoting Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012)). "[A] matter not covered is to be treated as not covered." Scalia & Garner, READING LAW 93.

This "venerable canon" goes for exceptions too. *Lewis v. Alexander*, 685 F.3d 325, 347 (3d Cir. 2012). When a rule maker provides exceptions, "it does not follow that courts have authority to create others." *Aristy-Rosa v. Attorney General*, 994 F.3d 112, 116 (3d Cir. 2021) (quoting *United States v. Johnson*, 529 U.S. 53, 58 (2000)). "The proper inference is that [the rule maker] considered the issue of exceptions and in the end, limited the rule to the ones set

forth." *Id.* From the structure of 8.4(g) there can be no doubt that CLE speeches of the type Greenberg presents constitute "conduct" within the scope of the rule.

Even aside from Comment [3], the rule defines "harassment" to include "conduct intended to . . . denigrate or show hostility or aversion toward a person on any of the bases listed in paragraph (g)." In the vast majority, if not all applications, those prohibitions target the communicative message itself (*i.e.*, pure expression), not speech incidental to conduct. Again, 8.4(g) is unlike the conduct-regulating equal access rule of *Rumsfeld v. FAIR*, 547 U.S. 47 (2006). *Greenberg*, 491 F. Supp. 3d at 28-29. It is also unlike the hypothetical "White Applicants Only" sign posited in *FAIR*. 547 U.S. at 62. Although certain of the 8.4(g)'s prohibitions ("conduct that is intended to intimidate" or "conduct . . . that manifests an intention: to treat a person as inferior . . . or . . . to cause inference with the fair administration of justice") may further the important aim of equal access, other clauses (prohibiting denigration, showing hostility or aversion, and manifesting an intent to disregard relevant characteristics of merit) directly regulate communication, expression and even an attorney's unpalatable thoughts. The reason why "White Applicants Only" is different is that the prohibition targets not the message but the "threat of tortious conduct." Eugene Volokh, *The "Speech Integral to Criminal Conduct" Exception*, 101 CORNELL L. REV. 981, 1004 (2016); *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 757 (8th Cir. 2019) (distinguishing the regulation of a restaurant that puts up a "White Applicants Only" sign because that regulation only targets speech incidental to "the activities of hiring employees and providing food, neither of which typically constitutes speech"). The "government may constitutionally prohibit speech whose non-expressive qualities promote discrimination." *Saxe*, 240 F.3d at 208.

Therefore, defendants are simply "wrong that the only thing actually at issue in this litigation is conduct." *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) (quoting *Humanitarian Law Project*, 561 U.S. at 27); *accord Billups v. City of Charleston*, 961 F.3d 673, 682–83 (4th Cir. 2020) (concluding that municipal licensing of tour guides is a regulation of speech not merely conduct).

16

Nor can the rule be immunized from First Amendment scrutiny simply because it deploys the labels of "harassment" and "discrimination." On multiple occasions, the Third Circuit has directly repudiated this idea. Both *Saxe* and *DeJohn* stand for the proposition that "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe*, 240 F.3d at 204; *DeJohn*, 537 F.3d at 316; *see also Rodriguez v. Maricopa Community College District*, 605 F.3d 703 (9th Cir. 2010). While "[t]here is no question that non-expressive, physically harassing conduct is entirely outside the ambit of the free speech clause," "there is also no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin or denigrate religious beliefs." *Saxe*, 240 F.3d at 206. "[W]hen anti-discrimination laws are 'applied to harassment claims found solely on verbal insults, pictorial, or literary matter, the statutes impose content-based viewpoint-discriminatory restrictions on speech.'" *Id.* (quoting *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596–97 (5th Cir. 1995) (internal alterations omitted))). "'Harassing' or discriminatory speech, although evil and offensive, may be used to communicate ideas or emotions that nevertheless implicate First Amendment protections." *Id.* at 209; *accord DeJohn*, 537 F.3d at 314. "[O]verbroad harassment policies can suppress or even chill core protected speech." *DeJohn*, 537 F.3d at 314. "The harassment policy can be found unconstitutionally overbroad if there is a likelihood that the statute's very existence will inhibit free expression to a substantial extent." *Id.* (internal quotations omitted); *accord Dambrot v. Central Mich. Univ.,* 55 F.3d 1177, 1182–85 (6th Cir. 1995) (affirming summary judgment invalidating school's overbroad and vague "discriminatory harassment" policy).[5]

---

[5] In *McCauley*, the Circuit also invalidated as facially overbroad another harassment policy because its "use of 'offensive' was, on its face, sufficiently broad and subjective that it could conceivably be applied to cover any speech that offends someone." 618 F.3d at 248–49 (cleaned up). It provided "no shelter for core protected speech." *Id.* at 249 (quoting *DeJohn*, 537 F.3d at 317–18).

To analyze overbreadth, the Court should compare the rule as written with the proper scope of the government's authority. In *Saxe* and *DeJohn*, the schools' authority was bounded by the "substantial disruption" and "invasion of the rights of others" test of *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S 503, 513 (1969). The Disciplinary Board's authority is bounded by the rule of *NIFLA*, spelling out "two circumstances" in which professional speech may be afforded less than full protection. 138 S. Ct. at 2372. First, courts may apply "more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *Id.* Second, "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *Id.*

Once again "Rule 8.4(g) does not fall into either of these categories." *Greenberg*, 491 F. Supp. 3d at 27. "Rule 8.4(g) does not seek to limit attorneys' speech only when that attorney is in court, nor when that attorney has a pending case, nor even when that attorney seeks to solicit business and advertise." *Id.* Just as the policies in *Saxe* and *DeJohn* were not tailored to harassing speech that created a substantial disruption, Rule 8.4(g) is not tailored to the defendants' interest in combatting speech that interferes with the administration of justice. *Compare Saxe*, 240 F.3d at 216–17, and *DeJohn*, 537 F.3d at 317, 319, *with* Comment [4] to Rule 8.4(g) (defining harassment without concern for prejudice to the fair administration of justice), and Comment 5 to Rule 8.4(g) (defining discrimination to include circumstances in which there is no prejudice to the fair administration of justice). Just as 8.4(g) elevates twelve protected characteristics, the *Saxe* school policy reached beyond the classes protected by federal statute. *Saxe*, 240 F.3d at 206. And just as Rule 8.4(g) extends beyond "harassment" and "discrimination" involving legal proceedings, the *Saxe* school policy "extend[ed] beyond harassment that objectively denies a student equal access to a school's education resources." *Id.* (contrasting "federal anti-harassment law, which imposes liability only when the harassment has a systematic *effect* on educational programs and activities" with the school policy which also prohibits conduct which merely has the "purpose" of interfering) (internal quotation omitted). Indeed, even the sub-prong of 8.4(g) that does contemplate the "fair administration of justice" encompasses an "intention . . . to cause

or attempt to cause interference with the fair administration of justice," not merely actual interference. Because 8.4(g) "does not, on its face, require any threshold showing of severity or pervasiveness, it could conceivably be applied to cover any speech about some enumerated personal characteristics the content of which offends someone." *Saxe*, 240 F.3d at 217.

Making matters worse, in revising 8.4(g), Pennsylvania has severed the connection between "the substantive law of antidiscrimination and anti-harassment statutes" and the new rule. *Compare* Comment [4] to Old 8.4(g). Not only does that mean there is less fair notice and guidance for regulated attorneys,[6] it suggests that the Commonwealth's real aim is not to root out harassment or discrimination in the legal process, but to "remove certain ideas or perspectives from the broader debate." *Greenberg*, 491 F. Supp. 3d at 31. Indeed, defendants previously attempted to distinguish Old 8.4(g) from the unconstitutional policies of *DeJohn* and *Saxe* by noting the "well-known structure for assessing complaints." Dkt. 15 at 22. But now, regulated attorneys and defendants do not even have that structure to guide them.

Nothing in the "sea of case law, statutes, regulations and other provisions that utilize [the terms 'harassment' and 'discrimination']" uses that terminology in a way that is remotely similar to Comments [4] and [5] to New 8.4(g). *Id.* at 27. Comparing other existing anti-discrimination and anti-harassment statutes reveals the radical nature of 8.4(g). Take the examples raised by Defendants in their earlier motion to dismiss. *Id.* at 22. Title VII of the Civil Rights Act of 1964 forbids discrimination in employment; the Americans with Disabilities Act prohibits discrimination, *inter alia*, in public accommodations. So too does the Pennsylvania Human Relations Act. 43 P.S. § 951 *et seq*. These statutes don't capture "manifest[ing] an intention" "to disregard relevant considerations of individual characteristics or merit"; they capture concrete "adverse actions" that subject individuals to disfavored treatment at work or with respect to obtaining public services. *See Jones v. SEPTA*, 796 F.3d 323, 325–27 (3d Cir. 2015) (concluding

---

[6] *See* Section III.A, *infra*.

that Title VII claim failed for lack of adverse action); *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010) (same under ADA).

The contrast between 8.4(g)'s redefinition of "harassment" and the preexisting legal construct of harassment is even starker. Pennsylvania's criminal code—18 Pa. C. S. § 2709— prohibits the offense of "harassment." But unlike 8.4(g), § 2709 delineates specific acts that constitute the offense. And applying that statute to expression requires "repeated[]" communications. Indeed, state judicial constructions have further limited § 2709 to apply only when the challenged conduct is "of a non-legitimate nature—conduct which is not constitutionally protected." *Haagensen v. Pa. State Police*, 490 Fed. Appx. 447, 453 (3d Cir. 2012) (quoting *Commonwealth v. Miller*, 689 A.2d 238, 242 (Pa. Super Ct. 1997)). Comment [4] to 8.4(g), by contrast, vaguely defines "harassment" to include expression that "denigrate[s] or show[s] hostility or aversion toward a person." It does not require repetition or severity, and, on its face, it arrests core protected speech. "It is not an anti-discrimination clause; it is a happy-talk clause." *Matal*, 137 S. Ct. at 1765.

Moreover, this panoply of existing federal, state, and local anti-discrimination and anti-harassment statutes demonstrates that there are speech-neutral alternatives to combat invidious discrimination and harassment. *See McCauley*, 618 F.3d at 252 (referencing existing statutes as evidence that the risk of chilled speech outweighed the government's need for regulation). Even more tools are available to enforcement authorities in the course of legal proceedings. *See* Pa. Code. Jud. Cond. 2.3(C) (tasking judges with "requir[ing] lawyers in proceedings before the court to refrain from manifesting bias or prejudice, or engaging in harassment"); 204 Pa. Code § 99.3(7) (exhorting attorneys to, among other things, "refrain from acting upon or manifesting racial, gender or other bias or prejudice toward any participant in the legal process."); Pa. R. Prof. Cond. 4.4(a) (prohibiting lawyers "in representing a client" from mistreating third parties or violating their legal rights); Pa. R. Prof. Cond. 8.4(d) (proscribing conduct prejudicial to the administration of justice). More troubling, the existence of these well-established federal, state, and local frameworks, and 8.4(g)'s deviation from those frameworks, suggests that the

20

Commonwealth's primary object is not rooting out actual discrimination and harassment. For again, it already has the tools to do that. Rather, 8.4(g) aims to ensnare all the protected expression that traditional anti-discrimination and anti-harassment law cannot reach. It aims to socially engineer the desired culture of the Pennsylvania Bar. It aims to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. Bd. of Educ. v. Barnette*, 319 U.S 624, 642 (1943). And once 8.4(g) is in effect, neither ODC nor the Board will even have to lift a finger to achieve that result: the "continuous threat[]" of the looming rule will take care of that naturally, by causing attorneys to "self-censor and constantly mind what [they] say] and how [they say it]." *Greenberg*, 491 F. Supp. 3d at 25.

All the accounts compiled in Greenberg's amended complaint and summary judgment declaration (Dkt. 49 ¶¶ 113-119; Dkt. 54 ¶¶ 44-87) show that the problem of weaponization of anti-harassment and anti-discrimination policies is not merely theoretical. Certain actors seek to use these types of rules for "enforcing not just equal opportunity but progressive ideology." Aaron Sibarium, *A Yale Law Student Sent a Lighthearted Email Inviting Classmates to His 'Trap House.' The School is Now Calling Him to Account*, THE WASHINGTON FREE BEACON (Oct. 13, 2021, 5:00 AM), https://freebeacon.com/campus/a-yale-law-student-sent-a-lighthearted-email-inviting-classmates-to-his-trap-house-the-school-is-now-calling-him-to-account/. Complainants and officials will construe the speaker's political affiliation or, as in the Yale incident referenced in the preceding citation, membership in the Federalist Society, as a "triggering" or aggravating factor. Aaron Terr, *How Yale Law School pressured a law student to apologize for a Constitution Day 'trap house' invitation*, FIRE (Oct. 14, 2021), https://www.thefire.org/how-yale-law-school-pressured-a-law-student-to-apologize-for-a-constitution-day-trap-house-invitation/. In the words of Judge Stephanos Bibas, upon receiving such complaints, enforcers often seek to extract a "corruption of apology" from the respondent—a public performance regularly "demanded by Twitter mobs" these days. David Lat, *Yale Law School And the Federalist Society Caught In a Bad Romance*, ORIGINAL JURISDICTION (Nov. 13, 2021), https://davidlat.substack.com/p/yale-law-school-and-the-federalist.

21

Perhaps this portrayal is too uncharitable, and 8.4(g) is merely the Commonwealth's attempt to make a political statement of its own. Greenberg does not dispute that Pennsylvania can engage in whatever government speech it wishes. The problem is that the Rules of Professional Conduct are not an avenue for government speech; they are an imposition on private speakers. The government may not "co-opt" private parties to act as the mouthpiece of the government's preferred message. *NIFLA*, 138 S. Ct. at 2376. "If there be a time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). Lawyers must remain "unintimidated—free to think, speak, and act as members of an Independent Bar." *Konigsberg v. State Bar of Cal*., 353 U.S. 252, 273 (1957).

## III.    Rule 8.4(g) does not provide fair notice nor admit of reasoned and even-handed application.

If a rule either fails to provide fair notice to "people of ordinary intelligence" or "authorizes or even encourages arbitrary and discriminatory enforcement," it is void for vagueness. *United States v. Stevens*, 533 F.3d 218, 249 (3d Cir. 2008). As usually defined:

> The void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.

*FCC v. Fox TV Stations*, *Inc.*, 567 U.S. 239, 253 (2012). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox TV*, 567 U.S. at 253–54; *accord Reno v. ACLU*, 521 U.S. 844, 871–72 (1997). Accordingly, "all forms of content-based restriction"—whether the most egregious viewpoint-based restrictions or the less egregious subject-based restrictions—"must be capable of reasoned application." *Ctr. for Investigative Reporting,* 975 F.3d at 313–14. Again, this standard applies to professional rules regulating attorney speech. *Gentile*, 501 U.S. at 1051; *NAACP v. Button*, 371 U.S. 415, 433 (1963); *Konigsberg v. State Bar of Cal.*, 353 U.S. 252, 263 (1957). The question is

not whether discriminatory enforcement will necessarily occur, "but whether the Rule is so imprecise that discriminatory enforcement is a real possibility." *Gentile*, 501 U.S. at 1051.

Along multiple dimensions, 8.4(g) is simply too vague. It does not provide fair notice of what is prohibited, nor does it provide objective and workable standards that avoid the possibility of discriminatory and arbitrary enforcement.

**A.    Rule 8.4(g)'s "conduct that is intended to intimidate, denigrate, or show hostility or aversion" standard is vague.**

Vagueness lies at the very heart of 8.4(g): what speech, what words, what ideas are sufficient to qualify as "harassment" because they "denigrate" or "show hostility or aversion"? As Greenberg's Amended Complaint shows, in society today speakers are accused of displaying hostility or aversion for taking policy positions, for discussing statistics or academic theories, for espousing legal views, or for even just mentioning loaded words. Amended Complaint ¶¶ 113–19. At the height of the McCarthyite Red Scare, there were those "among us always ready to affix a Communist label upon those whose ideas they violently oppose." *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 286–87 (1961). Though the labels have changed, the phenomenon now is similar—"it would be blinking reality not to acknowledge" comparable forces and efforts to tar and brand ideological opponents. *Id.*

In particular, denigration, hostility, and aversion are not "susceptible of objective measurement." *Id.* at 286. Just as a "ban on 'offensive' signs is hopelessly ambiguous and subjective," so too is a ban on denigrating and showing hostility or aversion. *McCauley*, 618 F.3d at 250; *see also Dambrot*, 55 F.3d at 1184 (policy unconstitutionally vague where it turned on the "subjective reference" whether speech was "negative" or "offensive"); *Monroe v. Houston Indep. Sch. Dist.*, 419 F. Supp. 3d 1000, 1008 (S.D. Tex. 2019) (restriction on "name-calling" and "offensive or derogatory remarks" is unconstitutionally vague); *cf. also Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. #204*, 523 F.3d 668, 675 (7th Cir. 2008) (injunction against forbidding "'negative comments' about homosexuality short of 'fighting words'" would be "too vague" to satisfy Rule 65). Similarly, the Supreme Court has suggested that a metric of "general standards

23

of decency and respect," if it "appeared in a criminal or regulatory statute," "could raise substantial vagueness concerns." *NEA v. Finley*, 524 U.S. 569, 588 (1998). In another context, the Supreme Court held void for vagueness a state statute that penalized anyone who "treats contemptuously" the flag. *Smith v. Goguen*, 415 U.S. 566, 573 (1974). Just as "what is contemptuous to one man may be a work of art to another," what one person perceives as denigration or hostility another perceives as a religious or moral tenet, and yet another perceives as an intellectual curiosity or theory. *Id.* Rule 8.4(g) "fails to draw reasonably clear lines" between what is prohibited and what is not. *Id.* at 574.

Again, New 8.4(g) exacerbates the vagueness problem by removing the guideposts of existing anti-discrimination and anti-harassment statutes and case law. Of course, Old 8.4(g) itself failed to appropriately clarify *which* body of case law would govern. But at least it purported to define "harassment" and "discrimination" as "those terms are defined in applicable federal, state, or local statutes or ordinances." New 8.4(g)'s solution is simply to untether the rule from any existing law.

**B.     Rule 8.4(g)'s "conduct" that "manifests an intention" "to treat a person as inferior" or "to disregard relevant considerations of individual characteristics or merit" standard is vague.**

The Rule's vagueness does not stop there. Under the Rule, discrimination is defined to include manifestations of an intent to treat a person as "inferior" or an intent "to disregard relevant considerations of individual characteristics or merit." 8.4(g), Comment [5]. The latter prong appears to derive from a comment to a previous version the Rule that defined manifesting bias and prejudice to include making "irrelevant references to personal characteristics." *Greenberg,* 491 F. Supp. 3d at 28 (quoting 48 Pa.B. 2936). But what is treating someone as "inferior"? And what is disregarding "relevant" characteristics?

Anti-discrimination laws customarily define their universe of application, to provide fair notice of which adverse actions constitute violations. For example, Title VII covers wrongful "fail[ures] to hire," "discharge[s]," or other discrimination "with respect to . . . compensation,

terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2. Title IX covers

wrongfully excluding individuals from participation in, or denying them the benefits of,

educational programs. 20 U.S.C. § 1681; *see also Davis v. Monroe County Bd. of Educ.*, 526 U.S.

629, 652 (1999) (reading Title IX to be limited to conduct "serious enough to have the systemic

effect of denying the victim equal access to an educational program or activity.").

By contrast, 8.4(g) is unbounded; it encompasses free-floating intentions to treat someone

as "inferior" and free-floating intentions to "disregard relevant considerations of individual

characteristics or merit." What constitutes "inferior" treatment or "relevant considerations" is left

to those enforcing the rule. Under such a regime, arbitrary and discriminatory enforcement "is a

real possibility" because inferiority and relevant considerations are "both classic terms of

degree." *Gentile*, 501 U.S. at 1048–49, 1051. And in turn, terms of degree "vest[] virtually

complete discretion in the hands of the [enforcement official]." *Kolender v. Lawson*, 461 U.S.

352, 358 (1983).

To take concrete examples, imagine one CLE attorney speaker advocates for racial or

ethnic profiling in client or juror selection or even in policing. Imagine another attorney speaker

advocates for race or ethnicity-based diversity preferences in law school admissions or in law

firm hiring.[7] Whether the speakers have violated 8.4(g) turns on whether the enforcement official

deems each of them to have disregarded relevant considerations of individual characteristics or

merit. In other words, it turns on whether the enforcement official agrees with the speaker's

views that race and ethnicity are relevant characteristics in any given context, or alternatively

whether the speaker has instead disregarded relevant individual characteristics. Enforcement

---

[7] This Court has already correctly concluded that 8.4(g)'s safe harbor for "advocacy consistent with [the professional rules]" refers only to advocacy in the context of representing a client, not in the context of academic advocacy at CLE presentations. *Greenberg*, 491 F. Supp. 3d at 24.

officials with one constellation of political views may come to one conclusion, and those with another constellation may come to the diametrically opposite conclusion.

Similarly, imagine a law firm partner sets up a compulsory mentoring program for new hires of a certain race, or a certain age, or a certain socioeconomic status, because it wants those in that demographic to have more success within the firm's ranks. Does that qualify as treating those new hires as "inferior"? Again, it depends entirely on whether the enforcement official sees the mentoring program as necessary or improper, beneficial or harmful. And that is an "opportunity for abuse" that the First Amendment cannot abide. *Minnesota Voters Alliance*, 138 S. Ct. at 1891 (internal quotation omitted).

     ~~~     ~~~     ~~~

As currently written, the language of the Rule is not capable of reasoned, consistent, and neutral application. Its failure to provide to clear standards will chill speech by Pennsylvania attorneys on matters of public and private concern. For that reason, it violates the Fourteenth Amendment and should be enjoined as void for vagueness.

## IV. Greenberg's claims remain justiciable.

In its earlier decision, this Court concluded that Greenberg had standing to seek prospective declaratory and injunctive relief from Old 8.4(g). *Greenberg*, 491 F. Supp. 3d at 19–25. Neither the amendment of 8.4(g) nor the recent Farrell Declaration should alter this conclusion.

First of all, it is clear that, under New 8.4(g) and Comment [3], CLE presentations fall within the ambit of the rule. *See supra* at 15 (discussing the negative implication canon). Although the new rule now speaks in terms of "denigrat[ing]" or "show[ing] hostility or aversion" rather than "manifesting bias or prejudice," as described in Greenberg's supplemental declaration, there are countless examples of speakers being accused of this type of "harassment" or "discrimination" by endorsing an absolutist view of the First Amendment. As one particularly recent example of this phenomenon, an advocacy group accused Eighth Circuit Judge David

Stras of spreading a discriminatory homophobic message when he spoke against applying anti-discrimination laws in a way that abridge free speech. Greenberg Supp. Decl. ¶ 83. Nor is this type of accusation an isolated instance. Greenberg Supp. Decl. ¶¶ 44–87. Greenberg himself has been informed after multiple audience events that the content of his presentations was offensive. Greenberg Supp. Decl. ¶¶ 88–91. Fear of a disciplinary complaint under Rule 8.4(g) will chill Greenberg's speech and cause him to self-censor. Greenberg Supp. Decl. ¶¶ 31–42. And this Court found such beliefs to be "objectively reasonable." *Greenberg*, 491 F. Supp. 3d at 23.

Significantly, the Court observed that "[e]ven if the disciplinary process does not end in some form of discipline, the threat of a disruptive, intrusive, and expensive investigation and investigatory hearing into the Plaintiff's words, speeches, notes, written materials, videos, mannerisms, and practice of law would cause Plaintiff and any attorney to be fearful of what he or she says . . . ." *Id.* at 25. The Third Circuit has recently endorsed a similar concept of First Amendment chill resulting from a government investigation. *McGee v. Township of Conyngham*, No. 20-3229, 2021 WL 4315936, 2021 U.S. App. LEXIS 28829 (3d Cir. Sept. 23, 2021) (unpublished). Concerns about being subject to an investigation are "sensible because the transaction costs of dealing with [it] are never zero." *Id.*, at *8.

For several reasons, the subsequent declaration from Mr. Farrell does not undermine the justiciability of Greenberg's claims. First, because "standing is determined at the outset of the litigation,"[8] the jurisdictional effect of Farrell's later-filed declaration is best considered a question of mootness, under which Pennsylvania bears a "heavy burden" that harm will not continue. *Pool v. Houston*, 978 F.3d 307, 314 (5th Cir. 2020) (quoting *Friends of Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 527 U.S. 167, 189 (2000)). "The action at its inception was

---

[8] *McNair v. Synapse Group, Inc.*, 672 F.3d 213, 226 (3d Cir. 2012) (citing *Davis v. FEC*, 554 U.S. 724, 734 (2008)).

properly brought and this subsequent representation of the [government] should not suffice to defeat it." *Abbott Labs. v. Gardner*, 387 U.S. 136, 154 (1967).

Although, Mr. Farrell in his discovery responses contends that he, ODC, and his successors are all estopped from acting inconsistent with the views of his declaration, he nevertheless acknowledges that "there is no set process for amending, revising, or withdrawing the position taken in the Farrell Declaration."  Def.'s Answers to Pl.'s Interrogs. ¶¶ 12-13. And where, as here, the change of position is "ad hoc" and "discretionary" rather than the product of "legislative-like procedures" "significantly more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 768 (6th Cir. 2019); *see also DeJohn*, 537 F.3d at 310 (voluntary cessation did not moot challenge to sexual harassment policy where defendant "continue[d] to defend not only the constitutionality of its prior . . . policy, but also the need for the former policy"). "The focus is whether the defendant made the change unilaterally and so may return to its old ways later on." *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 307 (3d Cir. 2020) (internal quotation omitted).

Additionally, Mr. Farrell is mistaken about the legal issue of estoppel. Under both federal and Pennsylvania law, it is "well-settled that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Cmty. Health Servs. of Crawford Cty.*, 467 U.S. 51, 60 (1984). "It is a fundamental legal principle that a State or other sovereignty cannot be estopped by acts or conduct of its officers or agents in the performance of a governmental as distinguished from a proprietary function." *DS Waters of Am., Inc v. Commonwealth*, 150 A.3d 583, 592 (Pa. Commonwealth Ct. 2016) (quoting *Commonwealth v. W. Md. R.R. Co.*, 105 A.2d 336, 340 (Pa. 1954)). And even if the government could sometimes be estopped by previous representations of its officials, the "[h]allmark of the doctrine is its flexible application." *Heckler*, 467 U.S. at 59. The Farrell Declaration does not provide the certainly necessary to moot a case.

Ultimately, the current "litigation position" of the defendant does not moot the case nor does it negate the credible threat of enforcement by "overrid[ing] the plain text of the [rule]." *EQT Prod. Comp. v. Wender*, 870 F.3d 322, 331 (4th Cir. 2017); *accord Woodhull Freedom*

*Found. v. United States*, 948 F.3d 363, 373 (D.C. Cir. 2020); *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010); *Pa. Family Inst.*, 521 F. Supp. 2d at 365. "[T]here is nothing that prevents the State from changing its mind. It is not forever bound, by estoppel or otherwise, to the view of the law that it asserts in this litigation." *Vt. Right to Life Comm'n v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000). Despite the averments of the Farrell Declaration, "nothing prevents [ODC] from enforcing" the full scope of the rule after "another change of mind." *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996). Even excluding the possibility of Mr. Farrell changing his mind, "he may be replaced in office." *Kucharek v. Hanaway*, 902 F.2d 513, 519 (7th Cir. 1990); Ex. 1 to Schulman Decl., Def.'s Answers to Pl.'s Req. for Admis. ¶ 11.

There is an even more fundamental issue though. As Mr. Farrell admits, none of the Board member defendants played a role in drafting the Farrell Declaration, nor are they bound by those views that they have not endorsed. *See supra* at 9 n.2 (citing Def.'s Answers to Pl.'s Req. for Admis. ¶¶ 10–11). Thus, at the very least, the controversy remains live with respect to those twelve defendants. *Cf. Presbytery of the Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1464–68 (3d Cir. 1994) (reversing determination that an enforcement waiver rendered suit non-justiciable because the scope of the waiver did not encompass the entirety of plaintiff's claims).

In sum, neither the amendment to Rule 8.4(g) nor the Farrell Declaration either moot the case or deprive Greenberg of standing.

## CONCLUSION

For the foregoing reasons, the Court should grant Greenberg's motion for summary judgment.

Dated: November 16, 2021          Respectfully submitted,

*/s/ Adam E. Schulman*
Adam E. Schulman
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
adam.schulman@hlli.org
(610) 457-0856

*Attorney for Plaintiff Zachary Greenberg*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I filed the foregoing with the Clerk of the Court via ECF thus effectuating service on all counsel who are registered as electronic filers in this case.


DATED: November 16, 2021


*(s) Adam Schulman*
Adam Schulman