## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ZACHARY GREENBERG | : | |
| | : | CIVIL ACTION |
| *Plaintiff* | : | |
| | : | No. 2:20-CV-3822 |
| v. | : | |
| | : | |
| JOHN P. GOODRICH, in his | : | |
| official capacity as Chair of the | : | Hon. Chad F. Kenney |
| Disciplinary Board of the Supreme | : | |
| Court of Pennsylvania, *et al.* | : | |
| | : | |
| *Defendants* | : | |

### <u>Notice of Appeal</u>

Defendants appeal to the United States Court of Appeals for the Third

Circuit from the District Court's March 24, 2022, Orders (Docs. 77, 78) and

accompanying Memorandum (Doc. 76) that granted Plaintiff's Motion for Summary

Judgment (Doc. 65) and denied Defendants' Motion for Summary Judgment (Doc.

61). Copies of the District Court's March 24, 2022, Orders and Memorandum are

attached.

Respectfully Submitted,

<u>s/Michael Daley</u>
MICHAEL DALEY, ESQUIRE
Attorney I.D. No. PA 77212
MEGAN L. DAVIS, ESQUIRE
Attorney I.D. No. PA 321341
Administrative Office of PA Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102
legaldepartment@pacourts.us
(215) 560-6326, Fax: (215) 560-5486
***Counsel for Defendants***

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ZACHARY GREENBERG | : | |
| | : | CIVIL ACTION |
| *Plaintiff* | : | |
| | : | No. 2:20-CV-3822 |
| v. | : | |
| | : | |
| JOHN P. GOODRICH, in his | : | |
| official capacity as Chair of the | : | Hon. Chad F. Kenney |
| Disciplinary Board of the Supreme | : | |
| Court of Pennsylvania, *et al.* | : | |
| | : | |
| *Defendants* | : | |

## Certificate of Service

The undersigned certifies that on *April 20, 2022*, he caused the foregoing

*Notice of Appeal* to be served via CM/ECF on all counsel of record

**/S/ Michael Daley**
MICHAEL DALEY, ESQUIRE
Attorney I.D. No. PA 77212
Supreme Court of Pennsylvania
Administrative Office of PA Courts
1515 Market Street, Suite 1414
Philadelphia, PA 19102
legaldepartment@pacourts.us
(215) 560-6326, Fax: (215) 560-5486

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ZACHARY GREENBERG, | : | CIVIL ACTION |
| *Plaintiff,* | : | |
| | : | |
| v. | : | No. 20-03822 |
| | : | |
| JOHN P. GOODRICH, | : | |
| in his official capacity as Board Chair | : | |
| of The Disciplinary Board of the | : | |
| Supreme Court of Pennsylvania, *et al.*, | : | |
| *Defendants.* | : | |

## ORDER

**AND NOW**, this **24**[th] day of **March 2022**, upon consideration of Plaintiff's

Motion for Summary Judgement (ECF No. 65), Defendants' response thereto (ECF

No. 71), the parties' Stipulated List of Facts for Purposes of Summary Judgment

Motions (ECF No. 53), and the oral argument held on January 20, 2022 (ECF No.

74), it is hereby **ORDERED** that for the reasons set forth in the accompanying

Opinion, Plaintiff's Motion for Summary Judgment is **GRANTED** as follows:

1. Pennsylvania Rule of Professional Conduct 8.4(g) facially violates the
   First Amendment to the Constitution.

2. Pennsylvania Rule of Professional Conduct 8.4(g) facially violates the
   Fourteenth Amendment to the Constitution.

3. Defendants are **PERMANENTLY ENJOINED** from enforcing
   Pennsylvania Rule of Professional Conduct 8.4(g).

4. This permanent injunction is immediately effective upon the issuance of this Order.

5. The Clerk's office is directed to **ENTER JUDGMENT** in favor of Plaintiff consistent with this Order.

6. The Clerk's office is directed to close the case and shall direct a copy of this Order to all counsel of record.

**BY THE COURT:**

**/s/ Chad F. Kenney**

_____

**CHAD F. KENNEY, JUDGE**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ZACHARY GREENBERG,<br>*Plaintiff,* | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | No. 20-03822 |
| | : | |
| JOHN P. GOODRICH, | : | |
| in his official capacity as Board Chair | : | |
| of The Disciplinary Board of the | : | |
| Supreme Court of Pennsylvania, *et al.,* | : | |
| *Defendants.* | : | |

## ORDER

**AND NOW**, this **24**th day of **March 2022**, upon consideration of Defendants' Motion for Summary Judgement (ECF No. 61), Plaintiff's response thereto (ECF No. 70), the parties' Stipulated List of Facts for Purposes of Summary Judgment Motions (ECF No. 53), and the oral argument held on January 20, 2022 (ECF No. 74), it is hereby **ORDERED** that for the reasons set forth in the accompanying Opinion, Defendants' Motion for Summary Judgment is **DENIED**.

**BY THE COURT:**

**/s/ Chad F. Kenney**
_____

**CHAD F. KENNEY, JUDGE**

1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ZACHARY GREENBERG,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 20-03822** |
| | : | |
| **JOHN P. GOODRICH,** | : | |
| **in his official capacity as Board Chair** | : | |
| **of The Disciplinary Board of the** | : | |
| **Supreme Court of Pennsylvania,** *et al.,* | : | |
| *Defendants.* | : | |

## OPINION

**KENNEY, J.**                                                                                **March 24, 2022**

This Court fully commends and supports the aims and intentions of the American Bar Association ("ABA") in its creation of the ABA Model Rule 8.4(g) as a statement of an ideal and as a written conviction that we must be constantly vigilant and work towards eliminating discrimination and harassment in the practice of law. If the ABA were to apply the Model Rule as a standard to maintain good standing for its voluntary members, it would indeed be the gold standard. It is a measure that most members of the ABA would aspire to, as would the vast number of those in the profession not represented by the ABA.[1] When, however, the ABA standard is adopted by government regulators and applied to all Pennsylvania licensed lawyers, as in this instance by the Disciplinary Board of the Supreme Court of Pennsylvania (the "Board"), it must pass constitutional analysis and muster. The ABA's power over its voluntary membership is of an immensely different kind, quality, and force than that of the government over its constituents. The government cannot approach free speech in the same manner in which

---

[1] The ABA is a nationwide professional legal association. Pennsylvania currently has nearly 70 independent, state and county bar associations.

the ABA may choose to do so with its voluntary membership. Here, the Board adopted its own version of the ABA Model Rule and Plaintiff Zachary Greenberg challenges the Rule on the basis that it violates his individual right to free speech. Plaintiff argues that the Board should not have the power to investigate, interrogate, and discipline attorneys based on this Rule, and the regulation is otherwise too vague to equitably enforce.

Before the Court are Defendants' Motion for Summary Judgment (ECF No. 61) and Plaintiff's Motion for Summary Judgment (ECF No. 65).

## I.   BACKGROUND

Plaintiff Mr. Greenberg is a licensed attorney in Pennsylvania and was admitted to the Pennsylvania Bar in May 2019. ECF No. 53 ¶¶ 3–4.[2] Mr. Greenberg is employed as a Senior Program Officer at the Foundation for Individual Rights in Education and speaks and writes on several topics, including freedom of speech, freedom of association, due process, legal equality, and religious liberty. *Id.* ¶¶ 6–7. Mr. Greenberg is also National Secretary and a member of the First Amendment Lawyers Association, which conducts continuing legal education ("CLE") events for its members. *Id.* ¶¶ 8–9. For both affiliations, Plaintiff speaks at CLE and non-CLE events on a variety of "controversial" issues. *Id.* ¶¶ 10–18. Mr. Greenberg has written and spoken against banning hate speech on university campuses and campaign finance speech restrictions. *Id.* ¶ 10. For example, Mr. Greenberg spoke at a CLE in Pennsylvania on his interpretation of the legal limits of a university's power to punish students for online expression deemed offensive or prejudiced. *Id.* ¶ 14.  Mr. Greenberg expects to continue speaking on issues such as Title IX's

---

[2] The facts included here were all alleged in the Amended Complaint (ECF No. 49) and/or stipulated in the Stipulated List of Facts for Purposes of Summary Judgment Motions (ECF No. 53). While the Court considered all allegations in the Amended Complaint for purposes of both parties' Cross-Motions for Summary Judgment, the Court found these facts pertinent to its analysis and conclusion.

effect on due process rights of individuals accused of sexual assault, university policies on misconduct, professional academic freedom, religious freedom on campuses, and others. *Id.* ¶ 18. Mr. Greenberg considers these topics to be "polarizing" and "fears that in today's climate he could be subject to professional disciplinary processes or sanction if his speech is perceived to violate the [Rule]." ECF No. 65–1 at 3.

Mr. Greenberg supports his concerns that his speech will be either chilled or subject to Rule 8.4(g)'s disciplinary process with numerous examples of public outcry and investigation after speakers in similar situations expressed information related to controversial topics. ECF No. 49 ¶¶ 113–114; ECF No. 54. For example, in 2013, Judge Edith Jones of the Fifth Circuit spoke at the University of Pennsylvania Law School and stated that members of certain racial groups commit crimes at rates disproportionate to their population, to which an attorney, among others, filed an ethics complaint alleging racial bias that resulted in a nearly two-year process of investigation. ECF No. 54 ¶¶ 44–45. In 2020, Professor Helen Alvare of George Mason University School of Law was accused of homophobic bias by Duke University School of Law students after supporting religious freedom accommodation laws and writing amicus briefs opposing gay marriage, in an effort by the law students to disinvite the speaker from coming to their university. *Id.* ¶ 50. Mr. Greenberg intends to continue speaking at CLE presentations and fears that his own discussion of "controversial" subjects will expose him to such investigation or discipline. ECF No. 53 ¶¶ 62–65.

The Board first considered adopting a version of the ABA Model Rule of Professional Conduct 8.4(g) in Pennsylvania in 2016.[3] ECF *Id.* ¶ 42; ECF No. 61 at 8. After an iterative

---

[3] The ABA Model Rule is available at
https://www.americanbar.org/groups/professional_responsibility/publications/model
_rules_of_professional_conduct/rule_8_4_misconduct/ (accessed Feb. 2, 2022); *see also* ABA Comm. on Ethics & Pro. Resp., Formal Op. 493 (2020). ABA's Model Rule 8.4 states, in relevant part, "It is professional misconduct for

process of notice and comment between December 2016 and June 2020, the Supreme Court of

Pennsylvania approved the recommendation of the Board[4] and ordered that Pennsylvania Rule of

Professional Conduct ("Pa.R.P.C") 8.4 be amended to include the below Rule 8.4(g) (the "Old

Rule") along with two comments, (3) and (4), (together, the "Old Amendments"). ECF No. 53 ¶¶

43–45, 47.

The Old Amendments state:

> It is professional misconduct for a lawyer to:
> * * *
> (g) in the practice of law, by words or conduct, knowingly manifest bias
> or prejudice, or engage in harassment or discrimination, as those terms
> are defined in applicable federal, state or local statutes or ordinances,
> including but not limited to bias, prejudice, harassment or
> discrimination based upon race, sex, gender identity or expression,
> religion, national origin, ethnicity, disability, age, sexual orientation,
> marital status, or socioeconomic status. This paragraph does not limit
> the ability of a lawyer to accept, decline or withdraw from a
> representation in accordance with Rule 1.16. This paragraph does not
> preclude advice or advocacy consistent with these Rules.
>
> Comment:
> * * *
> [3] For the purposes of paragraph (g), conduct in the practice of law
> includes participation in activities that are required for a lawyer to

---

a lawyer to: […] (g) engage in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of race, sex, religion, national origin, ethnicity, disability, age, sexual orientation, gender identity, marital status or socioeconomic status in conduct related to the practice of law. This paragraph does not limit the ability of a lawyer to accept, decline or withdraw from a representation in accordance with Rule 1.16. This paragraph does not preclude legitimate advice or advocacy consistent with these Rules." The Model Rule includes two relevant comments, as follows: "[3] Discrimination and harassment by lawyers in violation of paragraph (g) undermine confidence in the legal profession and the legal system. Such discrimination includes harmful verbal or physical conduct that manifests bias or prejudice towards others. Harassment includes sexual harassment and derogatory or demeaning verbal or physical conduct. Sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other unwelcome verbal or physical conduct of a sexual nature. The substantive law of antidiscrimination and anti-harassment statutes and case law may guide application of paragraph (g). [4] [4] Conduct related to the practice of law includes representing clients; interacting with witnesses, coworkers, court personnel, lawyers and others while engaged in the practice of law; operating or managing a law firm or law practice; and participating in bar association, business or social activities in connection with the practice of law. Lawyers may engage in conduct undertaken to promote diversity and inclusion without violating this Rule by, for example, implementing initiatives aimed at recruiting, hiring, retaining and advancing diverse employees or sponsoring diverse law student organizations"

[4] Justice Mundy dissented. ECF No. 53 ¶ 48.

> practice law, including but not limited to continuing legal education
> seminars, bench bar conferences and bar association activities where
> legal education credits are offered.
> [4] The substantive law of antidiscrimination and anti-harassment
> statutes and case law guide application of paragraph (g) and clarify the
> scope of the prohibited conduct.

ECF No. 1 ¶ 40 (quoting Pa.R.P.C. 8.4).

The Old Amendments were scheduled to take effect on December 8, 2020. ECF No. 53 ¶ 47. On August 6, 2020, Plaintiff filed a complaint in this Court alleging that the Old Amendments consist of content-based and viewpoint-based discrimination and are overbroad in violation of the First Amendment (Count 1) and that the Old Amendments are unconstitutionally vague in violation of the Fourteenth Amendment (Count 2). ECF No. 1. On October 16, 2020, Defendants filed a Motion to Dismiss (ECF No. 15), and Plaintiff filed a Motion for Preliminary Injunction (ECF No. 16). This Court held oral argument on November 13, 2020, addressing both parties' motions. ECF No. 26. On December 8, 2020, this Court entered an Order denying Defendants' Motion to Dismiss (ECF No. 30) and an Order granting Plaintiff's Motion for Preliminary Injunction (ECF No. 31). This Court found that Mr. Greenberg's allegation that the Old Amendments will have a chilling effect on his speech sufficient to satisfy the injury-in-fact requirement of standing because it was objectively reasonable that his speeches are considered prejudiced or offensive by some members of the audience.[5] *Greenberg v. Haggerty*, 491 F. Supp. 3d 12, 18–23 (E.D. Pa. 2020); ECF No. 29 at 18–23 (hereinafter the "Dec. 2020 Opinion"). Plaintiff's claims were further supported by his examples of speakers who had disciplinary complaints filed against them when discussing similar topics. Dec. 2020 Opinion at 19. Such examples also supported Plaintiff's claim of a credible threat of prosecution because complaints

---

[5] Plaintiff believed then, and continues to believe now, that any one of his speaking engagements related to First Amendment issues and jurisprudence carry the risk of an audience member filing a disciplinary complaint because the speech may be perceived as prejudiced or offensive. Dec. 2020 Opinion at 12.

have been filed against speakers under similar circumstances. *Id.* at 21. The Court ultimately held that the Old Amendments constitute viewpoint-based discrimination in violation of the First Amendment because it favored a subset of messages by permitting the government to determine what speech is biased or prejudiced based on whether the viewpoint is socially or politically acceptable at the time. *Id.* at 35.

Defendants filed an appeal of these Orders to the Third Circuit and the case was stayed pending resolution of the appeal. ECF Nos. 32–35. Defendants voluntarily dismissed without prejudice their appeal of the Orders on March 17, 2021 (ECF No. 37; ECF No. 53 ¶ 50) and the case was removed from stay on August 10, 2021 (ECF No. 48).

During this time, the Supreme Court of Pennsylvania revised the Old Amendments by Order on July 26, 2021.[6] *See* ECF No. 61 at 5; *see also* 51 Pa.B. 5190 (Aug. 21, 2021).[7] The Board did not follow the process of public notice and comment that it employed for the Old Amendments. ECF No. 53 ¶ 54. The revised Rule 8.4(g) (hereinafter the "Rule") and its revised Comments (together, "the Amendments") state:

> It is professional misconduct for a lawyer to:
> * * *
> (g) in the practice of law, knowingly engage in conduct constituting harassment or discrimination based upon race, sex, gender identity or expression, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, or socioeconomic status. This paragraph does not limit the ability of a lawyer to accept, decline or withdraw from a representation in accordance with Rule 1.16. This paragraph does not preclude advice or advocacy consistent with these Rules.

ECF No. 53 ¶ 57 (quoting Pa.R.P.C. 8.4). Comments Three through Five pertain to section (g):

---

[6] The parties stipulated facts state the date of the Order is July 26, 2021. ECF No. 53 ¶ 52. Defendants mistakenly identify July 25, 2021 as the date of the Order in their Motion for Summary Judgment. ECF No. 61 at 9. A quick check revealed the correct date is July 26. https://www.padisciplinaryboard.org/news-media/news-article/1439/supreme-court-amends-harassment-provisions-of-rule-84.

[7] Again, Justice Mundy dissented to the adoption of the Amendments. ECF No. 53 ¶ 53.

[3] For the purposes of paragraph (g), conduct in the practice of law includes (1) interacting with witnesses, coworkers, court personnel, lawyers, or others, while appearing in proceedings before a tribunal or in connection with the representation of a client; (2) operating or managing a law firm or law practice; or (3) participation in judicial boards, conferences, or committees; continuing legal education seminars; bench bar conferences; and bar association activities where legal education credits are offered. The term "the practice of law" does not include speeches, communications, debates, presentations, or publications given or published outside the contexts described in (1)- (3).

[4] "Harassment" means conduct that is intended to intimidate, denigrate or show hostility or aversion toward a person on any of the bases listed in paragraph (g). "Harassment" includes sexual harassment, which includes but is not limited to sexual advances, requests for sexual favors, and other conduct of a sexual nature that is unwelcome.

[5] "Discrimination" means conduct that a lawyer knows manifests an intention: to treat a person as inferior based on one or more of the characteristics listed in paragraph (g); to disregard relevant considerations of individual characteristics or merit because of one or more of the listed characteristics; or to cause or attempt to cause interference with the fair administration of justice based on one or more of the listed characteristics.

ECF No. 53 ¶ 58 (quoting Pa.R.P.C. 8.4, cmts.).[8]

Enforcement of the Amendments follows the same procedure as the Old Amendments. The Office of Disciplinary Counsel ("ODC") is charged with investigating complaints against Pennsylvania-licensed attorneys for violation of the Pennsylvania Rules of Professional Conduct and, if necessary, charging, and prosecuting attorneys under the Pennsylvania Rules of Disciplinary Enforcement. *See* Pa.R.D.E. 205–208; Pa.D.Bd.R. §§ 93.21, 93.61; ECF No. 53 ¶ 24. First, a complaint is submitted to ODC alleging an attorney violated the Pennsylvania Rules of Professional Conduct. ODC then investigates the complaint and decides whether to issue a DB-7 letter. ECF No. 53 ¶¶ 28–29. If ODC issues a DB-7 letter, the attorney has thirty days to respond to that letter. *Id.* ¶ 30. If, after investigation and a DB-7 letter response, ODC determines

---

[8] Rule 8.4(g) was set to take effect on August 25, 2021. ECF No. 53 ¶ 55. Defendants agreed to forebear enforcing Rule 8.4(g) pending this Court's disposition of cross-motions for summary judgment. ECF No. 46.

that a form of discipline is appropriate, ODC recommends either private discipline, public reprimand, or the filing of a petition for discipline to the Board. *Id.* ¶ 36. After further rounds of review and recommendation, along with additional steps, the case may proceed to a hearing before a hearing committee and *de novo* review by the Board and the Supreme Court of Pennsylvania. *Id.* ¶¶ 36, 38–41.

Following publication of the Amendments, on August 19, 2020, Plaintiff filed an Amended Complaint alleging that the Amendments consist of content-based and viewpoint-based discrimination and are overbroad in violation of the First Amendment (Count 1) and the Amendments are unconstitutionally vague in violation of the Fourteenth Amendment (Count 2).[9] ECF No. 49. On October 1, 2021, Thomas J. Farrell, the Chief Disciplinary Counsel of ODC, filed a declaration stating, among other things, that "ODC does not interpret Rule 8.4(g) as prohibiting general discussions of case law or 'controversial' positions or ideas" and that "ODC would not pursue discipline on this basis." ECF No. 56 ¶¶ 7, 10–14 (hereinafter the "Farrell Declaration").

On November 16, 2021, Defendants filed a Motion for Summary Judgment (ECF No 61), and Plaintiff filed a response in opposition (ECF No. 70). On November 16, 2021, Plaintiff also filed a Motion for Summary Judgment (ECF No. 65), and Defendants filed a response in opposition (ECF No. 71).[10] The Court held oral argument on January 20, 2022, addressing both Plaintiff and Defendants' Motions for Summary Judgment. ECF No. 73.

---

[9] All Defendants are sued in their official capacities only. ECF No. 49 ¶ 3. "State officers sued for damages in their official capacity are not 'person' for purposes of the suit because they assume the identity of the government that employs them." *Hafer v. Melo*, 502 U.S. 21, 27 (1991). In this case, Defendants are members of either the Board or ODC.

[10] On November 16, 2021, the Court granted Motions for Leave to File Amicus Brief (ECF No. 63; ECF No. 66), which were filed on the same day by the National Legal Foundation, Pacific Justice Institute, and Justice & Freedom Law Center (ECF No. 64) and the Christian Legal Society (ECF No. 67), both in support of Plaintiff.

Before the Court are Defendants' Motion for Summary Judgment (ECF No. 61) and Plaintiff's Motion for Summary Judgment (ECF No. 65).

## II.   STANDARD OF REVIEW

Summary judgment is granted where the moving party has established "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; the requirement is that there must be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A material fact is one that "might affect the outcome of the suit under governing law[.]" *Id.* at 248.

When ruling on a summary judgment motion, the court will consider the facts in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). The judge's role is not to weigh the disputed evidence and determine the truth of the matter, or to make credibility determinations; rather the court must determine whether there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 249.

When both parties move for summary judgment, the standard of review is the same. *Green Party of Pennsylvania v. Aichele*, 103 F. Supp. 3d 681, 687 (E.D. Pa. 2015). "Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and

determination whether genuine issues of material fact exist." *Rains v. Cascade Industries, Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

## III.   DISCUSSION

### A.   *Jurisdictional Issues*

The Court must first address the issues of standing and mootness. While Defendants attempt to conflate the issues, standing and mootness are two distinct justiciability doctrines. Standing ensures that each plaintiff has the "requisite personal interest […] at the commencement of the litigation[.]" *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (internal quotation marks omitted). Mootness "ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit." *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993). This Court will briefly address standing, an issue which was already adjudicated, and then will evaluate mootness, which is the justiciability doctrine applicable at this stage of the litigation.

#### 1.   Standing

This Court previously analyzed Defendants' allegations against standing and determined that Plaintiff has standing to bring this pre-enforcement challenge to the constitutionality of Rule 8.4(g) and its Comments. Dec. 2020 Opinion at 18–25. This Court found that the Old Amendments will have a chilling effect on Mr. Greenberg's speech sufficient to satisfy the injury-in-fact requirement of standing because it was objectively reasonable that his speeches are considered prejudiced or offensive by some members of the audience.[11] *Id.* at 18–23. Plaintiff's claims were further supported by his examples of speakers who had disciplinary complaints filed

---

[11] Plaintiff believed then, and continues to believe now, that any one of his speaking engagements related to First Amendment issues and jurisprudence carry the risk of an audience member filing a disciplinary complaint because the speech may be perceived as prejudiced or offensive. Dec. 2020 Opinion at 12.

against them when discussing similar topics. *Id.* at 19. Such examples also supported Plaintiff's claim of a credible threat of prosecution because complaints have been filed against speakers under similar circumstances. *Id.* at 21. Due to its own decision to appeal, voluntarily dismiss its appeal, revise the Amendments, and then continue with this proceeding, the Board now believes it can re-litigate the standing issue. ECF No. 61 at 17–26. The Court disagrees with Defendants and finds Plaintiff is correct that the relevant inquiry is mootness.

At the "commencement of the litigation," plaintiff has the burden of demonstrating that the standing requirements are met. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000). The evaluation of standing remains squarely focused on the circumstances existing at the start of the litigation, not at any point in the future chosen self-servingly by the defendant. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("While the proof required to establish standing increases as the suit proceeds […] the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.") (internal citations omitted); *see also Freedom from Religion Found, Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 481 (3d Cir. 2016) (remanding to district court to determine if plaintiff was a member of an organization "at the time the complaint was filed" to establish organizational standing); *Sims v. State of Fla., Dep't of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1458 (11th Cir. 1989) ("We must determine standing at the time a plaintiff files suit.") (internal citation omitted).

"[O]nce the plaintiff shows standing at the outset, []he need not keep doing so throughout the lawsuit." *Hartnett v. Pennsylvania State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020); *see also Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 2020 WL 6111020, at *5 (D.N.J. Oct. 16, 2020) (finding plaintiff had "an appropriate interest to initiate a case" and "had standing

to assert their claims when the Complaint was filed." The fact that related hearings were adjourned since that time did not mean plaintiffs "lacked standing when the Complaint was first filed.").

Here, Defendants reiterate their prior assertion that Plaintiff's claimed risk is based on speculative guesses regarding "the unknowable actions of unknown parties." ECF No. 61 at 19; *see also* ECF No. 15 at 11. However, this Court found in favor of the Plaintiff on this issue. This Court found that "Defendants' contention that Plaintiff's injury 'depends on an indefinite risk of future harms inflicted by unknown third parties' is not persuasive." Dec. 2020 Opinion at 21 (internal citation omitted). Plaintiff alleged specific examples of similarly situated individuals facing disciplinary and Title IX complaints for speeches on similar topics. *Id.* at 21. "It can hardly be doubted there will be those offended by the speech, or the written materials accompanying the speech[.]" *Id.* at 23. Plaintiff also sufficiently argued to the Court that, should the Rule remain in place, there would be a chilling effect on his speech and Mr. Greenberg would be forced to self-censor. *Id.* at 22. Defendants do not present any compelling reasons to reconsider our conclusion on this assertion.

Second, Defendants assert that Plaintiff cannot establish a credible threat of prosecution for four reasons: (1) there is no history of past enforcement as the Amendments have yet to go into effect (ECF No. 61 at 23); (2) Plaintiff's conduct falls outside of the scope of the Amendments and, even if a complaint were filed, "there is no reason to believe" that Plaintiff would need to respond or that ODC would bring charges (ECF No. 61 at 23); (3) Plaintiff's speech is protected from prosecution under both the plain language of the Rule and "safe harbor" for advocacy (ECF No. 61 at 25); and (4) ODC has "disavowed any intention" of enforcing the

Amendments against Plaintiff's described conduct through the Farrell Declaration and such complaints would be dismissed as "frivolous" (ECF No. 61 at 22).[12]

Most of those assertions were adequately addressed by Plaintiff in its prior Response in Opposition to the Defendants' Motion to Dismiss (ECF No. 25 at 3–12) and again in his Response in Opposition to the Defendants' Motion for Summary Judgment (ECF No. 70). Plaintiff contended, and this Court agreed, that the "chilling effect" on Mr. Greenberg's speech was sufficient to show an injury in fact and justified a pre-enforcement challenge to the Amendments. ECF No. 70 at 2–3 (citing the Dec. 2020 Opinion at 23–25). This chilling effect shows a "threat of specific future harm." Dec. 2020 Opinion at 18 (quoting *Sherwin-Williams Co. v Cty. of Delaware, Pennsylvania*, 968 F.3d 264, 269–70 (3d Cir. 2020), *cert. denied sub nom.* 141 S. Ct. 2565 (2021)). It continues to be evident to this Court that Plaintiff's alleged fear of disciplinary complaint and investigation is objectively reasonable based on the assertion that Plaintiff speaks on "controversial" issues that may be deemed offensive and hateful by others, as shown through the Plaintiff's lengthy list of similar presentations that faced significant public outcry. Dec. 2020 Opinion at 18; ECF No. 49 ¶ 113. "Even if the disciplinary process does not end in some form of discipline, the threat of a disruptive, intrusive, and expensive investigation and investigatory hearing […] would cause Plaintiff and any attorney to be fearful of what he or she says and how he or she will say it in any forum, private or public, that directly or tangentially touches upon the practice of law[.]" Dec. 2020 Opinion at 23. "The government, as a result, de facto regulates speech by threat, thereby chilling speech." *Id.* at 23. Not only is there an objectively reasonable chilling effect on Plaintiff's speech, but Plaintiff has also shown he will

---

[12] Defendants contend that Chief Counsel Farrell's Declaration is binding and estops ODC from arguing otherwise should an attorney rely on it. ECF No. 61 at 22. This contention is addressed in *supra* pp. 21–28.

self-censor in response. *Id.* at 19 (quoting *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020)).

According to Plaintiff, there are only two authorities cited in Defendants' Motion for Summary Judgment that were not cited in its previously-ruled-upon Motion to Dismiss on the issue of standing: *Republican Party of Minn v. Klobuchar*, 381 F.3d 785 (8th Cir. 2004), and *Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018). ECF No. 70 at 3. Plaintiff points out that neither of these cases represent or consider Supreme Court or Third Circuit precedent. In fact, Plaintiff asserts that those cases ignore Third Circuit precedent to "freely grant standing to raise" First Amendment facial overbreadth claims. *Id.* at 3 (citing *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 238 (3d Cir. 2010)). Even so, Plaintiff contends that those cases differ because they found neither of the challenged statute/policy affected the plaintiff's anticipated conduct or speech, unlike in this case where the Court found Plaintiff's speech is chilled. *Id.* at 9.

Regardless of the two new cases cited, the Court previously analyzed the first three arguments presented by Defendants above and Plaintiff's response and found that Plaintiff had standing to bring this pre-enforcement challenge based on the facts as they existed at the commencement of the litigation. Defendants again attempt to "sidestep a direct constitutional challenge by claiming no final discipline will ever be rendered" but that argument continues to fail as it pertains to standing. Dec. 2020 Opinion at 23.

Ultimately, this Court does not find any compelling reason to revoke its prior ruling on standing at this stage of the litigation. After the Court made its ruling on standing in December of 2020, Defendants chose to appeal the ruling and then subsequently chose to voluntarily dismiss that appeal. That chain of events does not affect the Court's prior decision on standing in the least. *See Am. Immigr. Laws. Ass'n*, 2020 WL 6111020, at *5 (concluding intervening events did

not negate plaintiff's standing at the time complaint was filed). After dismissing its appeal, Defendants chose to proceed on the same docket, continuing the pre-existing proceeding. It would certainly not be equitable, nor efficient, for the Court to allow the Defendants to file an appeal, voluntarily dismiss it, and then turn back the clock to the commencement of the case. This Court's procedural posture does not revert back merely because the Defendants wish it.

On Defendants' final assertion against a credible threat of prosecution, the parties disagree as to whether the Defendants' alleged "disavowal" shows lack of standing or mootness at this point in the litigation. Plaintiff points out that since the Old Amendments were revised in 2021 and the Farrell Declaration was prepared and submitted to the Court in 2021 as well, they postdate the inception of this action and are an issue of mootness not standing. ECF No. 70 at 11. Defendants contend that Plaintiff's assertion is "unavailing" because courts "regularly hold that standing is lacking where, during litigation, a defendant disavows an intention to prosecute the plaintiff." ECF No. 71 at 5. Defendants cite to only one case within the Third Circuit purportedly standing for the proposition that the disavowal should be evaluated as to standing. In that case, the court dismissed a single defendant who guaranteed to refrain from enforcement "pending review of its constitutionality[.]" *Jamal v. Kane*, 96 F. Supp. 3d 447, 454 (M.D. Pa. 2015). The court did not find the plaintiffs lacked standing to bring suit entirely. Further, that court was entertaining arguments of standing for the first time. This Court evaluated standing under similar procedural posture over a year ago and found Plaintiff has standing. Dec. 2020 Opinion at 23. A disavowal in the defendants first substantive response to the complaint is distinct from a disavowal here, years into the proceeding.

Defendants cite other authorities that can be similarly distinguished. In a Tenth Circuit case affirming no standing, the District Attorney filed an affidavit with the motion to dismiss

stating that enforcement of the statute is doubtful against *anyone* due to a court opinion in another circuit and would not be enforced against any of the plaintiffs for any act that might violate it. *Winsness v. Yocom*, 433 F.3d 727, 733 (10th Cir. 2006). Here, the Defendants continue to assert that the Rule is constitutional and will be enforced, but potentially not in the narrow circumstances listed in the Farrell Declaration, including discussing and citing case law or controversial positions. ECF No. 56. The disavowal does not end the material dispute of whether Plaintiff's conduct could fall within the scope of the Amendments or whether the Declaration estops ODC and/or the Board from enforcing the Rule against such speech in the future. In a Sixth Circuit case, the court found that the defendants had no authority to enforce the challenged order, and in fact were instructed not to enforce it against *anyone*. *McKay v. Federspiel*, 823 F.3d 862, 870 (6th Cir. 2016). Again, in the Eighth Circuit case cited by Defendants, the defendant admitted that plaintiffs' conduct never fell within the scope of the regulation but standing likely would have been affirmed if the court found "continuing, present adverse effects," which we find here in the chilling effect of the complaint and investigation process. *Harmon v. City of Kansas City*, 197 F.3d 321, 327 (8th Cir. 1999) (internal citations omitted).[13]

Therefore, the Court agrees with Plaintiff that any revisions to the Old Amendments in forming the current Rule and changes in posture due to the Farrell Declaration should be evaluated under the doctrine of mootness. Here, the "heavy burden of persua[ding] the court" shifts to the defendants to prove that such development has mooted the case. *Friends of the*

---

[13] Finally, in the above case and all cases cited by Defendants in support of its proposition that there is no standing after a disavowal, the plaintiffs were promised that they would not be prosecuted under the entire statute, not a narrow carve out based on their past activity. Here, ODC is not saying they will never prosecute Plaintiff for any reason under the statute, and Defendants cannot prevent a complaint and investigation from occurring with their disavowal. Thus, Plaintiff is still at risk under the Amendments despite the narrowly tailored disavowal.

*Earth*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).

    2.  Mootness

Under Article III's requirement for a case or controversy, a case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal citation and quotation marks omitted); *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980). Throughout the life of a lawsuit, the parties must have a personal stake in the outcome of the litigation. *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013); *Gayle v. Warden Monmouth Cty. Corr. Inst.*, 838 F.3d 297, 303 (3d Cir. 2016). "The central question of all mootness problems is whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Rendell v. Rumsfeld*, 484 F.3d 236, 240 (3d Cir. 2007) (internal citation and quotation omitted). Even if the alleged injury changes during the course of the lawsuit yet "secondary" or "collateral" injuries survive, a court "will not dismiss the case as moot[.]" *Chong v. Dist. Dir., I.N.S.*, 264 F.3d 378, 384 (3d Cir. 2001).[14]

Though Defendants state their arguments under the doctrine of standing, the Court will consider them as to mootness as this Court has concluded that mootness is the relevant inquiry at this stage in the litigation. According to Defendants, through the Farrell Declaration "ODC has declared that [Plaintiff's] conduct does not violate the Amendments." ECF No. 61 at 19. Mr. Farrell, the Chief Disciplinary Counsel of ODC since January 2020, submitted the Farrell Declaration to clarify ODC's position in this case. ECF No. 56. According to Mr. Farrell, all

---

[14] *See also Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001) ("[T]he question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be any effective relief.") (internal citations omitted).

recommendations to ODC to pursue disciplinary charges under Rule 8.4(g) require his review and express approval. *Id.* ¶ 5. Mr. Farrell also claims to have "authority to direct how ODC interprets the Rules of Professional Conduct, as well as determining [] ODC's policy on handling complaints, including those raising First Amendment issues." *Id.* ¶ 6. Based on this authority, Mr. Farrell informed the Court that he does not interpret Rule 8.4(g) as "prohibiting general discussions of case law or 'controversial' positions or ideas." *Id.* ¶7. The Farrell Declaration further lists the instances raised specifically by Plaintiff in which Plaintiff believes his speech may be chilled by the Amendments and Mr. Farrell states that "ODC would not pursue discipline on this basis." *Id.* ¶¶ 10–14. Defendants are emphatic that "ODC has disavowed any intention to [charge Plaintiff with violating the Amendments]." ECF No. 61 at 22. They claim this disavowal is "binding" and estops ODC from arguing otherwise should an attorney rely on it. *Id.* Defendants assert that, "[u]nder the principles of official estoppel, the Farrell Declaration is binding upon Respondent and his future official actions, other employees at ODC, and potential successors to his position as Chief Disciplinary Counsel." ECF No. 62 at 8.

Plaintiff counters that the Farrell Declaration does not "undermine the justiciability" of his claims. ECF No. 65-1 at 35. Plaintiff disagrees that the promises made in the Farrell Declaration are permanent and binding. ECF No. 70 at 11. Plaintiff points out Mr. Farrell's interrogatory response, which admits that there is "no set process for amending, revising, or withdrawing the positions taken in the Farrell Declaration." ECF No. 62 at 8. Yet Mr. Farrell could be replaced at his position at any time. ECF No. 65-1 at 37. In addition, Plaintiff contends that no form of estoppel prevents enforcement of Rule 8.4(g) against Mr. Greenberg as the Defendants provided "no legal support for this theory of so-called 'official estoppel' and they are not bound by views asserted in this litigation. ECF No. 70 at 11; ECF No. 65–1 at 37. Even if the

Board could at some point develop an applicable estoppel theory against ODC, Plaintiff adds that this is too uncertain to render his Complaint moot. ECF No. 70 at 12; ECF No. 65–1 at 36.

Further, there is disagreement among the parties on whether this disavowal moots the case against all Defendants or only ODC. Plaintiff contends that even if the Court finds ODC is estopped from enforcing the Rule against Mr. Greenberg, "the case remains live with respect to the Board Defendants." ECF No. 70 at 6. The Farrell Declaration never asserts that the speech concerns raised by Plaintiff would be "outside the jurisdiction of the Board[.]" *Id.* at 13. The Defendants contend that ODC "is the only entity that can investigate and seek disciplinary action [and] has disavowed enforcement of the Amendments for Plaintiff's conduct." ECF No. 61 at 23; ECF No. 71 at 8. Defendants further assert that the Board is merely an adjudicatory body for disciplinary cases "that come before it" but "the Board does not enforce the Amendments, conduct investigations, or propose discipline." ECF No. 71 at 8. If ODC dismisses a complaint, according to Mr. Farrell, the Board cannot review it or otherwise adjudicate it. *Id.* at 9 (citing ECF No. 62, Exh. B). Defendants do admit that the Farrell Declaration is not binding on the Board or its members, "although the Board would have to consider the Declaration should an attorney rely on it and argue estoppel or detrimental reliance." ECF No. 62 at 8; *see also* ECF No. 70 at 12 (the Board is "admittedly not bound by it"). The Court will evaluate all of these arguments in turn.

As Defendants voluntarily declared through the Farrell Declaration that they would not enforce the Amendments against Plaintiff under the circumstances Mr. Greenberg described and also revised the Amendments to conform with this Court's previous ruling, the Court now considers whether an exception to mootness from the voluntary cessation doctrine is

applicable.[15] Voluntary cessation occurs when the defendant alleges mootness because of its own unilateral action taken after the litigation began. *See Hartnett v. Pennsylvania State Educ. Ass'n*, 963 F.3d 301, 306 (3d Cir. 2020). This situation "will moot a case only if it is 'absolutely clear that the allegedly wrongful behavior could not be reasonably expected to recur.'" *Fields v. Speaker of the Pa. House of Representatives*, 936 F.3d 142, 161 (3d Cir. 2019) (quoting *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007)).[16] The voluntary cessation doctrine exemplifies "the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001) (internal citation omitted).

"Voluntary cessation cases highlight the important difference between standing (at the start of a suit) and mootness (mid-suit)." *Hartnett*, 963 F.3d at 306. "[T]he prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Friends of the Earth*, 528 U.S. at 190. If the voluntary cessation doctrine applies, then a case is not moot.

"The burden always lies on the party claiming mootness[.]" *Hartnett*, 963 F.3d at 307 (internal citation omitted); *see also*, *Friends of the Earth*, 528 U.S. at 189 (the defendant has the "heavy burden of persuading the court.") (internal citation and marks omitted); *Already, LLC*, 568 U.S. at 91 (explaining that a party's burden to avoid the voluntary cessation doctrine is formidable). "Nevertheless, voluntary cessation of illegal conduct does render a challenge to that

---

[15] It is "well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth*, 528 U.S. at 189 (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).

[16] "If it is absolutely clear that the allegedly wrongful behavior will not recur after the court dismisses the case, then a case can become moot notwithstanding a party's voluntary cessation of that unlawful behavior. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017) (internal citation omitted). "Voluntary cessation of challenged conduct moots a case, however, only if it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (internal citation and quotation marks omitted).

conduct moot where (1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Louisiana Counseling & Fam. Servs., Inc. v. Makrygialos, LLC*, 543 F. Supp. 2d 359, 366 (D.N.J. 2008) (citing *Friends of the Earth*, 528 U.S. at 189). To determine whether a defendant meets this heavy burden, courts analyze multiple factors including, timing of the voluntary cessation, defense of past policies, and permanence of the shift in policy. *See, e.g., United States v. Gov't of Virgin Islands*, 363 F.3d 276, 285 (3d Cir. 2004); *Knights of Columbus Star of Sea Council 7297 v. City of Rehoboth Beach*, 506 F. Supp. 3d 229, 235 (D. Del. 2020).

The timing of the Farrell Declaration and the revised Rule certainly favor an exception to mootness under the voluntary cessation doctrine. Following the Court's ruling against Defendants on both standing and the merits of the constitutionality challenge, Defendants submitted the Farrell Declaration to the Court. Defendants also bypassed the notice and comment period employed in the creation of the Old Amendments in its revisions of the Amendments likely to quickly remove problematic phrasing and submit its current version of the Amendments to the Court prior to summary judgment motions. *See, e.g., Hartnett*, 963 F.3d at 306 ("A party's unilateral cessation in response to litigation will weigh against a finding of mootness."); *DeJohn v. Temple Univ.*, 537 F.3d 301, 311 (3d Cir. 2008) (finding that Temple's timing of the policy change was a factor against mootness and did not meet the "formidable" burden of proving there was "no reasonable expectation" it could reimplement its former policy); *Gov't of Virgin Islands*, 363 F.3d at 285 ("the timing of the contract termination … strongly suggests that the impending litigation was the cause of the termination" and such timing weighs against mootness); *Knights of Columbus*, 506 F. Supp. 3d at 235 (finding proposed policy change was on the city's agenda

*before* plaintiff filed its motion, thus the policy was not adopted in response to litigation and can

moot the case); *ACLU of Mass. v. U.S. Conf. Catholic Bishops*, 705 F.3d 44, 55 (1st Cir. 2013)

("[t]he voluntary cessation doctrine does not apply [as an exception to mootness] when

the voluntary cessation of the challenged activity occurs because of reasons unrelated to the

litigation.") (internal citation omitted).

The Third Circuit has found that a defendant's defense of past policy could suggest the

possibility of reinstating the policy in the future. *See, e.g.*, *Hartnett*, 963 F.3d at 305–07 ("Under

this well-recognized exception, courts are reluctant to declare a case moot when the defendant

voluntarily ceases the challenged conduct after litigation begins but still maintains the lawfulness

of its past conduct.") (internal citation and quotation marks omitted); *Parents Involved in Cmty.*

*Schs.*, 551 U.S. at 719 (finding voluntary cessation did not moot case where defendant

"vigorously defend[ed] the constitutionality of its race-based program"). While Defendants have

consistently asserted that Plaintiff's conduct falls outside the scope of the Amendments, they also

defend the constitutionality of the Old Rule and the Rule and vigorously assert the compelling

need to regulate attorneys in the practice of law, even if there are incidental impacts on speech.

In their Motion for Summary Judgment, Defendants continue to assert that the Supreme Court of

Pennsylvania has a compelling need to regulate the conduct of attorneys, ECF No. 61 at 6, and

that the state has "broad powers to regulate attorneys[.]" *Id*. at 28; *see also id*. at 30

("Pennsylvania's interest in regulating attorneys and the practice of law is compelling, and its

power to do so is broad."). Specifically for the Amendments, Defendants continue to assert its

unfocused "compelling interest in eradicating" discrimination and harassment. *Id*. at 30. Due to

that alleged broad power and compelling need for regulation, the Defendants continue to assert

that an "incidental[]" burden on speech is permissible because the Amendments regulate

professional conduct. *Id*. at 31. This evidences at least some gap between Defendants position that they will not aggressively enforce the Amendments against purportedly offensive language and their stated aim and need to police all licensed attorneys in activities related to the practice of law. *See DeJohn*, 537 F.3d at 310 (finding voluntary cessation exception to mootness applied where defendant "defended and continue[d] to defend not only the constitutionality of its prior sexual harassment policy, but also the *need* for the former policy") (emphasis added).

During oral argument on these cross-motions, Defendants reiterate that "Pennsylvania certainly has a compelling interest in eradicating harassment and discrimination from the practice of law" and the Rule need not be a "perfect fit" to serve this interest. ECF No. 74 at 13. Even though the Court concluded that Plaintiff's First Amendment protected speech at CLE presentations was likely to be impacted by the Old Rule (Dec. 2020 Opinion), Defendants continue to insist that "[e]ven under the [O]ld [R]ule, our position was that Mr. Greenberg's activities didn't come within the rule. And the fact that it's [sic] been changed, we haven't changed our position." *Id.* at 9. Defendants continue to assert that, despite the phrasing "manifesting bias and prejudice" from the Old Rule being deemed by the Court to include offensive language, "[t]hat's not what the rule is directed towards." *Id.* at 12. While Defendants acknowledge that the language which "troubled" the Court last year was not included in the revised Amendments, there was little to no appreciation shown of the unconstitutionality of the Old Rule. *Id.* at 6.

Making a concession to appease the Court in this litigation does not create confidence that Defendants truly understand the constitutional limitations of their allegedly broad power to regulate attorneys. *See Hartnett*, 963 F.3d at 306 ("[D]efendant's reason for changing its behavior is often probative of whether it is likely to change its behavior again. [The court will]

understandably be skeptical of a claim of mootness when a defendant yields in the face of a court order and assures us that the case is moot because the injury will not recur, yet maintains that its conduct was lawful all along."); *DeJohn*, 537 F.3d at 310 ("there have been no subsequent events that make it absolutely clear that Temple will not reinstate the allegedly wrongful policy in the absence of the injunction"); *Fields*, 936 F.3d at 161 (finding it was not "absolutely clear" the government would not revert to its prior policy when it only changed in response to the litigation and the claim is not moot); *but see Knights of Columbus*, 506 F. Supp. 3d at 235 (finding no credible suspicions that defendant would revert to challenged practice after defendants quickly revised no-religious-displays policy to address plaintiff's concerns).

Finally, courts are concerned with the permanence of the voluntary shift in policy in assessing mootness and the voluntary cessation exception. *See Hooker Chem. Co., Ruco Div. v. U.S. E.P.A., Region II*, 642 F.2d 48, 52 (3d Cir. 1981) ("A controversy still smoulders [sic] when the defendant has voluntarily, but not necessarily permanently, ceased to engage in the allegedly wrongful conduct."); *see also Cottrell v. Good Wheels*, 2009 WL 3208299, at *5 (D.N.J. Sept. 28, 2009) ("[V]oluntary cessation will only render a case non-justiciable where it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation").

Defendants describe the Farrell Declaration as a "binding" disavowal that estops ODC, the disciplinary enforcement authority, from arguing otherwise should an attorney rely on it. ECF No. 61 at 22. Defendants are emphatic that "ODC has disavowed any intention to [charge Plaintiff with violating the Amendments]" under the circumstances Mr. Greenberg outlined to the Court. *Id*. Defendants assert that, "[u]nder the principles of official estoppel, the Farrell

Declaration is binding upon Respondent and his future official actions, other employees at ODC, and potential successors to his position as Chief Disciplinary Counsel." ECF No. 62 at 8. Plaintiff disagrees that the promises made in the Farrell Declaration are permanent and binding. ECF No. 70 at 11.

The idea of "official estoppel" as presented by Defendants is not supported by case law and, in fact, Plaintiff points out that Defendants did not provide any legal support for this theory. ECF No. 70 at 11; ECF No. 65–1 at 37. Defendants cite to only one case from Pennsylvania state court where it states that if a defendant detrimentally relies on a disavowal then it *can* preclude prosecution – not that the government is *estopped* from bringing prosecution. ECF No. 71 at 9 (citing *Commonwealth v. Cosby*, 252 A.3d 1092, 1135–44 (Pa. 2021)).[17] Defendants also concede that generally estoppel is applied differently to the government than private citizens but assert they cannot ignore promises upon which citizens detrimentally rely. *Id.* at 9.

This Court found almost no federal case law addressing the term of art "official estoppel" presented by Defendants. Only in *Conforti v. United States* is it even mentioned, where the Eighth Circuit found no authority to support the idea of official estoppel. 74 F.3d 838, 841 (8th Cir. 1996). That court went as far as to say that "the Supreme Court has repeatedly indicated that an estoppel will rarely work against the government." *Id.*; *see generally*, *Office of Personnel Management v. Richmond*, 496 U.S. 414, 423 (1990); *Heckler v. Community Health Services*, 467 U.S. 51, 61 (1984). Even in the broader context of general estoppel, it is rare to apply

---

[17] Defendants refer to *Commonwealth v. Cosby*, where the District Attorney made an individual evaluation not to prosecute in a criminal case. 252 A.3d 1092, 1135 (Pa. 2021), *cert. denied sub nom. Pennsylvania v. Cosby*, 2022 WL 660639 (U.S. Mar. 7, 2022). The Supreme Court of Pennsylvania determined that the decision not to prosecute was unconditional and presented as absolute and final and found the defendant's detrimental reliance on the government's assurances during the plea bargaining phase implicated due process rights. *Id*. However, the court added "[t]here is nothing from a reasonable observer's perspective to suggest that the decision was anything but permanent." *Id*. at 1137. That is not the case here. For a variety of reasons, the Court finds the promises made by one defendant in a civil rather than criminal case, who may or may not have the authority to make such promises binding, do not mirror the circumstances in *Cosby*.

equitable estoppel against state action as it is disfavored unless it is required by justice and fair play or to prevent manifest injustice. 31 C.J.S. Estoppel and Waiver § 256; *see Wayne Moving & Storage, Inc. v. Sch. Dist. of Phila.*, 625 F.3d 148 (3d Cir. 2010).

Regardless of the semantics over Defendants' seemingly novel use of the term official estoppel, there is reason to be skeptical that the promises made in the Farrell Declaration are indeed binding on Defendants and moot Plaintiff's First Amendment challenge. *See, e.g.*, *Cottrell*, 2009 WL 3208299, at *5 (finding defendant's promise on its own was not enough to show the clarity needed to render a claim moot because of its timing and that the defendant "could conceivably re-institute" the challenged policy). Similar to the current circumstances, in *Elim Romanian Pentecostal Church v. Pritzker*, the governor of Illinois placed an order restricting in-person religious services and later lifted the challenged parts of the restrictions after the case was filed. 962 F.3d 341, 342 (7th Cir. 2020). The Seventh Circuit concluded that the question of whether the revoked order violated the First Amendment was not moot because the governor could change the policy at will. *Id.* at 344–45.[18] Defendants here admit that there is "no set process for amending, revising, or withdrawing the positions taken in the Farrell Declaration," which prevents clarity on whether the disavowal could be changed at will or with the appointment of a new Chief Counsel for ODC and leads this Court away from a finding that this disavowal is binding and permanent. ECF No. 62 at 8.

In the alternative, Plaintiff contends that even if the Court finds the claim against ODC is moot, "the case remains live with respect to the Board Defendants." ECF No. 70 at 6. Defendants do admit that the Farrell Declaration is not binding on the Board or its members, "although the

---

[18] The court notes that the new order specifically reserved the right to change the policy at will. Here, Mr. Farrell claims his interpretation is binding for the foreseeable future. While that is a small distinction between the two cases, it still serves as persuasive support for Plaintiff's assertion that such revisions and changes in position made during litigation is not binding against the government.

Board would have to consider the Declaration should an attorney rely on it and argue estoppel or detrimental reliance." ECF No. 62 at 8; ECF No. 70 at 12 (the Board is "admittedly not bound by [the Farrell Declaration]"); *see also Hansen Found., Inc. v. City of Atl. City*, 504 F. Supp. 3d 327 (D.N.J. 2020) (finding "heavy burden" of mootness was not met where promise was made after litigation began and defendant made no claim that it was binding on the city). However, Defendants assert that ODC is the only entity that can investigate and seek disciplinary action for Rule 8.4(g) and that the Board does not enforce the Amendments, conduct investigations, or propose disciplines. According to Mr. Farrell, if ODC dismisses a complaint, the Board cannot review it or otherwise adjudicate it. ECF No. 71 at 9, n.5 (citing ECF No. 62, Exhs. A & B). Plaintiff adds, though, that the Board has the authority to replace Mr. Farrell at any time, indicating some control or authority over the author of the Farrell Declaration. ECF No. 70 at 12.

Most important here is that Defendants admit the Farrell Declaration is not binding on the Board so if there is any indication that the Board could review ODC's decision to dismiss a complaint or otherwise be involved in the disciplinary process under Rule 8.4(g), the case cannot be moot against the Board. It is within the Board's authority and in fact is their obligation to appoint the Chief Disciplinary Counsel, though that alone is not sufficient to show they are involved in the disciplinary procedures run by ODC. Pa. Disc. Bd. Rules § 93.23 (a)(2). The Board also assigns its hearing committee members "to review and approve of or modify recommendations" by ODC, including dismissals and informal admonitions. Pa. Disc. Bd. Rules § 93.23 (a)(7)(i). The Board can also assemble a panel of three members to review and approve or modify a determination by that hearing committee, including dismissal or informal admonitions. Pa. Disc. Bd. Rules § 93.23 (a)(8). These Board Rules appear to give the Board discretion to make a determination on attorney misconduct even if ODC has dismissed the

complaint following investigation. Finally, under Pa. Disc. Bd. Rules §87.1 (a), the Board, with consensus from at least five of its members, may direct ODC to undertake an investigation into attorney misconduct. Pa. Disc. Bd. Rules § 87.1 (a). It is unclear whether the Board can request this investigation after ODC has dismissed a complaint as frivolous, but, in any case, it does imply that ODC does not have sole authority over instigating investigations into attorney misconduct. While the Court finds the controversy remains live as to all Defendants, even if it were moot against ODC, there is sufficient evidence showing the Board has not met its heavy burden to show that the controversy between Plaintiff and the Board is moot.

Regardless, Plaintiff continues to assert that it is "the investigatory process itself that has a chilling effect." ECF No. 70 at 13. Both parties stipulate that each complaint that ODC receives triggers an investigatory process. ECF No. 53 ¶ 28. And Mr. Farrell stated in response to requested Interrogatories that "intake counsel may contact the respondent in an effort to resolve the matter quickly" during that investigation. ECF No. 70 at 13 (quoting Farrell Interrog. Answers ¶ 18). If in fact ODC is estopped from enforcing Rule 8.4(g) against Mr. Greenberg in the context of his CLE presentations, there remains First Amendment concerns regarding the initial complaint and investigation process that keep the case and controversy live. *Id.* at 13. Therefore, the Farrell Declaration does not moot Mr. Greenberg's claims.

While this Court does not find that the Farrell Declaration moots the case, Defendants also assert that even if the Old Amendments were applicable to Plaintiff's described speech and conduct, such circumstances do "not come within the Amendments" as written today and that the case should be moot on that basis. ECF No. 61 at 24. [19] Defendants allege that the plain language of Rule 8.4(g) no longer includes the phrasing prohibiting "words… manifest[ing] bias or

---

[19] "[ODC, the Board, and the Supreme Court of Pennsylvania] stipulate that Plaintiff's speech, which the Court rightly aimed to protect, is protected from prosecution." ECF No. 61 at 25.

prejudice" that the Court found problematic in its prior decision. *Id.* at 34. Since the language the Court found "simply regulates speech" (Dec. 2020 Opinion at 32) is no longer included in the Rule, Defendants contend that the Rule is only directed towards conduct. Defendants further assert that "such conduct is not based on whether the listener perceives verbal conduct to be discriminatory or harassing, but whether the verbal conduct actually targets a person for discrimination or harassment." ECF No. 62, Exh. A at 6–7. Since the Amendments now only implicate conduct, according to Defendants, Plaintiff's described speech would not fall under the revised Rule and therefore there is no risk of injury, and no relief can be granted that has not already been achieved by changes from the Old Rule.

Plaintiff alleges that Rule 8.4(g) "threatens to harm" attorneys and himself in "the same way" as the Old Rule. ECF No. 70 at 11. Mr. Greenberg continues to assert that the fear of complaint and investigation under Rule 8.4(g) will chill his speech and cause him to self-censor. ECF No. 54 ¶¶ 31–42; ECF No. 65-1 at 35. Plaintiff points out that Comment [3] of the Amendments still includes CLE presentations, which is the primary forum in which his speech will be chilled by the Rule. ECF No. 65-1 at 34.

First, the revisions voluntarily taken to amend the Old Rule into the Rule now before the Court during the course of this litigation still fall prey to the analysis of the voluntary cessation doctrine. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982); *but see Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (per curiam) (finding case moot, where party substantially amended its regulations while the case was pending on appeal and without explicitly mentioning the voluntary cessation doctrine). In *City of Mesquite*, following the lower court's determination that the language was unconstitutionally vague and while the case was pending appeal, the city repealed the challenged provisions of a municipal ordinance and revised

the ordinance to remove the vague language. 455 U.S. at 289. The Supreme Court found that the city's "repeal of the objectionable language would not preclude it from reenacting precisely the same provision" if the judgment were vacated for mootness and finding the uncertainty enough to move ahead to the merits of the appeal. *Id*. *City of Mesquite* is applicable here, in part due to the similarity of the circumstances, where the Board removed the offending language pending their own appeal and now offer revised Amendments created through an expedited process. Without judgment, there is no certainty that Defendants will not modify the Rule in a way that incorporates the Old Rule's unconstitutional language.

Further, the Supreme Court elaborated in a later case that it is not merely the possibility of reenactment that prevents mootness, it is also that the defendant may replace the challenged rule with a new one that "differs only in some insignificant respect." *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993). The Third Circuit agrees that "an amendment does not moot the claim if the updated statute differs only insignificantly from the original." ECF No. 70 at 11 (quoting *Nextel W. Corp. v. Unity Twp.*, 282 F.3d 257, 262 (3d Cir. 2002)).

Without diving too deep into the merits at this threshold stage of our analysis, this Court finds the updated Amendments do not differ significantly enough from the Old Amendments to moot this case, particularly with respect to the likelihood for Mr. Greenberg's speech to be chilled under the Amendments as currently written. While ODC asserts that the Amendments only prohibit verbal conduct that *actually* targets an individual, not speech that is *perceived* to be discriminatory or harassing, this is nonsensical and subjective at best. It is nonsensical to say that an individual's perception is irrelevant where the Rule relies on complaints filed by the public to start an investigation into the attorney's conduct. It is also nonsensical to consider anything

under the umbrella of harassment to be devoid of perception. Whether an individual perceives another's conduct to be welcome or unwelcome is a basic premise for harassment. For example, if a person in a protected class hears an otherwise offensive joke from a friend at a Pennsylvania Bar event, it may not be considered by that person as discrimination or harassment, while the same exact joke made by a panelist at a CLE would more likely be deemed offensive. Plaintiff provides numerous examples of speakers in similar situations to Mr. Greenberg's being accused of this type of discrimination or harassment by simply endorsing certain views of case law or the Constitution. ECF No. 65–1 at 34. That individual's perception is exactly what compels them to file a complaint under Rule 8.4(g). Outside of the third party's perception, it is also the subjective assessment of ODC as to whether the verbal conduct is actual or perceived. The standards for that assessment are, at best, subjective, and, at worst, completely unknown to both Pennsylvania licensed attorneys like Mr. Greenberg and even ODC itself. Therefore, speech that would have been chilled due to the Old Rule will continue to be so affected under the revised Rule.

The revisions also do not address many of the concerns raised by the Court under the Old Amendments. It is still true that Rule 8.4(g) is not limited to the legal process and instead extends to "participation in judicial boards, conferences, or committees; continuing legal education seminars; bench bar conferences; and bar association activities where legal credits are offered." ECF No. 61 at 10 (citing Pa.R.P.C. 8.4 cmt. 3).[20] The following sentence adds, "[t]he term 'the practice of law' does not include speeches, communications, debates, presentations, or publications given or published outside the contexts described in [Comments] (1)- (3)[,]" which

---

[20] Mr. Daley, attorney for the Defendants, confirmed to the Court during oral argument that the Amendments extend beyond judicial proceedings and beyond representation of the client or anything that instructs their administration of law. ECF No. 74 at 30.

indicates, and defense counsel confirmed during oral argument,[21] that any speeches, communications, debates, presentations, or publications given within the context defined above falls under the scope of the Rule. *See* Pa.R.P.C. 8.4 cmt. 3; *see also* ECF No. 74 at 30–37. This assures that attorney's speech is targeted by the Rule and will continue to be broadly monitored and subject to government censure under this Rule. The Rule limits what a lawyer may say and it serves as a warning to Pennsylvania lawyers to self-censor during the course of their interactions that fall within the Board's broad interpretation of the practice of law. There are other insignificant revisions made by Defendants that compel this Court to deny their claims of mootness – *e.g.* changing "manifest bias or prejudice" in the Rule to "manifests an intention: to treat a person as inferior […]; to disregard relevant considerations […]" in Comment [5]. ECF No. 61 at 10; Dec. 2020 Opinion at 38. The immediately apparent similarities between the Old Rule and the revised Rule evidences the need for an evaluation on the merits.

Based on the foregoing, the Court does not find that Defendants have met their formidable burden to prove that it is absolutely clear that there is no reasonable expectation Plaintiff could be affected by the Amendments and thus this Court continues to the merits of the constitutional challenge.

### B.  *First Amendment Violation*

<u>Plaintiff's Motion for Summary Judgment</u>

In Plaintiff's Motion for Summary Judgment, Mr. Greenberg contends that verbal or written communicative "conduct" constitutes pure expression, wholly apart from conduct

---

[21] Mr. Daley, attorney for the Defendants, confirmed to the Court during oral argument that "speeches, communications, debates, presentations, or publications" made within the context described in (1) – (3) of Comment [3] are included in the scope of Rule 8.4(g). ECF No. 74 at 37. ("they could be, yes […] if they're, again, harassing and discriminatory.").

involving incidental speech, and is fully protected by the First Amendment. ECF No. 65–1 at 21;
*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 202–03 (3d Cir. 2001) (holding
unconstitutional an anti-harassment policy that prohibited "any unwelcome verbal, written or
physical conduct."); *DeJohn v. Temple Univ.*, 537 F.3d 301, 305 (3d Cir. 2008) (holding
unconstitutional an anti-harassment policy that prohibited "expressive, visual, or physical
conduct of a sexual or gender-motivated nature"). Even so, Plaintiff asserts that the Third Circuit
has consistently supported the principle that regulations of communicative conduct are
indistinguishable from regulations of speech. ECF No. 65–1 at 23 (citing *McCauley v. Univ. of
the Virgin Islands*, 618 F.3d 232 (3d Cir. 2010)). Plaintiff relies heavily on the analysis found in
*Saxe*, *DeJohn*, and *McCauley*.

Furthermore, the plain language of the regulation, according to Plaintiff, places
restrictions on speech. Plaintiff contends that the First Amendment protects "statements that
impugn another's race or national origin or that denigrate religious beliefs." *Id.* at 18 (quoting
*Saxe*, 240 F.3d at 206). Clauses such as prohibiting denigration, showing hostility or aversion,
and manifesting an intent to disregard relevant characteristics of merit "directly regulate
communication, expression and even an attorney's unpalatable thoughts." *Id.* at 24. The
Comment listing "speeches, communications, debates, presentations or publications" inside the
contexts described in (1)-(3) (e.g., at CLEs, bench bar conferences, or bar association events
offering legal education credits) do fall within the ambit of the Rule. *Id.* at 23. Plaintiff points out
that due to the structure of Rule 8.4(g), "there can be no doubt" that speeches similar to those
given by Mr. Greenberg at CLEs fall within the scope of the Amendments. *Id.* at 24.

Plaintiff then describes how the Amendments constitute content-based and viewpoint-
based discrimination in violation of the First Amendment. *Id.* at 13. Plaintiff contends that the

Amendments are a form of impermissible viewpoint discrimination, and that viewpoint discrimination should be considered "in a broad sense." *Id*. at 13 (quoting *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017)). Plaintiff contends that Rule 8.4(g) prohibits preaching hate and denigration, which is protected expression under the First Amendment, even if the expression offends or angers listeners. *Id.* at 15, 19 (citing *Bible Believers v. Wayne County*, 805 F.3d 228, 234 (6th Cir. 2015) (en banc); *Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 895 (6th Cir. 2021) (holding that restrictions on "antagonistic," "abusive" and "personally directed' speech" are unconstitutionally viewpoint-based); *Saxe*, 240 F.3d at 206 ("[A] disparaging comment directed at an individual's sex, race, or some other personal characteristic […] and thus come within the ambit of anti-discrimination laws—precisely because of its sensitive subject matter and because of the odious viewpoint it expresses.")). Despite Defendants assertion that discrimination and harassment statutes should be treated differently than other rules, Plaintiff asserts that "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause." *Id.* at 25 (citing *Saxe*, 240 F.3d at 204; *DeJohn*, 537 F.3d at 316; *Rodriguez v. Maricopa Community College District*, 605 F.3d 703 (9th Cir. 2010)).

Plaintiff cites to *Matal v. Tam* where the Supreme Court assessed the constitutionality of a federal statute that prohibited the registration of trademarks that may "disparage or bring into contempt or disrepute" any "persons, living or dead" and found that the disparagement clause discriminates on the basis of viewpoint. *Id.* at 13 (quoting *Matal*, 137 S. Ct. at 1751, 1763). In that case, the Supreme Court stated that "[g]iving offense is a viewpoint." *Id.* (quoting *Matal*, 137 S. Ct. at 1751). Plaintiff adds that the targeting requirement does not prevent viewpoint discrimination because "[a] mark that disparages a substantial percentage of the members of a

racial or ethnic group, necessarily disparages many 'persons,' namely, members of that group."
*Id.* (quoting *Matal*, 137 S. Ct. at 1756).

 In this case specifically, Plaintiff shares his concerns that the "unfortunate modern
reality" is that people consider defense of incendiary speakers to be "as incendiary as the
underlying speech itself." *Id.* at 15. Rule 8.4(g) could cause an attorney to be "embedded in an
inquisition" and "an exploration of the attorney's character and previously expressed
viewpoints" before any misunderstanding could even begin to be cleared up. *Id.* at 16 (quoting
Dec. 2020 Opinion at 28).

 Furthermore, Plaintiff contends that Defendants' declarations in this case are insufficient
to avoid constitutional violation. *Id.* at 16 ("the litigation position of a single defendant,
departing from the text of the Rule, offers [Mr.] Greenberg and other Pennsylvania attorneys
little solace."); *see also id.* (citing *Pa. Family Inst., Inc. v. Celluci*, 521 F. Supp. 2d 351, 365 &
n.7 (E.D. Pa. 2007)). According to Plaintiff, "a promise by the government that it will interpret
statutory language in a narrow, constitutional manner cannot, without more, save a potentially
unconstitutionally overbroad statute." *Id.* at 16 (quoting *Free Speech Coal., Inc. v. AG United
States*, 787 F.3d 142, 164 (3d Cir. 2015) (internal quotation omitted)). Plaintiff contends that
regardless of whether Defendants intend to use Rule 8.4(g) "responsibly," the Court still may not
uphold an unconstitutional rule. *Id.* (citing *United States v. Stevens*, 559 U.S. 460, 480 (2010)).
Even if the Court wants to adopt a narrowing construction for the regulation, Plaintiff urges that
it must be "reasonable and readily apparent." *Id.* at 17 (quoting *Stenberg v. Carhart*, 530 U.S.
914, 944 (2000) (internal citation omitted)).

 Finally, Plaintiff's Motion for Summary Judgment contends that the Amendments are
overbroad because the restrictions apply outside the context of a legal representation or legal

proceeding and extend to situations where there can be no prejudice to the administration of justice. *Id.* at 18. "[O]verbroad harassment policies can suppress or even chill core protected speech." *Id.* at 25 (quoting *DeJohn*, 537 F.3d at 314). Plaintiff also asserts that the emphasized targeting requirement does not sufficiently remedy the overbreadth issue. *Id.* at 18.

In Defendants' Opposition to Plaintiff's Motion for Summary Judgment, they contend that the Amendments are directed towards discriminatory and harassing professional conduct that has detrimental effects on the judicial system. ECF No. 71 at 15. Thus, the Amendments may incidentally burden speech. *Id.* at 15 n. 11 (citing *Nat'l Inst. of Fam. & Life Advocs.v. Becerra*, 138 S.Ct. 2361, 2373 (2018) (hereinafter "*NIFLA*") ("the First Amendment does not prevent restrictions directed at . . . conduct from imposing incidental burdens on speech," and "professionals are no exception to this rule")). Defendants also assert that Plaintiff's references to *Saxe*, *DeJohn*, and *McCauley* are not persuasive because those cases involve much broader educational institution policies that included "offensive" speech, which is irrelevant under the Amendments. *Id.* at 17. The language in the Amendments is much narrower than in those cases, according to Defendants, and does not prohibit a "substantial amount of protected expression." *Id.* at 18 (quoting *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002)).

In response to Plaintiff's claim of viewpoint discrimination, Defendants assert that the Amendments do not distinguish between which views one may take on a particular subject. *Id.* at 11. The Amendments merely ask whether an attorney engaged in harassing or discriminatory conduct directed toward a specific individual. *Id*.

Defendants contend that *Matal v. Tam* does not compare to this case and that the examples provided by Plaintiff are too hypothetical for the Court to consider. *Id*. Defendants assert that *Matal* was an as-applied case that did not involve the state's compelling interest of

addressing discrimination and harassment in the practice of law. *Id.* In *Matal*, according to

Defendants, the court held that "[s]peech may not be banned on the ground that it expresses

*ideas that offend*." *Id.* at 12 (quoting *Matal*, 137 S.Ct. at 1755) (emphasis added). Defendants

also assert that the government's rejection of the trademark at issue in *Matal* relied on the

"reaction of the applicant's audience." *Id.* (quoting *Matal,* 137 S. Ct. at 1766–67). Defendants

insist that that case does not apply because the Amendments prohibit conduct and include no

prohibition against offensive language, nor do the Amendments take into account the listener's

subjective views. *Id.* Defendants also promise, through the Farell Declaration, not to consider

whether one is offended in investigating complaints under Rule 8.4(g). *Id.* (quoting *Ward v. Rock*

*Against Racism*, 491 U.S. 781, 796 (1989) (court "must . . . consider any limiting construction

that a state court or enforcement agency has proffered")). Defendants assert that this case also

differs from *Matal* because the Amendments have an explicit targeting requirement in Comment

Three requiring harassment "toward a person" and Comment Four requiring discrimination in

how one "treat[s] a person." *Id.* at 13.

Finally, Defendants contend that the regulation is not overbroad because attorneys must

obtain CLE credits to be in good standing and, therefore, rules of professional conduct may

apply to functions where CLE credits are offered. *Id.* at 14. Defendants contend that Plaintiff

fails to show the Amendments were enacted to oppress speech as opposed to harmful conduct.

*Id.* at 14.


Defendants' Motion for Summary Judgment

In Defendants' Motion for Summary Judgment, they contend that a facial challenge to the

constitutionality of a rule is "strong medicine" that must be used "sparingly and only as a last

resort." ECF No. 61 at 27 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). Defendants assert that since Pennsylvania's "disciplinary system has not yet applied the Amendments to 'actual disputes,' judicial restraint is called for." *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 750 (1987)). Defendants also assert that this Court must consider the limiting instructions "provided here through the ODC Declaration and discovery responses." *Id.* at 27–28. Defendants offer the "elementary rule" that "every reasonable construction" must be considered to "save a statute from unconstitutionality." *Id.* at 28 (quoting *Stretton v. Disciplinary Bd. of Supreme Ct. of Pa.*, 944 F.2d 137, 144 (3d Cir. 1991)).

Further, they contend that the Amendments regulate conduct and only incidentally affect speech. *Id.* at 31–32.[22] Antidiscrimination laws like Rule 8.4(g), which aim to ensure equal access to society's benefits serve goals "unrelated to the suppression of expression" and are neutral as to both content and viewpoint. *Id.* at 29 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623–24 (1984)). Therefore, it is permissible if such a rule may incidentally burden speech. *Id.* at 31 (citing *NIFLA,* 138 S. Ct. at 2373). Since this regulation addresses the conduct of a particular profession, Defendants assert incidental burdens on speech are treated differently by the Supreme Court than restrictions on speech. *Id.* (citing *Capital Associated Indus., Inc. v. Stein*, 922 F.3d 198, 207-08 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 666 (2019)). Finally, Defendants contend that this regulation should be evaluated under intermediate scrutiny, which Rule 8.4(g) satisfies because the Amendments serve a compelling state interest, and the regulation is a reasonable fit to serve that need. *Id.* at 31–32.

Even if the Amendments do regulate speech, Defendants emphasize that a state's "broad power to regulate the practice of professions within their boundaries" is "especially great" in

---

[22] Defendants' Reply in Opposition to Plaintiff's Motion for Summary Judgment instructs the Court that their arguments are "detailed in Defendants' Summary Judgment Brief." ECF No. 71 at 15.

"regulating lawyers" because "lawyers are essential to the primary governmental function of administering justice, [sic] and have historically been officers of the courts." *Id.* at 28 (quoting *In re Primus*, 436 U.S. 412, 422 (1978)). Defendants espouse Pennsylvania's noble effort to ensure the efficient and law-based resolution of disputes and guarantee that its judicial system is equally accessible to all by regulating the conduct of its attorneys through Rule 8.4(g). *Id.* at 28–29. Defendants emphasize the need to protect the integrity and fairness of Pennsylvania's judicial system and protect the reputations of lawyers by preventing attorneys from engaging in anything "regarded as deplorable and beneath common decency." *Id.* at 28–29 (citing *Fl. Bar v. Went For It*, 515 U.S. 618, 625 (1995) (quotations omitted); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1075 (1991)). Defendants also refer to Colorado's Rule 8.4(g), where the court stated "[t]here is no question that a lawyer's use of derogatory or discriminatory language that singles out individuals involved in the legal process damages the legal profession and erodes confidence in the justice system." *Id.* at 30 (quoting *Matter of Abrams*, 488 P.3d 1043, 1053 (Colo. 2021) (rejecting a First Amendment challenge to Colorado's Rule 8.4(g)).

Furthermore, Defendants assert that it is not viewpoint-based or content-based because the regulation asks whether an attorney engaged in harassing or discriminatory conduct, not what viewpoint the attorney takes on a particular issue, and the Amendments do not distinguish between favored or disfavored speech. *Id.* at 33, 35 (quoting *Christian Legal Society Chapter of the Univ. of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 695 (2010) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.")). Defendants also assert that the regulation applies equally to all attorneys, regardless of their views. *Id.* at 33 (citing *Barr v. Lafon*, 538 F.3d 554, 572 (6th Cir. 2008)).

The targeting requirement in Rule 8.4(g), according to Defendants, additionally prevents any viewpoint discrimination. Defendants assert that the Amendments are not grounded on whether words may offend someone. *Id.* at 33. Defendants further provide limiting instructions within which ODC states it does not consider the Amendments to cover being offended or offensive language. *Id.* at 33–34; ECF No. 56 ¶ 16. Thus, this Court's concern related to the Old Rule, that it was intended to regulate offensive speech based on "words manifesting bias or prejudice," is absent in the Amendments. ECF No. 61 at 33–34 (quoting Dec. 2020 Opinion at 32).

Defendants also distinguish *Matal* from Rule 8.4(g) for a few reasons. First, Defendants assert that the government in *Matal* denied trademark protections to allegedly offensive terms based on whether the speech offended the listener. *Id.* at 34 (citing *Matal*, 137 S. Ct. at 1766). Here, according to Defendants, whether a listener is offended is irrelevant. *Id.* Second, Defendants reiterate that the Amendments regulate attorney conduct, specifically discrimination and harassment, while the activity in *Matal* involved pure speech. *Id.* (citing *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 32 (2d Cir. 2018) (recognizing that *Matal* does not affect the government's ability to target ethnic slurs through anti-discriminatory regulations)).

Finally, Defendants assert that the Amendments are not overbroad and, even so, any concern regarding overbreadth should be evaluated on a case-by-case basis. *Id.* at 37–40. Defendants assert again that the Amendments apply only to conduct even if speech is involved in that conduct. They cite to the Supreme Court stating that "it has never been deemed an abridgment of freedom of speech" to make a "course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* at 37 (quoting *Rumsfeld v. F. for Acad. & Inst. Rights, Inc.*, 547 U.S. 47,

62 (2006)). Defendants emphasize that Plaintiff bears a "heavy burden" to establish that the Amendments are facially overbroad. *Id.* at 38 (quoting *Free Speech Coal., Inc. v. United States*, 974 F.3d 408, 429 (3d Cir. 2020)). Defendants assert that Plaintiff must show from "the text of [the Amendments] and from actual fact, that substantial overbreadth exists" yet Plaintiff fails to do so. *Id.* at 38 (quoting *Virginia v. Hicks*, 539 U.S. 113, 122 (2003)).

In Plaintiff's Response in Opposition to the Defendants' Motion for Summary Judgment, Plaintiff asserts that the regulation directly restricts speech and is not merely an incidental burden on speech. Plaintiff cites frequently to *Saxe v. State Coll. Area Sch. Dist.*, where the Third Circuit found a First Amendment violation from a harassment policy that covered "unwelcome verbal, written, or physical conduct directed at the characteristics of a person's [race/religion/national origin/sexual orientation/etc]." ECF No. 70 at 26 (citing 240 F.3d 200, 220 (3d Cir. 2001)). Plaintiffs urge that in cases like *Saxe*, *DeJohn*, and *McCauley*, where the threat of chilled speech was real, the Third Circuit entertained and credited facial overbreadth challenges, and this Court should follow suit. *Id.* at 27.

Plaintiff frequently cites to *NIFLA*, which this Court stated previously does not countenance such an unlimited scope of professional speech regulation. *Id.* at 27 (citing Dec. 2020 Opinion at 27) (discussing how, with two exceptions, *NIFLA* contemplates full First Amendment rights for professional speech)). Plaintiff contends that state bar authority generally ends where speech does not prejudice a legal proceeding or the administration of justice. *Id.* at 26 (citing *NIFLA*, 138 S. Ct. at 2372). Plaintiff further contends that if the Court were to allow the state to possess so much power over professional speech, there would be no limit to the control regulatory authorities would have over professionals' lives. *Id.* at 22.

Plaintiff also contends that the general interest of the government in maintaining the "reputation of lawyers" and judicial integrity through Rule 8.4(g) "exceeds the scope" of *NIFLA*. *Id*. Plaintiff asserts that, for example, an attorney's hostile remark at a bar association event or a denigrating CLE presentation bears no relationship to judicial integrity as it takes place well outside the context of the courtroom or representing a client. *Id*. Plaintiff cites to the Third Circuit, contending that the interest in "public confidence in the judiciary" is the sort of underdeveloped post-hoc government rationale rejected by the Third Circuit in the First Amendment context. *Id.* at 23.

In addition, Plaintiff contends that Rule 8.4(g) unconstitutionally discriminates against opposing viewpoints by prohibiting Pennsylvania attorneys from "denigrat[ing] or show[ing] hostility or aversion toward a person" on selected disfavored bases. *Id.* at 16 (quoting Comment [4] to Rule 8.4(g)). Plaintiff cites to this Court's previous opinion to counter Defendants' argument that Rule 8.4(g) applies equally to all attorneys and thus cannot be viewpoint discriminatory. *Id.* at 17 (quoting Dec. 2020 Opinion at 31 ("To prohibit all sides from criticizing their opponents makes a law more viewpoint based, not less so.")).

Plaintiff again compares this case to *Matal*, asserting that "disparage," a term used in the unconstitutional rule in that case, is a synonym of "denigrate," a term used here in Rule 8.4(g). *Id.* at 16. Plaintiff also disagrees with Defendants' reasoning to distinguish the two cases, contending that the statutory standard in *Matal* did not proscribe "offensive" terms; it proscribed "disparag[ing]" ones, just as Rule 8.4(g) proscribes "denigrat[ing]" ones. *Id.* at 16. In practice that reduces to "a subset of messages that [the Government] finds offensive." *Id.* at 16 (quoting *Matal*, 137 S. Ct. at 1766). Plaintiff identifies the problem that 8.4(g) has defined "harass" in a manner that includes pure expression and turns on viewpoint, rather than simply on "non-

expressive, physically harassing conduct." *Id.* at 18 (quoting *Saxe*, 240 F.3d at 206). By distinguishing between speech that is denigrating and speech that is not; speech that displays aversion and hostility and speech that does not, Plaintiff contends that Rule 8.4(g) engages in viewpoint discrimination, under the guise of regulating harassment. *Id*. Plaintiff refers to its Motion for Summary Judgment and claims that *Saxe* and *DeJohn* do not allow this. *Id.*; ECF No. 65–1 at 17.

Plaintiff refers to examples of laws in its Motion for Summary Judgment that prohibit actual harassment and discrimination but look nothing like Rule 8.4(g). ECF No. 70 at 18; ECF No. 65–1 at 19–20 (citing examples). Plaintiff also refutes the comparison of many of the cases cited by Defendants because those laws involved membership in an organization, employment, or public access regulations that did not on their face "target speech or discriminate on the basis of its content." ECF No. 70 at 19 (quoting *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 801 (9th Cir. 2011)). Plaintiff asserts that these comparisons do not apply here because those laws do not discriminate based on speech, they are policies to monitor rejecting would-be group members. *Id.* (citing *Christian Legal Soc'y*, 561 U.S. at 696). Plaintiff points out another case Defendants cite, where the court found no unconstitutional viewpoint discrimination because the policy affected only government speech, which is not the case with Rule 8.4(g). *Id.* at 19 n.8 (citing *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 151 (2004)). Rule 8.4(g) differs significantly from the cases Defendants cite, according to Plaintiff, because the Amendments discriminate based on speech – speech that denigrates, speech that shows hostility or aversion, and speech that disregards considerations of relevant individual characteristics or merit. *Id.* at 19.

Finally, because Rule 8.4(g) is content-based regulation, Plaintiff urges that it must be subject to strict scrutiny, not intermediate scrutiny as Defendants propose. *Id.* at 25. Plaintiff

reiterates that Rule 8.4(g) is not narrowly tailored to prevent discrimination and harassment in the administration of justice. *Id.* at 24. Plaintiff contends that if the Amendments solely limited speech in the course of client representations and directed towards a specific person in the legal process, "we wouldn't be here today." *Id*. Plaintiff also points to Pennsylvania Rule of Professional Conduct 8.4(d), which already prohibits conduct prejudicial to the administration of justice, and Plaintiff asserts that harassment and discrimination in legal proceedings are currently sanctionable under this rule. *Id.* at 25 (citing Pa.R.P.C. 8.4(d)). Plaintiff contends that many of the cases cited by the Defendants in support of Rule 8.4(g) are in fact much more limited in scope than the proposed Rule. *Id.* at 24. Plaintiff also emphasizes that the Amendments fail to meet the "least restrictive alternative" requirement in "the third prong of the three-prong strict scrutiny test." *Id.* at 25 (quoting *ACLU v. Mukasey*, 534 F.3d 181, 198 (3d Cir. 2008)). Even if this Court adopts the standard of intermediate scrutiny, Plaintiff contends that the Amendments still fail to pass the test. *Id*.

1. <u>Amendments Regulate Speech Versus Conduct</u>

The first point of contention between the parties is whether the Amendments regulate speech, as Plaintiff asserts, or conduct and potentially incidentally burden speech, as Defendants claim. The Court finds that the Amendments regulate speech, not merely conduct, and therefore the burden placed on freedom of expression is not incidental to the enforcement of Rule 8.4(g). Unfortunately for Defendants, "[t]he government cannot regulate speech by relabeling it as conduct." *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020). Furthermore, "a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." *NAACP v. Button*, 371 U.S. 415, 439 (1963).

Defendants list numerous cases for the proposition that anti-discrimination laws or regulations of attorney conduct are unrelated to the suppression of expression or place permissible incidental burdens on speech. ECF No. 61 at 29–32. None of these cases offer a direct comparison to the Amendments at issue here. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623–24 (1984) (evaluating a rule prohibiting women from membership in a local civic organization and stating that ensuring equal access is unrelated to suppression of expression); *NIFLA*, 138 S. Ct. 2361, 2373–74 (2018) (citing cases where burden on speech was incidental in the context of informed consent and notice laws in the medical profession and finding that the notice at issue, which applied to all interactions between a covered facility and its clients, with no tie to a medical procedure, "regulates speech as speech"); *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019) (finding state's ban on practice of law by corporations, which was part of a licensing regime that restricted practice of law only to bar members, affected primarily who could conduct themselves as lawyers and did not focus on the communicative aspects of practicing law).

Plaintiff points the Court in the right direction by repeatedly referencing the Third Circuit decision in *Saxe*.[23] "When laws against harassment attempt to regulate oral or written expression on such topics, however detestable the views expressed may be, we cannot turn a blind eye to the First Amendment implications." 240 F.3d at 206. The anti-harassment policy in *Saxe* and the Amendments here both use versions of the same terms, "intimidate," "denigrate," and "hostile" in similar contexts, all of which necessitate the policing of expression. *Id.* at 202–03. The Third

---

[23] The Third Circuit in *Saxe* evaluated an anti-harassment policy in a school, which defined harassment, in part, as "verbal or physical conduct based on one's actual or perceived race, religion, color, national origin, gender, sexual orientation, disability, or other personal characteristics, and which has the purpose or effect of substantially interfering with a student's educational performance or creating an intimidating, hostile or offensive environment." 240 F.3d at 202. The policy goes on to state examples of harassment, including conduct that "offends, denigrates or belittles an individual because of any of the characteristics described above." *Id.* at 203.

Circuit explicitly rejected the argument that anti-harassment statutes are categorically not subject to the First Amendment protections on free speech and further decided that the policy "prohibits a substantial amount of speech that would not constitute actionable harassment under either federal or state law." *Id.* at 204. The Court adopts similar reasoning here. Rule 8.4(g)'s prohibition on denigrating another a person, like the *Saxe* policy's prohibition on disparaging speech directed at a person, causes this Court First Amendment concern. *Id.* at 210. The Amendments also lack the necessary protection of free speech identified by the Third Circuit in *DeJohn*. "Absent any requirement akin to a showing of severity or pervasiveness—that is, a requirement that the conduct objectively and subjectively creates a hostile environment or substantially interferes with an individual's work—the policy provides no shelter for core protected speech." *DeJohn v. Temple Univ.*, 537 F.3d 301, 317–18 (3d Cir. 2008).

Furthermore, both the plain language of the Amendments and the statements made by Defendants during oral argument prove there is no genuine dispute that the regulation restricts speech on its face and not incidentally. Comment Three to Rule 8.4(g) states that "the practice of law does not include speeches, communications, debates, presentations, or publications given or published outside the contexts described" earlier in the Comment. Pa.R.P.C. 8.4 cmt. 3. The Court interprets that plain language to mean all of those *are included* within the scope of Rule 8.4(g) if they occur within the listed contexts of a legal proceeding, representation of a client, operating or managing a law firm or practice, and various activities and conferences where CLE credits are offered. Thus, a plain reading of the Amendments restricts speeches, communications, debates and presentations – all of which obviously involve speech – at conferences, seminars, and other activities. Defendants, through counsel, confirmed to the Court during oral argument that "speeches, communications, debates, presentations, or publications" made within the contexts

described in (1) – (3) of Comment Three are included in the scope of Rule 8.4(g). ECF No. 74 at 37–38. ("they could be, yes […] if they're, again, harassing and discriminatory."). This language and counsel's statements convince the Court that attorneys' speech is not incidentally burdened here, it is targeted by Rule 8.4(g) and will continue to be broadly monitored and subject to government censure under this Rule. *See* Pa.R.P.C. 8.4 cmt. 3; *see also* ECF No. 74 at 30–37. Comment Three to the ABA Model Rule 8.4(g) confirms the Court's understanding, stating in relevant part that "[s]uch discrimination includes harmful verbal or physical conduct that manifests bias or prejudice towards others." Model Rules of Pro. Conduct r. 8.4 (g) (Am. Bar Ass'n). And even though the ABA in its Formal Opinion 493 on the Model Rule 8.4(g) describes the regulation as prohibiting conduct, it also concedes that speech is restricted by stating, "a lawyer would clearly violate Rule 8.4(g) by directing a hostile racial, ethnic, or gender-based epithet toward another individual, in circumstances related to the practice of law." ABA Comm. on Ethics & Pro. Resp., Formal Op. 493 (2020). Therefore, there is no genuine dispute as to any material fact that the Rule limits what a lawyer may say and it serves as a warning to Pennsylvania lawyers to self-censor during the course of their interactions that fall within the Board's broad interpretation of the practice of law.

### 2. Regulating Professional Speech

Even if the Amendments target speech directly, Defendants assert that the state has broad authority to regulate professional speech and thus Rule 8.4(g) should not be subject to strict constitutional evaluation. The Court disagrees yet again and finds no genuine dispute on this issue either. The Court noted when it granted the preliminary injunction against Old Rule 8.4(g) that Pennsylvania has an important interest in regulating licensed attorneys and their conduct

related to the fair administration of justice. Dec. 2020 Opinion at 27. That interest, however, does not give the government the authority to regulate attorneys' speech without limits.

The Supreme Court "has not recognized 'professional speech' as a separate category of speech." *NIFLA*, 138 S. Ct. at 2371 (finding petitioners were likely to succeed on merits of claim that act requiring clinics that primarily serve pregnant women to provide certain notices violated the First Amendment). While the Supreme Court has recognized that an attorney's speech while representing a client or appearing in the courtroom could be limited, Pennsylvania's Rule 8.4(g) expands far beyond regulation of speech within a judicial proceeding or representing a client. *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1071–72 (1991). It is by no means limited to the legal process, as the Amendments explicitly apply to activities such as seminars or conferences where legal education credits are offered. Pa.R.P.C. 8.4(g). Rule 8.4(g) seeks to limit attorney speech much more broadly than inside the courtroom or related to a pending case.

The Court stated previously, and repeats once again, that "[s]peech is not unprotected merely because it is uttered by 'professionals.'" *NIFLA* 138 S. Ct. at 2371–72. There are only two circumstances in which professional speech is "afforded less protection" and the Amendments do not fit into either category. *Id.* at 2372. First, courts may apply "more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *Id.* This does not apply here as Rule 8.4(g) is not a regulation of commercial speech. Second, "[s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *Id.*; ECF No. 65–1 at 26. The Court determined above there is no genuine dispute that the Amendments do not merely regulate conduct, the Amendments directly restrict speech. While the drafters of Rule 8.4(g) attempted to remedy the apparent speech regulation by eliminating the offending language of

"words…manifest[ing] bias or prejudice" from Old Rule 8.4(g), the Amendments as revised continue to restrict speech outside of the courtroom, outside of the context of a pending case, and even outside the much broader playing field of administration of justice. It is a stretch to consider statements made by attorneys outside of those situations to be considered professional speech merely because it is uttered by an attorney.

Even so, when considering such speech to constitute professional speech, it is still deserving of full First Amendment protection since the Amendments regulate speech directly. As detailed above, the Amendments do not restrict conduct that is merely carried out by means of language, despite Defendants' contention that it is an incidental burden. The plain language of "speeches, communications, debates, [and] presentations," which are all restricted within the contexts where the Rule applies, and the definition of harassment including the terms "denigrate or show hostility or aversion" all expressly restrict speech. Though other aspects of Rule 8.4(g) address conduct, the Rule on its face restricts speech. "Outside of the two contexts discussed above—disclosures under [attorney advertising] and professional conduct—[the Supreme] Court's precedents have long protected the First Amendment rights of professionals." *NIFLA*, 138 S. Ct. at 2374. "States cannot choose the protection that speech receives under the First Amendment, as that would give them a powerful tool to impose 'invidious discrimination of disfavored subjects.'" *Id.* at 2374. (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423–424 (1993)) (additional citations omitted). "Because of the danger of censorship through selective enforcement of broad prohibitions, and '[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in [this] area only with narrow specificity.'" *In re Primus*, 436 U.S. 412, 432–433 (1978) (quoting *Button*, 371 U.S. at 433) (alteration in original).

Furthermore, while the Court admires the ideal of high standards of professionalism and benevolence which the Rule would have Pennsylvania lawyers aspire to, the state simply does not have the authority to police professionals in their daily lives to root out speech the state deems to be below "common decency." ECF No. 61 at 29. That nebulous notion of decency, combined with the exceptional authority the state would have if allowed to monitor attorneys outside of judicial proceedings and representation of a client and determine whether they are "decent" enough causes this Court grave concern. Even the ABA disagrees with such overzealous policing of attorneys. In Comment Two to its Model Rule 8.4, the ABA states in part that "a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, breach of trust, or serious interference with the administration of justice are in that category." Model Rules of Pro. Conduct r. 8.4 cmt. 2 (Am. Bar Ass'n,). Therefore, Rule 8.4(g) prohibits attorneys' speech too broadly to fall within the acceptable circumstances of professional speech regulation and the Court will not provide the deferential review sought by Defendants. Instead, attorney speech under Rule 8.4(g) will be given the full protection of the First Amendment.

### 3. Viewpoint-Based Discrimination

"Viewpoint discrimination is an 'egregious form of content discrimination.'" *Ne. Pennsylvania Freethought Soc'y v. Lackawanna Transit Sys.*, 938 F.3d 424, 432 (3d Cir. 2019) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). "[L]aws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Startzell v. City of Phila.*, 533 F.3d 183, 193 (3d Cir. 2008) (quoting *Turner Broadcasting*, 512 U.S. at 643) (alteration in original). It "targets ... particular

views taken by speakers[,]" which "violates the First Amendment's most basic promise."

*Freethought Soc'y*, 938 F.3d at 432 (internal citations omitted). It is a "core postulate of free

speech law: The government may not discriminate against speech based on the ideas or opinions

it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (internal citation omitted).

     "The government must abstain from regulating speech when the specific motivating

ideology or the opinion or perspective of the speaker is the rationale for the restriction."

*Freethought Soc'y*, 938 F.3d at 432 (quoting *Rosenberger*, 515 U.S. at 829); *see also Good News

Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001). According to Justice Kennedy, the essence of

viewpoint discrimination is when the law "reflects the [g]overnment's disapproval of a subset of

messages it finds offensive." *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017). "If there is a bedrock

principle underlying the First Amendment, it is that the government may not prohibit the

expression of an idea simply because society finds the idea itself offensive or disagreeable."

*Texas v. Johnson*, 491 U.S. 397, 414 (1989); *see also Matal*, 137 S. Ct. at 1763. "At its most

basic, the test for viewpoint discrimination is whether—within the relevant subject category—the

government has singled out a subset of messages for disfavor based on the views expressed."

*Matal*, 137 S. Ct. at 1766. Such restrictions on speech "are subject to the 'most exacting

scrutiny,' … because they 'pose the inherent risk that the Government seeks not to advance a

legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the

public debate through coercion rather than persuasion.'" *Startzell*, 533 F.3d at 193 (quoting

*Turner Broadcasting*, 512 U.S. at 641-642); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200,

207 (3d Cir. 2001) ("[C]ontent- or viewpoint-based restriction is ordinarily subject to the most

exacting First Amendment scrutiny.").

Plaintiff relies on *Matal v. Tam*, in which the Supreme Court considered the constitutionality of a prohibition on the registration of trademarks that may "disparage" or bring "contemp[t] or disrepute any persons, living or dead." 137 S. Ct. at 1751 (internal quotation marks omitted). The Court found that the provision violated the First Amendment because "[s]peech may not be banned on the ground that it expresses ideas that offend." *Id*. The Supreme Court encouraged that viewpoint discrimination be considered in a broad sense and even if the provision "prohibits disparagement of all group[s]," it should still be seen as viewpoint discrimination because "[g]iving offense is a viewpoint." *Id.* at 1763. Defendants assert that all attorneys are equally affected by Rule 8.4(g) thus it cannot be viewpoint discrimination, but Justice Kennedy specifically addresses this argument in *Matal*. Justice Kennedy adds, "[t]o prohibit all sides from criticizing their opponents makes a law more viewpoint based, not less so." *Id*. at 1766 (Kennedy, J., concurring) (internal citation omitted).

Similarly, the Amendments state that it is professional misconduct for an attorney to "knowingly engage in […] harassment" that is "intended to denigrate or show hostility or aversion toward a person[.]" Just as the provision in *Matal* prohibited trademarks that disparage, or show contempt or disrepute towards a person, Rule 8.4(g) prohibits the denigration of or hostility or aversion to a person based on the provided list of categories: race, sex, gender identity or expression, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, or socioeconomic status. Defendants have "singled out a subset of message," namely language that knowingly engages in denigration or hostility or aversion of a person, "for disfavor based on the views expressed." *Id.* at 1766 (Kennedy, J. concurring) (internal citation omitted).

Again here, *Saxe* is on point regarding whether Rule 8.4(g) prohibits offensive language. The Third Circuit found that the anti-harassment policy in *Saxe* focused too heavily on the purpose of the speech or conduct and ignored federal harassment law, which imposes liability when harassment has a profound effect on the institution. 240 F.3d at 210. Here, both the definitions of harassment and discrimination begin with the speaker's intentions – intended to intimidate and manifests an intention – thereby extending the regulation "to speech that merely has purpose of" harassing another. *Id.* By focusing on the speaker's intention, the regulation extends to simple offensive acts that are generally insufficient for federal anti-harassment liability. *Id.* at 211.

Defendants insist that the listener's subjective feelings of offense are irrelevant to Rule 8.4(g) but that seems impossible from both the plain language of the regulation and its administrative process. By using the terms "denigrate," "hostility," and "aversion," as well as questioning when an attorney "manifests an intention: to treat a person as inferior," the Amendments prohibit offensive language. The listener, regardless of whether that person is the person targeted by the derogatory remarks, subjectively determines if they are offended enough to file a complaint. It is nonsensical for Defendants to assert that an individual's perception is irrelevant where the Rule relies on complaints filed by the public and whether an individual perceives another's expression to be welcome or unwelcome is a basic premise of harassment. An individual's perception is exactly what compels them to file a complaint. Then it is the reviewing employee at ODC who determines whether the language is offensive enough to proceed towards discipline. Defendants promise, through the Farrell Declaration, not to consider whether one is offended in investigating complaints. ECF No. 71 at 12. That promise, however, is completely untenable. If the Amendments were tied to judicial proceedings or the

representation of a client, then ODC could evaluate more objectively the impact of an attorney's conduct on the proceeding or representation and whether it prevented equal access or the fair administration of justice. But without that sort of tethering, the Rule floats in the sea of whatever the majority finds offensive at the time. The standards for ODC's assessment are, at best, subjective, and, at worst, completely unknown to both Pennsylvania attorneys like Mr. Greenberg and even ODC itself. Mr. Greenberg cites to numerous instances where speakers or panelists at legal conferences and seminars made objectively benign, yet subjectively offensive to some, statements and the uproar against the speaker was significant. Indeed before its promulgation, Rule 8.4(g)'s stated government purposes included to "affirm[] that no lawyer is immune from the reach of law and ethics." ECF No. 61 at 23 (quoting 49 Pa.B. 4941). The inclusion of ethics in the public introduction of the Rule is very telling in how the Board imagined the regulation would be implemented and applied. This Court finds no genuine dispute that Rule 8.4(g) invites disciplinary action on the occasions where listeners are offended and appears to be a thinly veiled effort to police attorneys for having undesirable views and bad thoughts.

"[T]here is also no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin or that denigrate religious beliefs." *Saxe*, 240 F.3d at 206 (internal citation omitted). Here, the Court agrees with Mr. Greenberg that Rule 8.4(g) ultimately turns on the perceptions of the public to Plaintiff's speech and then the judgment of the government agents to investigate the incident or administer some form of discipline. Therefore, the Court finds that the Amendments, including Rule 8.4(g) and Comments [3] and [4], constitute viewpoint-based discrimination in violation of the First Amendment.

4. <u>Content-Based Discrimination</u>

Now that the Court has determined that the Amendments constitute viewpoint-based discrimination, there is no need to analyze the Amendments under either strict scrutiny or intermediate scrutiny. The Amendments are unconstitutional under the First Amendment as viewpoint-based discrimination. However, in the alternative, the Court elects to determine whether the Amendments constitute content-based discrimination, which is subject to strict scrutiny analysis.

There is a distinction "between content-based and content-neutral regulations of speech." *NIFLA v. Becerra*, 138 S. Ct. 2361, 2371 (2018). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* Laws are also considered content-based if they were adopted by the government "because of disagreement with the message convey[ed]." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Such content-based regulations are subject to strict scrutiny. The Supreme Court has a long history of applying strict scrutiny to content-based laws that regulate the noncommercial speech of lawyers. *See e.g.*, *Reed*, 576 U.S. at 2228; *In re Primus*, 436 U.S. 412, 432 (1978); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 798 (1988).

"Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral[.]" *Reed*, 576 U.S. at 166. The Court finds the

Amendments are both content based on their face and that the purpose for the law is content based (though the Court need not find both to be content based), requiring the Court to evaluate Rule 8.4(g) under strict scrutiny.

First, the restrictions in Rule 8.4(g) apply to any attorney at any event even tangentially related to the practice of law and thus depend entirely on the communicative content of the attorney's speech. While Defendants espouse admirable views justifying the enactment of Rule 8.4(g), "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Reed*, 576 U.S. at 166. It is easy to consider, for example, that an ODC official who disliked religious teachings against abortion would investigate a CLE presenter advocating for restrictive abortion laws on those grounds because ODC official perceives that such teachings intend to treat women as inferior based on their sex. Any listener at the CLE presentation could feel targeted by this presentation and thus it is up to ODC to determine if the content of that presentation is discriminatory or not.

At its foundation, Rule 8.4(g) was adopted by the government for the Board to express disapproval with the message an attorney conveys in their speech. Defendants also offer limiting instructions through the Farrell Declaration in an effort to promise that the Rule will not be used in the manner Mr. Greenberg fears. The Court determined already that this promise is not binding on the Board or ODC. *See supra* pp. 21–28. Further, "future government officials may one day wield such statutes to suppress disfavored speech" even if the Defendants in power today do not plan to do so. *Reed*, 576 U.S. at 167. It is not enough for the Defendants to claim the regulation intends to "insure high professional standards and not to curtail free expression." *NAACP v. Button*, 371 U.S. 415, 439 (1963).

Defendants concerns for the reputation of lawyers focuses the Amendments not on how the attorney's speech affects the practice of law but how it affects the perception of lawyers by the public, which is content-based discrimination. *See e.g.*, *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 811 (2000) ("The overriding justification for the regulation is concern for the effect of the subject matter on [listeners].... This is the essence of content-based regulation."). Defendants even justify the existence of Rule 8.4(g) for "maintaining the public confidence in legal system's impartiality, and its trust in the legal profession as a whole," making it apparent that public perception is a critical motivation in enacting this regulation. ECF No. 61 at 36.

The Court finds that Rule 8.4(g) regulates speech based on the message a speaker conveys and is, therefore, subject to strict scrutiny. "To survive strict scrutiny analysis, a statute must: (1) serve a compelling governmental interest; (2) be narrowly tailored to achieve that interest; and (3) be the least restrictive means of advancing that interest." *ACLU v. Mukasey*, 534 F.3d 181, 190 (3d Cir. 2008).

### i.    Compelling Interest

According to Defendants, Pennsylvania has a compelling interest in "eradicating discrimination and harassment, ensuring that the legal profession functions for all participants, maintaining the public confidence in the legal system's impartiality, and its trust in the legal profession as a whole." ECF No. 61 at 36.[24] Rule 8.4(g) was thus created to allow Pennsylvania to regulate the attorneys it licenses to ensure "the efficient and law-based resolution of disputes and guaranteeing that its judicial system is equally accessible to all." *Id.* at 2. Defendants also

---

[24] Before its promulgation, Rule 8.4(g)'s stated government purpose was to "promote[] the profession's goal of eliminating intentional harassment and discrimination, assure[] that the legal profession functions for all participants, and affirm[] that no lawyer is immune from the reach of law and ethics." ECF No. 61 at 9 (quoting 49 Pa.B. 4941).

aim to "protect the integrity and fairness of [Pennsylvania's] judicial system[.]" *Id.* at 29 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1075 (1991)). Defendants go further to state Pennsylvania must protect the reputations of its lawyers by preventing them from engaging in something "deplorable and beneath common decency[.]" ECF No. 61 at 29 (quoting *Fl. Bar v. Went For It*, 515 U.S.618, 625 (1995) (internal quotations omitted)).

While Defendants justifications are aspirational, they are also largely unfocused. Within one regulation, the Board would like to improve the reputation of all Pennsylvania licensed attorneys, confirm the impartiality of the legal system, promote efficiency in dispute resolution, guarantee equal access to the judicial system, and so on. It is difficult for the Court to credit Defendants for presenting a compelling government interest when they have instead provided amorphous justifications untethered to attorneys or Pennsylvania or any of the contexts listed in the Amendments. There may also be a concern regarding public distrust and unequal access in the medical profession, but surely that is not a compelling reason to regulate doctors to never make offensive statements in a forum tangentially related to the practice of medicine just so public perception of doctors will improve. There is public distrust in large banks but surely that is not a compelling reason to regulate bankers to never make offensive statements. This notion of public distrust used as an anchor for government regulation could conceivably extend to every industry in which the state has licensing authority and serve as an invitation to those regulatory agencies to engage in censoring unfavorable speech, deemed subjectively unworthy of those in their industry. Such broad strokes have a corrosive effect on the ability of the Constitution to protect individual rights and hold back the of-the-moment popular movements that seek to limit those rights. It is a concerning slippery slope for government to involve itself in the manner and direction of public discourse that cannot be overstated.

The main issue here is that Pennsylvania has espoused this global need to make lawyers better people and improve public confidence in the judicial system without really presenting a compelling interest specifically related to Pennsylvania-licensed attorneys or discrimination and harassment's effect on the practice of law in Pennsylvania. Aside from stating these lofty goals, Defendants provide no evidence whatsoever that harassment and discrimination among attorneys in Pennsylvania is a rampant issue requiring government interference. While the Court does not doubt that such problems exist, Defendants make no attempt to prove that harassment or discrimination is in any way related to public trust in the legal system or efficiency in dispute resolution or access to justice, etcetera. Indeed, the instances of harassment and discrimination that have been cited by the government occurred nationwide and were handled swiftly and with alacrity by the judges managing those cases using the procedural and disciplinary rules already at their disposal. Those judges should be examples for others to follow in managing attorneys and encouraging quick and decisive responses to any kind of abusive, demeaning, or belittling treatment affecting the administration of justice. However, the government cannot make general pronouncements and use those aspirations to restrict free speech without any evidence that the proposed regulation serves a particular compelling interest.[25]

The Board's regulations are not the type to come under close public scrutiny, particularly here where there was no public process of notice and comment. Such regulations, largely operating without public oversight, advancing into this area of individual rights is something protectors of the Constitution must be mindful of. Ironically here, it is the protectors themselves

---

[25] Defendants were given ample opportunity to provide examples or data related to their compelling interests both in their briefing and at oral argument and they could not come up with any specific support for Pennsylvania's need being addressed by this Rule. ECF No. 74 at 25–26. Counsel for Defendants stated, "I don't know that [Pennsylvania Supreme Court] need[s] to wait […] we're not going to do anything until we have a specific incident. And I'm not saying there haven't been specific incidents, Your Honor. I mean certainly there's no evidence before the Court in this case of that." *Id.* at 27.

that have introduced this corrosive catalyst, albeit for a good cause. Yet when protected individual rights are in play, the government's adopting of a good cause with the ends justifying the means is not the test.

In addition, Rule 8.4(g) is remarkably both over-inclusive and under-inclusive in achieving those lofty goals. It is over-inclusive, as this Court has explained on multiple occasions, by reaching beyond the bounds of the administration of justice to any activity in which CLE credits are offered. It strains the Court to figure out how a participant at a bench bar conference showing aversion to a fundamentalist religious advocate would prevent the fundamentalist religious individual from accessing the judicial system because Defendants do not elaborate on how the regulation affects the state's purported interests. Yet it is also under-inclusive to achieve many of those extensive interests. Impartiality and efficiency often rely on judges or mediators or arbitrators, who would only be covered under this Rule if they are in fact Pennsylvania-licensed attorneys, though many of those roles do not require an active license to practice law. It is entirely unclear what, if any, impact Rule 8.4(g) would have on the efficiency of the dispute resolution process.

Further, it is not the role of the government to ensure that all lawyers are noble guardians of the profession or well-liked by the public. That is equivalent to requiring that all public school teachers love children or insisting all doctors develop a good bedside manner. Would we prefer that in an ideal world? Sure. But it is not for the government to enact regulations that monitor the type of people who work in a particular profession. Ultimately, Defendants want the Court to blindly accept anti-harassment and anti-discrimination policy as an overwhelming good that is justified in and of itself, and the Court cannot do so without more focus in the state's interests for

enacting this particular rule. This nebulous good is insufficient to serve as a compelling interest to restrict freedom of speech and expression.

Even so, for the sake of the government at this procedural stage in summary judgment, the Court will evaluate the rest of the test assuming the government has a compelling interest in regulating attorneys through Rule 8.4(g).

### ii.    *Narrowly Tailored*

As discussed at length throughout this opinion, the Amendments are not narrowly tailored.[26] Defendants assert that the Amendments are narrowly tailored because they only apply to activities that are required to practice law, but the Court disagrees with this conclusion. ECF No. 61 at 36–37. The regulation must be narrowly tailored to the compelling interest stated by the government. However, Rule 8.4(g) permits the government to restrict speech outside of the courtroom, outside of the context of a pending case, and outside of the administration of justice. The government does not provide any indication or evidence that individuals are being harassed, discriminated against, or excluded specifically at events offering CLE credits. Defendants never make the contention that there is a problem in Pennsylvania where attorneys in the listed protected categories are unable to access bench bar conferences or bar association activities due to attorney misconduct of this nature. Defendants do not provide a single example of a panelist at a CLE seminar harassing or discriminating against an individual in a manner that impeded that

---

[26] Even under intermediate scrutiny, the Amendments would not survive as they are not "narrowly tailored to serve a significant governmental interest" for much of the same reasons. *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2356 (2020) (Sotomayor, J. concurring) (internal citation omitted). Defendants have failed to prove that Rule 8.4(g) does not "burden substantially more speech than necessary." *Turco v. City of Englewood*, 935 F.3d 155, 162 (3d Cir. 2019). Defendants have also failed to show that "more targeted tools" for achieving their compelling interest were "seriously considered" in the process of creating Rule 8.4(g). *Drummond v. Robinson Twp.*, 9 F.4th 217, 232 (3d Cir. 2021). Thus, for many of the same reasons why Rule 8.4(g) is nor narrowly tailored in a strict scrutiny analysis, the regulation also does not pass intermediate scrutiny.

individual's ability to maintain good standing as an attorney or otherwise participate in the practice of law. These examples, or lack thereof, illustrate how broadly Rule 8.4(g) applies in response to the government's provided compelling interest, which generically emphasizes the need for judicial integrity and fair and equal administration of justice.

While Pennsylvania should be commended for its attempts to eradicate harassment and discrimination in the practice of law, the broad-reaching and generic interests justifying Rule 8.4(g) do not comport with the actual applications of the Amendments. Even the compelling interest identified by Defendants, to eliminate harassment and discrimination in the judicial system, is rooted in either judicial proceedings or representation of a client, which is much more limited than the overarching scope of Rule 8.4(g). Defendants themselves refer to attorneys as "officer[s] of the court" who must "conduct themselves in a manner compatible with the role of courts in the administration of justice." ECF No. 61 at 29 (quoting *In re Snyder*, 472 U.S. 634, 644–45 (1985)). Yet they propose Amendments that reach well beyond the scope of the administration of justice or anything remotely involving the courts.

Defendants themselves cite to cases limited in scope to judicial proceedings or representation of a client. Defendants assert "[m]any courts have spoken to the corrosive and negative effect that discrimination and harassment cause to the legal system" and list cases well within the acceptable scope of attorney regulation. ECF No. 61 at 7 n.3. In *Principe v. Assay Partners*, an attorney was sanctioned for making abusive and offensive comments *during a deposition*. 586 N.Y.S.2d 182, 185 (N.Y. Sup. Ct. 1992) (emphasis added). Again, in *Cruz-Aponte v. Caribbean Petroleum Corp.*, a female attorney sought sanctions against a male opposing counsel for joking that she had menopause *during a deposition*. 123 F. Supp. 3d 276, 280 (D.P.R. 2015) (emphasis added). Defendants also cite to two state court cases where an

attorney was punished for using race to either imply a person of color was dangerous or to exclude that person from participating in a legal proceeding – both involved race-based comments made in petitions filed in court. *See In re Charges of Unprofessional Conduct*, 597 N.W.2d 563, 568 (Minn. 1999); *see also In re Thomsen*, 837 N.E.2d 1011, 1012 (Ind. 2005). With the abundance of case law cited by Defendants involving attorney discipline during legal proceedings, it is incredible for the Court to be expected to find these as persuasive examples to prove that Rule 8.4(g)'s much broader scope is narrowly tailored to serve the government's interest.

### iii.    Least Restrictive Means of Advancing the Interest

The Court employs similar reasoning for why there exists no genuine dispute that the Amendments are not the least restrictive means of advancing the government's interest. There is no doubt that the government is acting with admirable intentions to root out bias in practicing attorneys. But that lofty goal has enabled the government to create a rule that promotes a government-favored method of controlling disfavored speech and is so broad as to be able to police attorneys whenever the government deems their speech to be offensive. Constitutional limitations on government regulation were created for this exact purpose, to protect an individual's right to speak freely, even when that individual expresses ideas or statements that society detests.

Plaintiff points out numerous examples of other regulations focused on attorneys that prove that Rule 8.4(g) has not been drafted in the least restrictive means of advancing the government's interest in maintaining equal access to and the fair administration of justice. *See e.g.*, Code. Jud. Cond. 2.3(C) (tasking judges with "requir[ing] lawyers in proceedings before the

court to refrain from manifesting bias or prejudice, or engaging in harassment"); 204 Pa. Code § 99.3(7) (exhorting attorneys to, among other things, "refrain from acting upon or manifesting racial, gender or other bias or prejudice toward any participant in the legal process."); Pa.R.P.C. 4.4(a) (prohibiting lawyers "in representing a client" from mistreating third parties or violating their legal rights); Pa.R.P.C. 8.4(d) (proscribing conduct prejudicial to the administration of justice; ECF No. 65–1 at 28.

Tellingly, Plaintiff highlights an existing Pennsylvania Rule of Professional Conduct, which already prohibits conduct prejudicial to the administration of justice, and harassment and discrimination in legal proceedings are both sanctionable under the current rule. ECF No. 70 at 25; Pa.R.P.C. 8.4(d). That would seem to encompass the least restrictive means of advancing the government interest of preventing harassment and discrimination in the practice of law. Defendants would need to adequately argue that there is a compelling need not being addressed by the current rules, necessitating regulation of attorney speech outside of the administration of justice, and that Rule 8.4(g) is the least restrictive method of addressing that need. The Court does not find such assertions anywhere in Defendants' arguments.

For all these reasons, the Court finds that Rule 8.4(g) does not pass the strict scrutiny test for constitutionality.


5. <u>Overbroad</u>

While the Court's determination that the Amendments constitute content-based and viewpoint-based discrimination in violation of the First Amendment could end the discussion, the Court is concerned with the Defendants' potential to partially modify and attempt to re-implement the regulation as it did with Old Rule 8.4(g). Since Rule 8.4(g) presents the Court

with significant concerns regarding the overreach of state authority on speech that happens to be expressed by professionals, the Court will also undertake an analysis of whether the Amendments are facially overbroad.

"The First Amendment overbreadth doctrine states that: A regulation of speech may be struck down on its face if its prohibitions are sufficiently overbroad—that is, if it reaches too much expression that is protected by the Constitution. [A] policy can be found unconstitutionally overbroad if there is a likelihood that the statute's very existence will inhibit free expression to a substantial extent." *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 241 (3d Cir. 2010) (quoting *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 258 (3d Cir. 2002) (internal quotation marks omitted); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001) ("A regulation is unconstitutional on its face on overbreadth grounds where there is a likelihood that the statute's very existence will inhibit free expression by inhibiting the speech of third parties who are not before the Court.") (internal citation and quotation marks omitted). "To render a law unconstitutional, the overbreadth must be 'not only real but substantial in relation to the statute's plainly legitimate sweep.'" *Saxe*, 240 F.3d at 214 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

The Court indeed recognizes that the "overbreadth doctrine is not casually employed." *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999). In addition, the Court must consider whether the Amendments are amenable to a reasonable limiting construction. "[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Stretton v. Disciplinary Bd. of the Supreme Court of Pennsylvania*, 944 F.2d 137, 144 (3d Cir. 1991) (internal citations omitted); *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494 n. 4 (1982) ("In evaluating a facial

challenge to a state law, a federal court must, of course, consider any limiting construction."). Here, the Court agrees with Plaintiff that the Amendments extend far beyond situations that would necessarily affect the administration of justice and that the targeting requirement does not remedy the prohibitions on protected speech. The Defendants' proffered limitations on the enforcement of Rule 8.4(g) do not prevent the overbreadth of its construction.

First, the Amendments are allegedly confined to harassment or discrimination that prevents the administration of justice. Yet the plain language of the regulation applies to any speech that is intended to or manifests an intention to behave in a laundry list of offensive ways. These phrases necessarily require an inquiry into the motivation of the speaker. *DeJohn v. Temple Univ.*, 537 F.3d 301, 318 (3d Cir. 2008). The Court finds no provision in the plain language of the Amendments that limits the regulation only to speech that actually causes disruption to the administration of justice. *Id.* at 319. Instead, it covers speech where an attorney intends to or manifests an intention to harass or discriminate even without any impact on the administration of justice or access to the judicial system.

In addition, the protected categories include marital status or socioeconomic status; categories not often included in federal anti-harassment or anti-discrimination laws of this type. This means an attorney could show aversion to their colleagues' marriage at a bench bar conference or a partner could exclude a single associate from an invitation for couples to participate in a bar association activity and, incredibly, Rule 8.4(g) would allow for discipline against those attorneys. Even more ridiculous, an attorney showing aversion to another person wearing cheap suits or worn-out shoes at a bench bar conference could be subject to discipline by the Board under Rule 8.4(g). The scope here is quite broad and could easily prohibit speech that

is, at best, tangentially related to the administration of justice and, at worse, completely irrelevant to it.

Second, the Amendments do not contain reasonable contextual limitations. Rule 8.4(g) applies to "participation in judicial boards, conferences, or committees; continuing legal education seminars; bench bar conferences; and bar association activities where legal credits are offered." Pa.R.P.C. 8.4 cmt. 3. While Defendants believe that anything where CLE credits are offered are related to the administration of justice and practice of law because CLE credits are required to be an attorney of good standing in Pennsylvania, this justification strains credulity. Permitting the Board to hold panelists and audience members alike accountable under Rule 8.4(g) at any event that offers CLE credits would greatly inhibit freedom of expression. That means an audience member at a conference or seminar where legal credits are offered can face discipline under Rule 8.4(g) for making statements towards a person under an extensive number of categories. While these comments may be denigrating, deplorable and offensive, such statements made outside of the workplace and outside of the administration of justice are protected speech.[27]

Even narrowly read to apply only to an attorney specifically targeting a person in a flagrant manner, the Amendments still prohibit a substantial amount of protected speech. Defendants do not describe with certainty to the Court how this targeting requirement operates except that the speech must be directed towards a person, per the language of the Amendments. There is some direction provided by the ABA on what is considered targeting under the ABA Model Rule 8.4(g). In a hypothetical situation where a partner at a firm remarks in a meeting to "never trust a Muslim lawyer" and "never represent a Muslim client[,]" the ABA would find that

---

[27] Comments made in the work environment certainly form a foundation for office discipline and a federal employment action.

Model Rule 8.4(g) applies even if the associate hearing those remarks was not Muslim because the offense is "targeted towards someone who falls within a protected category." ABA Comm. on Ethics & Pro. Resp., Formal Op. 493 (2020). That guidance from the ABA does not solve the problem of overbreadth. Thus, the targeting requirement does not remedy the overbreadth issue wherein Rule 8.4(g) applies outside the context of legal representation or proceedings.

Finally, considering limiting constructions offered by ODC does not solve the problem of overbreadth. ODC may promise not to enforce Rule 8.4(g) in the way its plain language suggests, yet the investigatory process itself has a chilling effect on Mr. Greenberg's speech and will cause him, and likely other attorneys, to self-censor. There is no dispute that each complaint ODC receives triggers an investigatory process and that ODC may contact an attorney during that investigation. ECF No. 53 ¶ 28; ECF No. 70 at 13. Even if ODC promises not to enforce the Rule against attorneys in situations like Mr. Greenberg's, there are still First Amendment concerns regarding the initial complaint and investigation process that ODC's promises do not resolve. Therefore, even after considering a limiting construction, the Amendments still prohibit a substantial amount of protected speech and are unconstitutionally overbroad.

### C.  *Fourteenth Amendment Void-for-Vagueness*

<u>Plaintiff's Motion for Summary Judgment</u>

In their Motion for Summary Judgment, Plaintiff claims certain terminology in the Amendments should be void for vagueness under the Fourteenth Amendment because there is insufficient fair notice and guidance as to what the regulation prohibits. ECF No. 65–1 at 27, 30–31. Plaintiff contends that if a rule either fails to provide fair notice to "people of ordinary intelligence" or "authorizes or even encourages arbitrary and discriminatory enforcement," it is

void for vagueness. ECF No. 65–1 at 30–31 (citing *United States v. Stevens*, 533 F.3d 218, 249 (3d Cir. 2008); *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012); *Gentile v. State Bar Nev.*, 501 U.S. 1030, 1051 (1991)).

Specifically looking at the Amendments, Plaintiff contends that nothing in the "sea of case law, statutes, regulations and other provisions that utilize [the terms 'harassment' and 'discrimination']" uses that terminology in a way that is remotely similar to Comments [4] and [5] to Rule 8.4(g). ECF No. 65–1 at 27 (citing Pa.R.P.C. 8.4(g) cmts. 4, 5). In addition, Plaintiff points out differences in the definition of harassment in the Amendments and Pennsylvania's criminal code. In the criminal code, the law prohibits the offense of "harassment" but, unlike in Rule 8.4(g), the criminal code delineates specific acts that constitute the offense. *Id.* at 26; 18 Pa. C. S. § 2709. Plaintiff adds that the criminal statute requires repeated communications before it applies to expression. ECF No. 65–1 at 27. By contrast, Rule 8.4(g) does not require repetition or severity, and, on its face, it arrests core protected speech. *Id.*

Plaintiff identifies two phrases that are too vague to satisfy the Fourteenth Amendment. First, Rule 8.4(g)'s "conduct that is intended to intimidate, denigrate, or show hostility or aversion" standard is vague. *Id.* at 31. Plaintiff likens this rule prohibiting denigrating or hostility or aversion to the "hopelessly ambiguous and subjective" ban on "offensive" signs in *McCauley*. *Id.* (citing *McCauley*, 618 F.3d at 250; *Dambrot*, *v. Cent. Michigan Univ.*, 55 F.3d 1177, 1184 (6th Cir. 1995) (policy unconstitutionally vague where it turned on the "subjective reference" whether speech was "negative" or "offensive"); *Monroe v. Houston Indep. Sch. Dist.*, 419 F. Supp. 3d 1000, 1008 (S.D. Tex. 2019) (restriction on "name-calling" and "offensive or derogatory remarks" is unconstitutionally vague)).

Second, Rule 8.4(g)'s "conduct" that "manifests an intention" "to treat a person as inferior" or "to disregard relevant considerations of individual characteristics or merit" standard is vague. *Id.* In the Amendments, discrimination is defined to include manifestations of an intent to treat a person as "inferior" or an intent "to disregard relevant considerations of individual characteristics or merit." *Id.* Plaintiff interprets this definition as vague "free floating intentions to treat someone as 'inferior' and free-floating intentions to 'disregard relevant considerations of individual characteristics or merit.' *Id.* Plaintiff contends that what constitutes "inferior" treatment or "relevant considerations" is so imprecise that their application to an attorney will necessarily be left to those enforcing the rule. *Id.* Plaintiff is concerned that "arbitrary and discriminatory enforcement 'is a real possibility' because inferiority and relevant considerations are 'both classic terms of degree.'" *Id.* (quoting *Gentile*, 501 U.S. at 1048–49, 1051). Plaintiffs further assert that terms of degree "vest[] virtually complete discretion in the hands of the [enforcement official]." *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)). For all these reasons, Plaintiff urges the Court to find the Amendments unconstitutionally vague under the Fourteenth Amendment.

In Defendants Response in Opposition to Plaintiff's Motion for Summary Judgment, Defendants contend that the Amendments use familiar, well-known terms that an objective attorney would understand and thus provide fair warning of prohibited conduct. ECF No. 71 at 18. These terms meet the standard that "the ordinary person exercising ordinary common sense can sufficiently understand and comply with[.]" *Id.* at 19 (quoting *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992); *In re Snyder*, 472 U.S. at 645 ("case law, applicable court rules, and 'the lore of the profession,' as embodied in codes of professional conduct[,]" guide attorneys)).

First, Defendants refute Plaintiff's claim that "conduct that is intended to intimidate, denigrate, or show hostility or aversion" is vague. *Id.*. Defendants instruct the Court that "perfect clarity and precise guidance have never been required[.]" *Id.* (quoting *Ward Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). And that the Amendments must be read as a whole, not as terms out of context. *Id.* at 20 (citing *Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19, 25 (1988) (stating that the meaning of words depends on their statutory context). Since harassment is a familiar term, the other terms must be taken in the context of an objective attorney's knowledge of what constitutes harassment)).

Second, Defendants refute Plaintiff's claim that the definition of discrimination in the Amendments is vague. *Id.* at 21. Defendants reiterate that advocating for ideas or expressing opinions does not fall within the Amendments. *Id.* at 22. Defendants ask the Court not to consider speculation about possible vagueness in hypothetical situations, which cannot support a facial challenge to the Amendments. *Id.* (citing *Hill v. Colorado*, 530 U.S. 703, 733 (2000)).

Defendants' Motion for Summary Judgment

In their Motion for Summary Judgment, Defendants contend that this Court must decide if they are "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest." ECF No. 61 at 41 (citing *San Filippo*, 961 F.2d at 1136).[28] Defendants also claim that imprecision should be tolerated under these circumstances because no criminal punishment can be applied under the regulation. *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982);

---

[28] Defendants list a number of cases supporting the same premise. *See, e.g.*, *Villeneuve v. Connecticut*, 2010 WL 4976001, at *3 (D. Conn. Dec. 2, 2010) (provisions addressing conduct involving "dishonesty, fraud, deceit or misrepresentation," and conduct "prejudicial to the administration of justice" not vague); *Howell*, 843 F.2d at 206 ("prejudicial to the administration of justice" not vague).

ECF No. 61 at 41. Further, Defendants assert that "harassment" and "discrimination" are well-known terms to attorneys. ECF No. 61 at 43. Finally, Defendants conclude that the Amendments provide sufficient notice to attorneys, and that they also guide ODC in deciding whether to enforce the Amendments, thereby ensuring that ODC is aware of the Amendments' boundaries. ECF No. 61 at 44.

Plaintiff responds by reiterating the ways in which Rule 8.4(g) is unduly vague as outlined in Plaintiff's Motion for Summary Judgment, particularly the definitions of harassment and discrimination. ECF No. 70 at 29. In contrast to Defendants' suggested tolerance of imprecision, Plaintiff contends that any law that interferes with the right of free speech should be evaluated under a "more stringent vagueness test." ECF No. 70 at 30 (quoting *Hoffman Estates*, 455 U.S. at 499).

<u>Discussion</u>

The Fourteenth Amendment's Due Process clause allows courts to find regulations unconstitutional due to vagueness. *See J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 935 (3d Cir. 2011); *see also Marshall v. Amuso*, 2021 WL 5359020, at *6 (E.D. Pa. Nov. 17, 2021). The Supreme Court has explained that the "void for vagueness doctrine [is] applicable to civil as well as criminal actions." *Mateo v. Att'y Gen. U.S.*, 870 F.3d 228, 232 (3d Cir. 2017) (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)). However, Defendants are correct that civil rules need not be as precise as criminal statutes. *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 167 (3d Cir. 2008). A facial challenge to vagueness will be upheld if "the enactment is impermissibly vague in all of its applications." *Hoffman Estates*, 455 U.S. at 495. "If, for example, the law interferes with the right of free speech or of association, a more stringent

vagueness test should apply." *Id.*. at 499. "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012).

There are two concerns related to vague laws: (1) fair notice and (2) arbitrary enforcement. First, the Court must ensure that those affected, i.e., Pennsylvania attorneys, are provided "fair warning of prohibited conduct" under Rule 8.4(g). *San Filippo*, 961 F.2d at 1135 (internal citation omitted). "Thus, a statute is unconstitutionally vague when [persons] of common intelligence must necessarily guess at its meaning." *Borden,* 523 F.3d at 167 (internal citations and quotation marks omitted). The ABA noted in its Formal Opinion 493 regarding Model Rule 8.4(g) that an important constitutional principle that guides and constrains its application is "an ethical duty that can result in discipline must be sufficiently clear to give notice of the conduct that is required or forbidden." ABA Comm. on Ethics & Pro. Resp., Formal Op. 493 (2020). The Court finds that the Amendments fail on both counts – they do not provide fair notice of the prohibited conduct to Pennsylvania attorneys, and they invite imprecise enforcement from ODC and the Board.

On the first ground for vagueness, the Amendments include made-up definitions that do not comport with the definitions of similar terms in similar contexts.[29] That is to say – ODC makes up its own definitions for the purpose of this rule alone. Starting with harassment, Comment Four to Rule 8.4(g) defines it broadly as "conduct that is intended to intimidate, denigrate or show hostility or aversion toward a person on any of the bases listed in paragraph

---

[29] Aside from the definitions crafted for the purpose of this regulation, the ABA confirmed that its Model Rule 8.4(g) was fashioned to capture incidents that federal law normally does not find objectively hostile or abusive enough to include. For example, Model Rule 8.4(g) was in fact designed to capture isolated circumstances not severe or pervasive enough to create a hostile environment or cause liability under Title VII of the Civil Rights Act of 1964. Pennsylvania's Rule 8.4(g) suffers from the same design wherein incidents that would normally be insufficient to cause liability under federal law may be subject to discipline under this regulation. ABA Comm. on Ethics & Pro. Resp., Formal Op. 493 (2020).

(g)." Pa.R.P.C. 8.4(g) cmt. 4. This definition is unlike other definitions of harassment in similar

contexts. For example, the Pennsylvania criminal statute defines harassment with very specific

conduct, including kicking, stalking, or severe communications, including threatening or lewd

communications to or about such other person, and repeated communications in an anonymous

manner or at extremely inconvenient hours. 18 Pa.C.S. § 2709(a). That criminal statute

"specifically defines and limits the offense of harassment in a manner to protect free speech."

*Haagensen v. Pa. State Police*, 2009 WL 3834007, at *9 (W.D. Pa. Oct. 22, 2009), *aff'd*, 490 F.

App'x 447 (3d Cir. 2012). The Amendments' definition of harassment bears little to no similarity

to the criminal statute's definition. While an ordinary attorney may understand the general notion

of harassment, it is entirely unclear from the novel definition created by ODC what the scope of

this regulation would be and whether there is any limitation based on repetition or severity or

other factors. The ABA Formal Opinion 493 on their Model Rule 8.4(g) states that "it is not

restricted to conduct that is severe or pervasive[,]" unlike the criminal statute. ABA Comm. on

Ethics & Pro. Resp., Formal Op. 493 (2020). The terms "denigrate," and "aversion" also leave

the Court wondering what an attorney would consider as violating behavior or expression. What

may be considered denigrating or showing aversion likely varies from speaker to speaker, and

listener to listener. While Comment Four does list a few broad examples of sexual harassment

under the Rule, there are no examples given of what constitutes other types of harassment within

this definition.

The definition of discrimination provided in Comment Five is hardly an improvement. It

is unclear to the Court how an attorney "manifests an intention" or "disregard[s] relevant

characteristics" in violation of this Rule. The Amendments offer no clarification as to what those

relevant characteristics may be and that prevents ordinary attorneys from understanding what

they must take into account in order to avoid any manifestation of discrimination. Both definitions, critical to the application of Rule 8.4(g) to attorneys, are unfamiliar and untenable. Since there is a significant risk that Rule 8.4(g) will inhibit free speech, its boundaries must be well-defined, yet there is minimal, if any, connection to the substantive law of discrimination and harassment statutes. There is additional reason to consider the "reputational injury" that may occur if an attorney is accused of discrimination or harassment under Rule 8.4(g), which the Court takes seriously when considering if fair notice is provided. *F.C.C.*, 567 U.S. at 255 (finding the standards unconstitutionally vague). An investigation into an attorney's alleged discrimination or harassment could inhibit their ability to obtain clients, retain employment, be admitted in other jurisdictions, and the list goes on of potential reputational harm that this attorney could incur. While the Court takes any harassment or discrimination in the practice of law seriously, this does not excuse the Board from drafting such regulations that provide attorneys with fair notice.

Second, Supreme Court Justice Thomas explained in a concurring opinion that the Supreme Court has "become accustomed to using the Due Process Clauses to invalidate laws on the ground of 'vagueness,'" because the vagueness doctrine "is quite sweeping" when a regulation "'authorizes or even encourages arbitrary and discriminatory enforcement.'" *Johnson v. United States*, 135 S. Ct. 2551, 2566 (2015) (Thomas, J., concurring in judgment) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). There is no genuine dispute that the Amendments as written invite arbitrary or discriminatory enforcement of Rule 8.4(g). The Court need not find that arbitrary enforcement will necessarily occur, "but whether the Rule is so imprecise that discriminatory enforcement is a real possibility." *Gentile*, 501 U.S. at 1051.

In the plain language of the Amendments, harassment is defined as "conduct that is intended to intimidate, denigrate, or show hostility or aversion" and by using the terms "denigrate" or "aversion," among others, the Board is encouraging subjective interpretation and enforcement. What is considered to denigrate a person will necessarily vary depending on the member of ODC reviewing the complaint.[30] *See e.g.*, *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 250 (3d Cir. 2010) (finding the ban on offensive signs "hopelessly ambiguous and subjective"); *Dambrot, v. Cent. Michigan Univ.*, 55 F.3d 1177, 1184 (6th Cir. 1995) (holding policy unconstitutionally vague where it turned on the "subjective reference" whether speech was "negative" or "offensive"). The definition of discrimination has similarly vague terms to require the attorney "manifest an intention" and "to disregard relevant considerations of individual characteristics or merit," which will give ODC complete discretion to determine whether an attorney has manifested anything under the regulation or to determine what relevant characteristics should have been considered.

Furthermore, the Supreme Court has recognized that "the more important aspect of vagueness doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).[31] While the context in *Kolender* was a criminal statute, the Court agrees that there must be some guidance to ensure consistent application of the regulation, even in the civil context. Plaintiff is correct in pointing out that Defendants'

---

[30] During oral argument, counsel for Defendants himself seemed unclear on the scope of the Amendments. He stated, "you could technically under the rule you could harass somebody without using offensive language. […] it's vexing annoying conduct, you know, that doesn't [sic] necessarily offensive but maybe, you know, if it's repeated to the person could be something that could constitute harassment[.]" ECF No. 74 at 12 ¶¶ 21–25.

[31] The Third Circuit has recognized that the "need for specificity is especially important where, as here, the regulation at issue is a content-based regulation of speech. The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 266 (3d Cir. 2002) (internal citation and quotation marks omitted).

discovery responses highlight the likely imprecision in choosing in which cases and what manner discipline will be applied under Rule 8.4(g). ECF No. 70 at 29; Farrell Interrog. Answers ¶¶ 2–6 (answering that ODC has never promulgated internal written policy guidance or training for 8.4(g), that the only verbal guidance or training was an instruction to report up any complaints alleging a violation of 8.4(g), and the only external policy guidance was a brief monthly newsletter in July 2020 describing Old 8.4(g)). The policy must be guided by "objective, workable standards" to prevent ODC from subjectively determining "what counts" as a violation. *Marshall v. Amuso*, 2021 WL 5359020, at *6 (E.D. Pa. Nov. 17, 2021) (quoting *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 (2018)). When asked outright during oral argument what the objective reasonable standard is in determining misconduct under Rule 8.4(g), counsel for Defendants stated that "it would be the plain meaning of the words […] as set forth in the comments to the rule[.]" ECF No. 74 at 22 ¶ 19–21. The Court finds there is insufficient guidance to implement Rule 8.4(g) in a precise, consistent manner. Therefore, the Amendments are void-for-vagueness under the Fourteenth Amendment.

IV.     **CONCLUSION**

In conclusion, the Court finds that Rule 8.4(g) is an unconstitutional infringement of free speech according to the protections provided by the First Amendment. The Court also finds that Rule 8.4(g) is unconstitutionally vague under the Fourteenth Amendment. Therefore, the Court grants Plaintiff's Motion for Summary Judgement and denies Defendants' Motion for Summary Judgment.

**BY THE COURT:**


**/s/ Chad F. Kenney**

_____

**CHAD F. KENNEY, JUDGE**